UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------X
UNITED STATES OF AMERICA,

                                    S2 07 Cr. 541 (RPP)

        -against-

DANIEL B. KARRON,

            Defendant.
----------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF
DANIEL KARRON'S MOTION FOR A JUDGMENT
OF ACQUITTAL, NEW TRIAL PURSUANT TO
RULES 29 AND 33 OF THE FEDERAL RULES
OF CRIMINAL PROCEDURE**


Ronald Rubinstein
*Attorney for Daniel Karron*
Rubinstein & Corozzo, LLP
260 Madison Avenue, 22d Fl.
New York, NY 10016

# Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 666(a)(1)(A) . . . . . . . . . . . . . . . . . . .

POINT I

THE EVIDENCE IS INSUFFICIENT TO
SUSTAIN THE DEFENDANT'S CONVICTION
ON COUNT ONE OF THE INDICTMENT . . . . . . . . . . . . . . . 2

A.    Legal Standard . . . . . . . . . . . . . . . . . . . . 3

B.    The Government Failed to Prove That
      Dr. Karron Knowingly and Willfully
      Intended to Misapply ATP Funds . . . . . . . . . . . . 3

POINT II

DR. KARRON IS ENTITLED TO A NEW
TRIAL BASED UPON THE COURT'S FAILURE
TO CHARGE A TRACING REQUIREMENT . . . . . . . . . . . . . . . 13

A.    Legal Standard . . . . . . . . . . . . . . . . . . . . 13

B.    The Facts and Circumstances Warranted
      Requiring That the Government Trace
      Misapplied Funds To The ATP Grant . . . . . . . . . . . 14

C.    The 18 U.S.C. § 666 Bribery Cases Are Factually
      Distinguishable from the § 666 Theft Cases And
      Should Not Have Been Relied Upon By The Court . . . . . 19

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . 24

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted in support of defendant Daniel B. Karron's motion, pursuant to Fed.R.Crim.P. 29, for a judgment of acquittal; and in the alternative, motion for a new trial in accordance with Fed.R.Crim.P. 33.  For the reasons set forth below, it is respectfully submitted that this Court should grant Dr. Karron's motion and enter a judgment of acquittal as to Count One of the Indictment; or in the alternative vacate his conviction and order a new trial.

## STATEMENT OF FACTS

Dr. Karron was charged in a one-count indictment with intentional theft of federal funds, in violation of 18 U.S.C. § 666(a)(1)(A).  On June 10, 2008, at the close of the defendant's case, defendant Daniel B. Karron moved for a judgment of acquittal.  The next day, on June 11, 2008, the jury returned its verdict finding defendant Daniel B. Karron guilty on Count One. Because this Court presided over the trial in this case and is fully familiar with the facts and circumstances underlying these motions, and with the goal of efficiency in mind, only the salient facts are incorporated into the argument below.

**STATUTE OF CONVICTION**
**18 U.S.C. § 666: Theft or Bribery**
**Concerning Programs Receiving Federal Funds**

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

(i) is valued at $5,000 or more, and

(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; [commits a crime]

**POINT I**

**THE EVIDENCE IS INSUFFICIENT TO**
**SUSTAIN DR. KARRON'S CONVICTION**
**ON COUNT ONE OF THE INDICTMENT**

The government failed to meet its burden of establishing, beyond a reasonable doubt, that the defendant intentionally misapplied federal funds in excess of $5,000. Rather, even viewed in the light most favorable to the government, the evidence established that Dr. Karron, in reliance upon the audit provisions provided by the CFR, never intended to misapply the ATP grant funds.

2

## A.    Legal standard

"Under [Fed.R.Crim.P.] 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).  It is well established that "[a] criminal defendant who challenges the sufficiency of evidence shoulders a heavy burden, but not an impossible one." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004).  This is because reviewing courts are required to examine "the facts in the light most favorable to the government, drawing all reasonable inferences in its favor." *United States v. Snow*, 462 F.3d 55, 59 (2d Cir. 2006), *quoting United States v. Morgan*, 385 F.3d 196, 198 (2d Cir. 2004). "Therefore, so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the jury's legal verdict will withstand a challenge to its legal sufficiency." *Jones*, 393 F.3d at 111.

## B.    The Government Failed To Prove That Dr. Karron Knowingly And Willfully Intended to Misapply ATP Funds

The government failed to present sufficient evidence that the Defendant willfully and knowingly misapplied ATP grant funds

3

in violation of 18 U.S.C. § 666(a)(1)(A).  Rather, the evidence
at trial demonstrated (1) that Dr. Karron had a reasonable
expectation that he was entitled under the CFR to challenge the
Hayes and OIG Audits through the statutorily mandated appellate
process; (2) that he was denied the right to such an appeal; (3)
that the Hayes audit was unverified;(4) that, in fact, that audit
was incorrect; and (5) that the defendant fully complied with the
administrative regulations embodied in 15 CFR part 14.  In light
of the foregoing, it is submitted that no reasonable juror could
find that Dr. Karron acted with the requisite intent to misapply
the ATP grant funds.

Specifically, the government presented the testimony of
Belinda Riley, an assistant regional inspector general for audits
at the Department of Commerce, Office of the Inspector General.
T. 462.  Ms. Riley performed an audit of CASI in the spring of
2003 and over defense objection she was qualified as an expert.
T. 466, 475.  During the course of her testimony, it became clear
that the witness had relied heavily upon the first year audit
report by Joan Hayes (hereinafter "the Hayes audit").  T. 469.
Hayes, who was not called by the government as a witness, had
served as Dr. Karron's personal accountant, accountant for CASI,
and as an "independent" auditor for NIST compliance purposes. T.

4

783. Moreover, although it was clear that Ms. Riley relied upon the Hayes audit, she did not produce any of the documents or notes she used to create her audit.

While Ms. Riley testified, on direct, about the disallowed expenses; during cross-examination it became clear that she could not defend her conclusions.  For example, she claimed that Dr. Karron made no contributions to CASI despite being confronted with $36,000 worth of checks from the defendants personal bank account to CASI.  T. 787-88, Exhibit FFF.  Likewise, Ms. Riley was unaware of the defendant's monthly salary. She incorrectly attributed $129,850 as "loans" to the defendant.  T. 796-97. While the defendant conceded the original $75,000 salary advance; which we contended was repaid during the first year of the grant as part of Dr. Karron's unpaid salary, Ms. Riley's claim of an additional $54,850 in loans is totally unsupported by the evidence.[1]  We can only speculate, in the absence of evidence to the contrary, that Hayes incorrectly classified legitimate expenses as loans – and that recording was adopted by Riley

---

[1] Annexed hereto is a copy of defense exhibit P-6, the salary check dated August 2, 2002.  The gross amount of the check is $61,918.07 but the net amount is only $5,675.03.  The adjustment between the gross and net amounts is an adjustment for the $75,000 advance.

without any critical analysis. *See* Govt Ex. 110, pp. 38-44. Riley did not know what those items classified as loans were for, but just that they were recorded that way. *Id.* Clearly, she was relying upon documentation, most likely the Hayes audit, that the defendant was precluded from cross-examining her with because she did not have them with her.

Even more incredibly, Ms. Riley did not give Dr. Karron credit for uncollected salary, T. 802-08. Additionally, her method of concluding that Dr. Karron had received $200,488 in salary was equally misleading. She included the withholding portion of the fringe benefits as part of his salary, as well as the difference between loans she determined were received by the defendant as offset by the amount she determined was paid back on those loans. T. 803, 805-7. She did not, however, provide a basis for how she determined these figures. While obviously, the conversion of fringe benefits to salary would require payroll taxes, Ms. Riley's calculations represent an accounting entry and no actual money was expended. Moreover, fringe benefits were, under the budget, separately calculated.

More importantly, the evidence adduced at trial showed that the ATP grant was governed by the administrative rules found in 15 CFR part 14. And included in that section, was a provision

6

that allowed grant recipients to challenge an auditor's determination that certain expenditures be disallowed. T. 809. Moreover, grant recipients were to be treated on a case-by-case basis. T. 746; 15 CFR 14.4.

So although there is a post-audit appeals process, "an audit resolution", Dr. Karron was denied the right to an audit resolution.[2] T. 809, 810. Had the defendant been given the opportunity to attend an audit resolution, Dr. Karron would have been entitled to negotiate what was allowable and what was not allowable. T. 810. Dr. Karron had successfully negotiated with NIST over the payment of utility bills, which are usually disallowed as indirect costs. T. 780. He had every reason to believe that he could successfully negotiate some of the disallowed expenses – or in the alternative negotiation a settlement.

Moreover, since there was no appeal permitted, Riley's audit was never reviewed. T. 810. Likewise, it is fair to infer that the Hayes audit was not reviewed either. There is no evidence

---

[2] 15 CFR 14.62(b) provides: "[i]n taking an enforcement action, the awarding agency shall provide the recipient an opportunity for hearing, appeal, or other administrative proceeding to which the recipient is entitled under any statute or regulation applicable to the action involved.

7

that Dr. Karron influenced Hayes' audit – as auditor, despite her relationship to CASI, she made the determination how financial events and transactions were recorded, to wit whether as loans, expenses, etc.  In effect, Dr. Karron is being held criminal liable for Hayes' choice of classifications while he was denied the opportunity to challenge those determinations administratively.

We submit, that the defendant's good faith belief that he would be provided the opportunity to defend CASI expenditures through administrative channels negates any finding that he intentionally violated 18 U.S.C. § 666(a)(1)(A).  This conclusion is not altered by the government's argument that payment of the rent or the seventy-five thousand dollar salary advance is evidence of the defendant willfully and knowing misapplication of ATP grant money.  The $75,000 was salary; and once Dr. Karron received his salary, the money could be spent in any way; including rent.  In other words, the rent paid was paid out of Dr. Karron's legitimately earned salary.  Also, the kick-off meeting wherein the rules were explained to the defendant occurred after the $75,000 salary advance was taken by the defendant.  T. 202.  Secondly, based upon his successful negotiations regarding the utilities, it may have been wishful

8

thinking, but Dr. Karron was optimistic that he would be able to negotiate rent an "indirect cost" as an allowable expense.

In addition to relying upon unsubstantiated and unverified "evidence" of wrongdoing by the defendant, the government relied heavily on the presumption that proof of Dr. Karron's intent to misapply the ATP funds was demonstrated by the defendant's failure to comply with administrative rules embodied in 15 CFR 14.  The government is incorrect.  An examination of the applicable regulations demonstrates, beyond dispute, that the defendant did not violate those regulations and as a result did not knowingly and willfully misappropriate ATP funds.  In fact, the common theme through out the regulations, is the acknowledgment that budgets are not fixed and can be subject to significant revisions without prior approval.

First, according to 15 CFR 295.2(h), the definitions section, while defining indirect costs as "costs incurred for common or joint objectives that cannot be readily identified with activities carried out in support of a particular final objective," there is the clear provision that "ATP shall determine the allowability of indirect costs in accordance with applicable Federal Cost principles." 15 CFR 295.2(h).  Certainly, based upon Dr. Karron's own experience regarding payment of

9

utilities, it is clear that the payment of indirect costs, *may* with approval, be paid for with grant monies.  Here, the only work being performed out of Apartment 4H, 300 East 33 Street was the ATP project.  Likewise, and with the same spirit, it is acknowledged in 15 CFR 14.4, that "exceptions" would be addressed "on a case-by-case basis."  15 CFR 14.4.  Therefore, Dr. Karron's repeated attempts to have the rent included within the scope of the grant was not evidence of wrongdoing but rather his attempt to comply with the regulations.

Nonetheless during its case-in-chief, the government claimed that all significant alterations to the budget required prior approval under the CFR regulations.  This is simply not true.  15 CFR 14.25 defines the times wherein a grant recipient was required to obtain prior approval and none of those situations were present in the instant case.  For example,  15 CFR 14.25(c) lists the specific instances were a grant recipient was required to prior approval for program or budget related reasons.  That regulation reads as follows:

> (c) For non construction awards, recipients shall request **prior approvals** from the Grants Officers for one or more of the following program or budget related reasons.  Approvals will be provided in writing by the Grants Officer.

10

(1) Change in the scope or the objective
of the project or program (even if there is
no associated budget revision requiring prior
written approval).

(2) Change in a key person specified in
the application or award document.

(3) The absence for more than three
months, or a 25 percent reduction in time
devoted to the project, by the approved
project director or principal investigator.

(4) The need for additional Federal funding.

(5) The transfer of amounts budgeted for
indirect costs to absorb increases in direct
costs, or vice versa, **if approval is required
by the DoC.**

(6) The inclusions, unless waived by
the DoC, of cost that require prior approval
in accordance with [ . . . ] 48 CFR part 31,
"Contract Cost Principles and Procedures as
applicable."

(7) The transfer of funds allotted for
training allowances (direct payment to
trainees) to other categories of expense.

(8) Unless described in the application
and funded in the approved awards, the
subaward, transfer or contracting out of any
work under an award. This provision does not
apply to the purchase of supplies, material,
equipment or general support services.

15 CFR 14.25(c)(emphasis supplied).

The above-described circumstances are the only times when a

recipient *must* seek prior approval prior to making a revision,

11

according to the regulations; and some of these provisions,
including 15 CFR 14.25(c)(5), only require prior approval if
required by the DoC.  Dr. Karron was aware that the budget
revisions CASI sought may not be approved, but accepted the risk
that if not accepted, CASI would be financial responsible for
restoring the original budget.

It is clear that Dr. Karron believed, based upon
representations made by NIST, that a budget could be revised
after the fact.  Ms. Lide, during her testimony conceded that the
information package give to CASI at the kick-off meeting on
November 8, 2001, could be understood to all for the submission
of a revised budget after all of the costs were reviewed at the
close of a fiscal year.  T. 193.  That slide, indicated in part,
that "review costs at the end of the year and submit a revised
budget and a narrative if changes have occurred."  *Id.*

The evidence adduced at trial demonstrated that Dr. Karron
acted in good faith and in compliance with the applicable federal
regulations; which alone negates any inferences that may support
a finding that the defendant acted with the intent to misapply
the ATP funds.  Dr. Karron's conviction must be vacated and a
judgment of acquittal entered as a result of the government
failure present sufficient evidence of the defendant's intent to

12

violate 18 U.S.C. § 666(a)(1)(A).

**POINT II**

**DR. KARRON IS ENTITLED TO A NEW
TRIAL BASED UPON THE COURT'S FAILURE
TO CHARGE A TRACING REQUIREMENT**

Ordinarily, the government is not required to prove
"tracing" to sustain its burden in prosecuting an 18 U.S.C. § 666
case.  However, in this case, the Court should have included a
tracing requirement in its charge to the jury due to the unique
facts and circumstances of this case. Moreover and as a direct
result, the Court's charge on the third and fifth elements of the
theft count were inconsistent and operated to remove the
requirement that the jury find that the defendant acted knowingly
and intentionally with respect to grant funds derived from ATP as
opposed to CASI funds.

For the reasons set forth below, including the factual
distinction between theft and bribery, the Court's failure to
charge a tracing requirement compels the vacating of defendant's
conviction and ordering of a new trial.

**A.    Legal Standard**

Rule 33(a) of the Federal Rules of Criminal Procedure
provides, in relevant part, that "[u]pon the defendant's motion,

13

the Court may vacate any judgment and grant a new trial if the

interests of justice so requires." Fed.R.Crim.P. 33(a). As

explained by the Court of Appeals, "the ultimate test" for a rule

33 motion is "whether letting a guilty verdict stand would be a

manifest injustice." *United States v. Canova*, 412 F.3d 331, 349

(2d Cir. 2005)(internal quotations marks omitted).

Here, it is submitted that the Court's erroneous reliance

upon case-law interpreting the bribery portion of 18 U.S.C. § 666

in determining that the government was not required to prove

tracing in a theft/misapplication prosecution establishes good

cause to vacate Dr. Karron's conviction and order a new trial.

As detailed below, the Court's instructions on 18 U.S.C. §

666(a)(1)(A) undermined the requirement that the government prove

beyond a reasonable doubt that the defendant acted knowingly and

intentionally. Allowing the defendant's conviction to stand

without sufficient proof of the defendant's intent to violate 18

U.S.C. § 666(a)(1)(A)by misapplying funds subject to ATP grant

rules would be manifestly unjust.

**B. The Facts and Circumstances Warranted
Requiring That The Government Trace
Misapplied Funds To the ATP Grant**

In the case at bar, Dr. Karron was charged with theft under

14

18 U.S.C. § 666(a)(1)(A) and not with bribery under § 666(a)(1)(B) or § 666(a)(2). The government based a significant portion of its argument on the premise that CASI was solely funded by the ATP grant and therefore any CASI monies spent in a manner inconsistent with the ATP grant directives were, by definition, misapplied.  However, the government's theory ignored contributions made by the defendant to CASI by means of foregoing the bulk of the $175,000 yearly salary allotted to him through the ATP grant.[3]  Simply put, monies cofunded by Dr. Karron, the unpaid salary, were not subject to the restrictions of the ATP grant. Yet the Court's instruction with respect to the Fifth Element of § 666, coupled with the government's theory of prosecution, served to conflate CASI funds with ATP funds. Unfortunately, the Court's failure to require that the government prove that the misapplied funds were directly traceable to the ATP grant rendered the crime charged one of strict liability, to wit, that the spending of CASI monies in a manner inconsistent with the grant – regardless of the source of those monies – was a crime.

---

[3]    The total amount of salary that should have been paid to the defendant at the time the program was frozen was approximately $300,000 gross.  The evidence at trial established he was paid around $35,000 net during the 21-month time frame.

15

Specifically, with respect to the Third Element, the Court in part, instructed the jury that the government was required to prove that: "During that one-year period, the defendant without authority intentionally misapplied the grant money." J.C. at 18. Under this standard it is clear that the government was required to prove that the intentionally misapplied funds were ATP grant monies, not merely CASI funds, in order to sustain its burden of proof.  However, the Court's latter instruction regarding the Fifth Element of the crime weakened that standard:

> The fifth and final element the government must prove beyond a reasonable doubt is that the value of the intentionally misapplied money was at least $5,000.

> The word "value" means face, par or market value, or cost price, either wholesale or retail, whichever is greater.  "Market value" means the price a willing buyer would pay a willing seller at the time the property was intentionally misapplied.

> You may aggregate or add up the value of money intentionally misapplied from a series of acts by the defendant to meet this $5,000 requirement, so long as you find that each act of intentional misapplication was part of a single scheme by the defendant to misapply grant money under the care, custody, and control of CASI.

> The government does not have to prove that the particular money misapplied by the defendant was the money received by CASI as a federal grant.  In other words, it is not

16

necessary for the government to show that the
intentionally misapplied money was traceable
to the actual federal grant received by the
organization.  Thus, if the government
establishes that CASI received more than
$10,000 in federal aid during a one-year
period, and that, during that period, the
defendant misapplied funds valued at more
than $5,000 under the care, custody, and
control of CASI, the government will have
satisfied its burden with respect to this
element.  Money is fungible, and the
government need not trace the $5,000 or more
alleged to be intentionally misapplied back
to the federal grant.

J.C. at 21-22.

As a result, the Court's charge regarding the Fifth Element

instructed the jury that they need not find that the misapplied

money is traceable back to the federal grant.  First, this

instruction failed to recognize that some CASI monies, ie, money

co-funded by Dr. Karron's unclaimed salary and loans to CASI,

were not subject to the grant requirements.  Second,

instructions regarding the Third and Fifth Elements of the crime

presents conflicting standards: (1) the misapplied monies must be

grant funds, but (2) the government need not prove that the

misapplied monies were grant funds.

This was a critical issue as demonstrated by the

government's opening and closing statements.  At the beginning of

trial, the Court deemed tracing the source of the funds to be a

17

part of the government's burden of proof, stating: "I think you
do have to prove the trace – I don't think you have to trace the
amount, but I think you have to show that the expenditure was
made by using those funds." T. at 10.  The government accepted
that it would have to prove a connection between the ATP grant
funds and the funds allegedly misapplied by CASI, wherein it
argued in its opening that "[y]ou will see how virtually 100
percent of CASI's income was from the grant funds and how those
funds went to pay for all of the nonallowable expenses." T. at
39.  The government intended to prove a traceable link between
the federal funds from the ATP grant and the misapplied money; in
other words, the government operated on the assumption that, at a
minimum there needed to be a connection between the source of the
funds and the grant.

It was clear, however, after argument and review of the
Court's propose instructions, that the Court did not intend to
require that the government prove a connection between the CASI
funds and the those funds subject to the ATP grant rules.  As a
consequence the government's altered its theory of prosecution as
demonstrated in its closing argument.  In summation, the
government argued that the sole issue here was "what is in
dispute in this trial?  It all comes down to this: Whether the

18

defendant intentionally misapplied $5,000 or more of funds under
CASI's control to pay for unauthorized expenses." T. at 1260-61.
The government dramatically alter their theory of prosecution as
a result of the Court determination that no connection need be
established between the CASI funds and the ATP grant.

**C.    The 18 U.S.C. §666 Bribery Cases Are Factually
        Distinguishable from the § 666 Theft Cases And
        Should Not Have Been Relied Upon By The Court**

The cases relied upon by the government in arguing it was
not required to prove tracing almost universally related to the
bribery provision of 18 U.S.C. § 666.  We submit that those cases
should not apply to a 18 U.S.C. § 666 theft prosecution.  For
example, in *United States v. Sabri*, the defendant was a real
estate developer convicted of offering bribes to a city
councilman in exchange for various regulatory approvals; 541 U.S.
600 (2004). The Supreme Court rejected Sabri's argument that the
government had to prove a connection between the bribes and
specific federal payments: "Money is fungible, bribed officials
are untrustworthy stewards of federal funds, and corrupt
contractors do not deliver dollar-for-dollar value." *Sabri*, 541
U.S. at 606.  While this concept was adopted by the Court in its
jury instructions, there is no recognition by the Court that the
bribery aspect was central to the interpretation of § 666 in

19

*Sabri.*

*United States v. Salinas* is another example of a § 666 bribery case in which the lack of a tracing requirement is largely attributable to the bribery element; 522 U.S. 52 (1997). In that case, a sheriff and deputy sheriff accepted bribes from a federal prisoner in county jail in exchange for permitting "contact visits" (i.e. conjugal visits) to that prisoner. *Salinas*, 522 U.S. at 55.  In rejecting the tracing requirement argument of the defendant, the Supreme Court carefully parsed the language of the statute: "The word 'any,' which prefaces the business or transaction clause, undercuts the attempt to impose this narrowing construction [i.e. the tracing requirement]." *Id.* at 57.  This language, analyzed so carefully by the Supreme Court, is found in § 666(a)(1)(B), the bribery provision, but *not* in § 666 (a)(1)(A), the theft provision.

There is a single Second Circuit case which takes the view that a tracing requirement may not be necessary with respect to the theft provision of § 666.  In *United States v. Naiman*, the Court of Appeals determined that the government was not obligated to trace the misapplied funds to federal funding; 211 F.3d 40, 48 (2d. Cir. 2000).  For a number of important reasons, however, *Naiman* is both distinguishable from and inapplicable to the

20

instant matter.  First, *Naiman* concerned the activities of the
director of a nonprofit community organization, whereas CASI is a
for-profit organization controlled by the defendant.  As
discussed in the jury charge conference, a case involving a not-
for-profit organization should not apply to the circumstances
surrounding a for-profit organization. T. at 1234.  Second, the
court in *Naiman* found overwhelming evidence of the defendant's
criminal intent without reference to tracing, stating: "[t]he
evidence at trial amply showed that Naiman's conduct rose above a
mere violation of accounting or banking rules and did not
constitute innocent maladministration." *Naiman*, 211 F.3d at 48.
This included the defendant's directing that fraudulent
subcontractor checks be issued which were cashed as part of the
theft scheme.  *Id.* at 44.  Here, the evidence showed a
disagreement in how expenses should be characterized and Dr.
Karron never sought to conceal any of those expenses.  Thus, the
situation in *Naiman* is markedly different from the instant
matter, in which the evidence of criminal intent  was much weaker
and very much in dispute.  It is submitted that the factual
circumstances in *Naiman* are distinguishable from those of the
instant case, and those distinctions render *Naiman* inapplicable
here.

21

While tracing may not be required in bribery cases, a
tracing requirement is appropriate for the theft element of 18
U.S.C. § 666.  Bribery and theft are sufficiently distinct crimes
that a tracing requirement may be applied to one and not the
other with respect to § 666.  A straightforward comparison of the
two crimes can be found in their definitions in Black's Law
Dictionary.  Bribery is defined as follows: "The corrupt payment,
receipt, or solicitation of a private favor for official action."
*Black's Law Dictionary* (8th ed. 2004).  *Sabri* represents a
classic example of bribery: The defendant, a real estate
developer, offered several bribes to a city councilman in
exchange for various regulatory approvals that allowed Sabri to
skirt licensing and zoning laws. *Sabri*, 541 U.S. at 602-3.  The
defendant in *Sabri* intended to avoid following the letter of the
law, and used his own personal funds to pay off public officials
in under-the-table deals.  This is a very different situation
from the instant matter, in which Dr. Karron kept records of
every transaction, both in his personal account and the CASI
accounts, and in which said transactions were out in the open for
all to see.

In contrast to its definition of bribery, Black's defines
theft as follows: "The felonious taking and removing of another

22

person's personal property with the intent of depriving the true owner of it." *Black's Law Dictionary* (8th ed. 2004).  While this does not accurately describe the conduct of the defendant, it does provide a telling contrast to the definition of bribery. The two offenses are quite distinct, and they merit different treatment with respect to a tracing requirement.  Dr. Karron was charged with violating the theft provision of § 666, the jury should have been instructed on a tracing requirement, and the Court's failure to do so criminalized non-criminal conduct by conflating CASI funds with ATP funds.  The interests of justice requires that this Court vacated the defendant's conviction and order a new trial.

**Conclusion**

For all the reasons set forth above, as well as the arguments presented on the record, it is respectfully submitted that this Court should grant Dr. Karron's motion in its entirety, enter a judgment of acquittal as to Count One, and for any other relief as seems just and proper.

Dated:     New York, New York
           June 27, 2008

                         Respectfully submitted,


                         RONALD RUBINSTEIN
                         Attorney for Daniel Karron
                         Rubinstein & Corozzo, LLP
                         260 Madison Avenue, 22d Fl.
                         New York, New York 10016

24