UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA,
                                     :
        - v. -
                                     :    S2 07 Cr. 541 (RPP)
DANIEL B. KARRON,
                                     :
                Defendant.
                                     :
- - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AND
FOR A NEW TRIAL**


                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States
                                      of America

CHRISTIAN R. EVERDELL
CHI T. STEVE KWOK
Assistant United States Attorneys

        - Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF FACTS    . . . . . . . . . . . . . . . . . . . .   2

    A.    The Government's Case . . . . . . . . . . . . . . .   2

        1.    The ATP Grant And The Applicable Rules . . .   2

        2.    The Defendant Knew About The Applicable
             ATP Rules . . . . . . . . . . . . . . . . . .   5

        3.    Karron Misapplied Federal Funds . . . . . .   7

        4.    Karron Misapplied ATP Funds Against The
             Warnings Of His Bookkeeper And Business
             Managers . . . . . . . . . . . . . . . . . .  12

    B.    The Defense Case . . . . . . . . . . . . . . . . .  16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

    POINT I: THE EVIDENCE WAS SUFFICIENT TO CONVICT KARRON .  17

    A.    Applicable Law . . . . . . . . . . . . . . . . . .  17

        1.    Standard Of Review . . . . . . . . . . . . .  17

        2.    Elements Of The Offense . . . . . . . . . .  20

    B.    Discussion . . . . . . . . . . . . . . . . . . . .  20

    POINT II: A NEW TRIAL IS NOT WARRANTED BASED ON THE
           CONTESTED JURY CHARGE . . . . . . . . . . . .  30

    A.    Applicable Law . . . . . . . . . . . . . . . . . .  30

        1.    Standard Of Review . . . . . . . . . . . . .  30

        2.    Challenge To Jury Instructions . . . . . . .  31

    B.    Discussion . . . . . . . . . . . . . . . . . . . .  32

        1.    The Jury Instructions Were Not Erroneous . .  32

        2.    The Defendant Was Not Prejudiced By The
             Jury Instructions . . . . . . . . . . . . .  41

3.   Letting The Verdict Stand Would Not Result
     In "Manifest Injustice"  . . . . . . . . . .   44

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . .   46

TABLE OF AUTHORITIES

<u>Cases</u>:

<u>California</u> v. <u>Brown</u>, 479 U.S. 538 (1987)  . . . . . . . . 31

<u>Holland</u> v. <u>United States</u>, 348 U.S. 121 (1954) . . . . . . 18

<u>Sabri</u> v. <u>United States</u>, 541 U.S. 600 (2004) . . . . . . . 35

<u>United States</u> v. <u>Abelis</u>, 146 F.3d 73
     (2d Cir. 1998) . . . . . . . . . . . . . . . . . . 19

<u>United States</u> v. <u>Allah</u>, 130 F.3d 33
     (2d Cir. 1997) . . . . . . . . . . . . . . . . . . 18

<u>United States</u> v. <u>Autuori</u>, 212 F.3d 105
     (2d Cir. 2000) . . . . . . . . . . . . . . 17, 18, 19

<u>United States</u> v. <u>Caro-Munoz</u>, 406 F.3d 22
     (1st Cir. 2005)  . . . . . . . . . . . . . . . . . 36

<u>United States</u> v. <u>Carr</u>, 880 F.2d 1550
     (2d Cir. 1989) . . . . . . . . . . . . . . . . . . 31

<u>United States</u> v. <u>Coyne</u>, 4 F.3d 100
     (2d Cir. 1993) . . . . . . . . . . 33, 34, 37, 38, 41

<u>United States</u> v. <u>Davis</u>, 8 F.3d 923
     (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 18

<u>United States</u> v. <u>Diaz</u>, 176 F.3d 52
     (2d Cir. 1999) . . . . . . . . . . . . . . . . . . 18

<u>United States</u> v. <u>Ferguson</u>, 246 F.3d 129
     (2d Cir. 2001) . . . . . . . . . . . . . . . . . . 30

<u>United States</u> v. <u>Friedman</u>, 998 F.2d 53
     (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 18

<u>United States</u> v. <u>Funaro</u>, 222 F.R.D. 41
     (D. Conn. 2004)  . . . . . . . . . . . . . . . . . 32

<u>United States</u> v. <u>Gambino</u>, 59 F.3d 353
     (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 30

<u>United States</u> v. <u>Guadagna</u>, 183 F.3d 122
     (2d Cir. 1999) . . . . . . . . . . . . . . 17, 18, 19

<u>United States</u> v. <u>Hernandez</u>, 85 F.3d 1023
     (2d Cir. 1996) . . . . . . . . . . . . . . . . . . 18

*United States* v. *Imran*, 964 F.2d 1313
    (2d Cir. 1992) . . . . . . . . . . . . . . . . . 30

*United States* v. *Jones*, 30 F.3d 276
    (2d Cir. 1994) . . . . . . . . . . . . . . . . . 31

*United States* v. *Kranovich*, 401 F.3d 1107
    (9th Cir. 2005) . . . . . . . . . . . . . . . . 36

*United States* v. *Locascio*, 6 F.3d 924
    (2d Cir. 1993) . . . . . . . . . . . . . . . . . 30

*United States* v. *Mariani*, 725 F.2d 862
    (2d Cir. 1984) . . . . . . . . . . . . . . . . . 17

*United States* v. *Masotto*, 73 F.3d 1233
    (2d Cir. 1996) . . . . . . . . . . . . . . . . . 18

*United States* v. *Matthews*, 20 F.3d 538
    (2d Cir. 1994) . . . . . . . . . . . . . . . . . 19

*United States* v. *Mirikitani*, 380 F.3d 1223
    (9th Cir. 2004) . . . . . . . . . . . . . . . . 36

*United States* v. *Monica*, 295 F.2d 400
    (2d Cir. 1961) . . . . . . . . . . . . . . . . . 19

*United States* v. *Morrison*, 153 F.3d 34
    (2d Cir. 1998) . . . . . . . . . . . . . . . . . 18

*United States* v. *Mulder*, 273 F.3d 91
    (2d Cir. 2001) . . . . . . . . . . . . . . . . . 31

*United States* v. *Naiman*, 211 F.3d 40
    (2d Cir. 2000) . . . . . . . . . . . . . . 32, 37, 38

*United States* v. *Nektalov*, 461 F.3d 309
    (2d Cir. 2006) . . . . . . . . . . . . . . . . . 31

*United States* v. *Resto*, 824 F.2d 210
    (2d Cir. 1987) . . . . . . . . . . . . . . . 17, 18

*United States* v. *Rosa*, 17 F.3d 1531
    (2d Cir. 1994) . . . . . . . . . . . . . . . . . 19

*United States* v. *Sabri*, 326 F.3d 937
    (8th Cir. 2003) . . . . . . . . . . . . . . . . 35

*United States* v. *Sanchez*, 969 F.2d 1409
    (2d Cir. 1992) . . . . . . . . . . . . . . . . . 30

United States v. Simas, 937 F.3d 459
     (9th Cir. 1991)   . . . . . . . . . . . . . . . . 33, 35

United States v. Spano, 401 F.3d 837, 840
     (7th Cir. 2005)   . . . . . . . . . . . . . . . . 36, 37

United States v. Spencer, 4 F.3d 115
     (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . 30

United States v. Sureff, 15 F.3d 225
     (2d Cir. 1994) . . . . . . . . . . . . . . . . . 18, 20

United States v. Stewart, 433 F.3d 273
     (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . 30

United States v. Taylor, 18 F.3d 55
     (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . 19

United States v. Torres, 845 F.2d 1165
     (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . 45

United States v. Urlacher, 979 F.2d 935
     (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . 33

United States v. Urlacher, 784 F. Supp. 61
     (W.D.N.Y. 1992)   . . . . . . . . . . . . . . . . . . 33

United States v. Valentine, 63 F.3d 459
     (6th Cir. 1995)   . . . . . . . . . . . . . . . . . 33

United States v. Westmoreland, 841 F.2d 572
     (5th Cir. 1988)   . . . . . . . . . . . 33, 34, 35, 41

United States v. Wilkerson, 361 F. 3d 717
     (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . 31


Other Authority:

15 C.F.R. § 14.62 . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 666 . . . . . . . . . . . . . . . . 32, 35, 36

Federal Rule of Criminal Procedure 33 . . . . . . . . . 30

L. Sand, et al., Modern Federal Jury
Instructions, Instruction 27A-2 . . . . . . . . 20, 25, 26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                   :
UNITED STATES OF AMERICA,
                                   :
         - v. -
                                   :    S2 07 Cr. 541 (RPP)
DANIEL B. KARRON,
                                   :
              Defendant.
                                   :
- - - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL

The Government respectfully submits this memorandum of law in opposition to the motion filed by Daniel B. Karron, the defendant, for a judgment of acquittal and, in the alternative, for a new trial, pursuant to Fed. R. Crim. P. 29 and 33.

For the reasons set forth below, the defendant's motion should be denied.  The Government presented more than sufficient evidence to support the jury's guilty verdict, and this Court properly instructed the jury that, because money is fungible, there is no requirement that the Government trace the $5,000 or more alleged to be misapplied back to the federal grant.

### PRELIMINARY STATEMENT

Indictment S2 Cr. 541 (RPP) (the "Indictment") was filed on or about May 21, 2008, in one count.  Count One charged Daniel B. Karron, the President and Chief Technical Officer of Computer Aided Surgery, Inc. ("CASI"), with intentionally misapplying more than $5,000 of funds under the care of CASI, in violation of Title 18, United States Code, Section 666.

Trial against Karron began on June 2, 2008, and ended on June 11, 2008.  At the close of all the evidence, the defendant moved under Rule 29 for a judgment of acquittal on the ground that there was insufficient evidence to show that the defendant intentionally misapplied federal grant funds.  (Tr. 1235-38).[1]  The Court denied the motion.  (Tr. 1247).  The jury returned a guilty verdict later that same afternoon.

On or about June 27, 2008, the defendant filed the instant motion renewing his Rule 29 motion for a judgment of acquittal on substantially the same grounds and, in the alternative, seeking a new trial pursuant to Rule 33 based on an alleged error in the Court's instructions to the jury.

### STATEMENT OF FACTS

**A.    The Government's Case**

**1.    The ATP Grant And The Applicable Rules**

The evidence at trial showed that, from in or about October 2001 to in or about June 2003, Daniel B. Karron was the President and Chief Technical Officer of Computer Aided Surgery Inc., or CASI.  (GX 10).  In October 2001, CASI received a $2 million federal grant, to be disbursed over three years, from the Advanced Technology Program ("ATP") that was designed to support high-risk scientific research.  (GX 11, 13; Tr. 56).

---

[1]    "Tr." refers to the trial transcript; "Br." refers to the defendant's Memorandum of Law in support of the instant motion for acquittal and a new trial; and "GX" refers to a Government exhibit at trial.

The rules of the federal grant were clear and simple: Recipients of the grant "must adhere to the budget" as approved by the National Institute of Standards and Technology ("NIST"), the office that administers the ATP grant. (Tr. 87, 265). A fixed dollar amount is allocated to each category in the approved budget (e.g., "Equipment," "Personnel," etc.), with each category further broken down in a detailed budget narrative that spells out exactly how the money is to be spent. (GX 10B). Grant recipients may not use federal funds to pay for items or services not included within the approved budget. (Tr. 87, 265).

While NIST recognized that changes to the approved budget may become necessary, prior written approval is required before federal funds may be used in a way different from that provided for in the approved budget. (GX 2, at 3; GX 4, at 7; Tr. 87, 94, 108-09, 265, 267). The only exception to this requirement is where the transfer of funds among approved categories does not exceed 10% of the total annual budget. (GX 2, at 3; Tr. 87, 348).

Furthermore, regardless of what non-ATP-specific rules may provide, ATP-specific rules trump less stringent generic regulations contained in the Code of Federal Regulations. See GX 2, at 3 ("In addition to the requirements specified in 15 C.F.R. 14.25, Recipients shall obtain prior written approval from the NIST Grants Officer for . . . [t]he transfer of funds among

3

direct cost categories . . . if the transfer exceeds 10% of the
approved total <u>annual</u> budget. . . . Recipients are not
authorized to create new budget categories without prior
approval.") (first emphasis added); Tr. 232 ("[ATP rules]
overrule[] any other federal cost principles."); Tr. 299 ("Your
ATP rules supersede all other rules because they're program-
specific rules.").

        In addition to the basic requirement that a grant
recipient must adhere to his approved budget, the ATP grant has
program-specific funding principles that govern how ATP funds
could be spent and, thus, whether certain items that a recipient
seeks to include in the budget would meet with NIST's approval.
One such principle is that ATP does not pay for "indirect costs,"
<u>i.e.</u>, overhead expenses that do not directly relate to the
research.   Typical examples of such indirect costs include rent,
utilities, facility renovations, legal fees, and general
administrative costs.  (Tr. 88; GX 1, Instructions For Form NIST-
1262, Item K).  It makes no difference whether the company
receiving the ATP grant is working solely on the ATP-funded
project, or whether it is working simultaneously on both ATP-
funded and non-ATP-funded projects.  (GX 1, at 6; GX 3, at 3).
ATP funds cannot be used to pay for indirect costs, period.  (Tr.
122-23; 256-57) ("Q: Would something like rents and utilities be
an allowable expense under the grant rules if the only project

4

that the grant recipient was working on was the project funded by the ATP money?  A: No. . . . It would make no difference at all.").  Here, too, ATP rules trump non-ATP-specific rules applicable to other federal grants.  See GX 1, at 6 ("Regardless of whether they are allowable under the Federal cost principles, the following are unallowable under ATP: . . . (b) Indirect costs"); Tr. 232.

Another funding principle relevant here is that ATP funds cannot be used to pay for sunk costs — i.e., costs incurred before the start of the ATP grant period.  (Tr. 88, 298).  This prohibition against using ATP funds to pay for pre-grant costs is a direct corollary of the general requirement that recipients use ATP funds only in accordance with the approved budget.  Since ATP budget submissions are forward-looking and relate to projected expenses for upcoming years, pre-grant costs are necessarily excluded from the approved ATP budget and, hence, cannot be paid for using ATP funds.  (GX 14; GX 22, at 3; Tr. 298).

## 2.    The Defendant Knew About The Applicable ATP Rules

These terms and conditions governing the ATP grant were explained to the defendant on multiple occasions.  Bettijoyce Lide, the ATP program manager responsible for the grant that had been awarded to CASI, testified that she met the defendant at a kick-off meeting in November 2001 when the project team conducted a slide-show presentation for Karron and the rest of the CASI

5

team that set forth the terms and conditions of the grant,
including, most notably, the "prior approval" requirement (Tr.
108) and the prohibition against using ATP funds to pay indirect
costs such as rent (Tr. 88, 109).  After the meeting, in response
to the defendant's inquiries about using ATP funds to pay for
rent based on CASI's "unique circumstances," Lide kept saying no
(Tr. 122-23), and kept reiterating the need for prior approval
before any expenditure outside of the approved budget could be
made (Tr. 123).  In response to Lide's insistence on obtaining
prior approval, Karron flippantly said that "no approval would be
needed if he would just come and schmooze and take us to lunch."
(Tr. 130).

          Hope Snowden, the grant specialist responsible for
reviewing CASI's budget submissions to the ATP program, also
testified at trial.  (Tr.262-65).  Indeed, Snowden testified that
her conversations with the defendant about the ATP rules preceded
even the kick-off meeting to which Lide referred.  (Tr. 257-59).
"[R]ight after Karron was told he . . . would be receiving this
federal fund" in October 2001, Karron called Snowden to ask
whether ATP funds could be used to pay rent and utilities.  (Tr.
258).  Snowden told the defendant that "the answer was no, time
and time again."  (Tr. 259).  Nonetheless, the defendant, along
with his business manager Lee Gurfein, kept calling, "like a day
apart, and they would consistently get the same exact answer,"

which was that rent and utilities "were unallowable costs, and, no, you cannot use federal funds." (Tr. 259).  Snowden gave the same response to Karron and Gurfein again during the kick-off meeting in November 2001 when Lide and Snowden conducted the slide-show presentation explaining the importance of adhering to the approved budget (Tr. 265), the need to obtain prior written approval for any changes greater than 10% of the total annual budget (Tr. 298), and the rule against using ATP funds to pay for indirect and pre-grant costs (GX 4, at 6; Tr. 298).

But the phone calls from Karron and his manager Gurfein did not stop.  Even after the kick-off meeting, Karron and Gurfein persisted in calling Snowden asking to use "federal funds to pay for rent and utilities." (Tr. 303).  Once again, Snowden's response to them "was always no.  No matter what [Karron] said, how he said it to me, it's no, these are taxpayers' money and we do not use that to pay for rent and utilities." (Tr. 303).  Her response to Gurfein was the same: "No, again and again, absolutely not." (Tr. 303-04).

### 3.    Karron Misapplied Federal Funds

Despite being told on multiple occasions in person, over the telephone, and through his business manager Lee Gurfein that he could not deviate from the research budget as approved by NIST, Karron did exactly that, and did so repeatedly.  Over the course of a year and a half, the defendant misapplied close to

7

half a million in federal funds toward the payment of
unauthorized expenses, including rent, utilities, a cleaning lady
for his apartment, restaurant meals, and miscellaneous household
items such as blenders, vacuum cleaners, power drills, and a GPS
navigation device.  (GX 101, 110, 114, 115).

        The evidence that established Karron's guilt at trial
was overwhelming.  First, there is no dispute that Karron alone
had signatory authority at CASI, and thus, no question that
Karron was the person responsible for the misapplication of the
grant funds.  (Tr. 299-301).  Although Lee Gurfein was initially
hired on the understanding that he would have dual signatory
authority with Karron, Lee's authority was stripped away one week
after CASI was awarded the ATP grant, as documented by a letter
Karron sent to NIST, dated October 11, 2001.  See GX 21, at 3;
Tr. 300-02; Tr. 639 (testimony of Lee Gurfein) ("Within a week
exactly on October 11th . . . , I was stripped of my ability to
control the business as I was told I would have.").  And as shown
by the Chase Bank records relating to CASI's business accounts(GX
81), the only signature that appears on the canceled checks is
the defendant's.

        Furthermore, the bank account records (GX 80, 81), the
American Express ("AMEX") statements for the credit cards issued
to CASI (GX 90), and invoices from various electronic equipment
and hardware vendors (GX 100-104) establish, beyond any

8

reasonable doubt, where the money that funded CASI's business accounts came from and where that money went.

To facilitate the jury's review of the voluminous records, the Government called Belinda Riley, a Department of Commerce auditor who analyzed CASI's financial records, and qualified her, without any objection from the defense (Tr. 464-65), as an expert in accounting and auditing procedures.[2] Riley testified that, based on the Chase Bank records (GX 81), she created a database listing every transaction in CASI's bank

---

[2]    The defendant's assertion that Ms. Riley "was qualified as an expert" "over defense objection" is simply incorrect.  (Br. at 4):

> Mr. Kwok:  Your Honor, government offers Belinda Riley as an expert in accounting and auditing procedures.
>
> Mr. Rubinstein:  No objection, Your Honor.
>
> The Court:  All right.  Ms. Riley is accepted as an expert in accounting [and] auditing procedures.

Tr. 464-65.

The two transcript citations contained in the defendant's brief are not to the contrary.  (Br. 4).  The first citation to page 466 of the transcript is altogether inapposite, as it relates to Ms. Riley's in-court identification of the defendant and contains no objection whatever from either party (Tr. 466).

The second citation to page 475 relates only to defense counsel's objection to the admission of GX 60, an audit report prepared by Riley, on the ground that the underlying documents that were the basis of GX 60 were not in evidence.  The Court properly overruled the objection to the admission of that exhibit because, under Fed. R. Evid. 703, the underlying "facts or data need not be admissible in evidence in order for the opinion or inference" of an expert witness to be admitted.

9

accounts that covers the time period from October 1, 2001 to June 2003. (GX 110; Tr. 516-17, 533-38). Riley supplemented her database with information obtained from the AMEX credit card statements that lists the date of every credit card transaction and the vendor where a particular purchase was made (GX 110; Tr. 538-47).

With respect to CASI's source of funding, the financial records as summarized in Riley's databases indisputably establish that, with the exception of about $1,170 in refund checks in Year 2 of the grant, the ATP grant was, on balance, CASI's only source of funding. (GX 112, 113). While the defendant made a number of transfers from his own personal bank account to CASI's business accounts (GX 110, at 32 of 37 & 38 of 44) and forwent accepting salaries for a time (GX 110, at 39 of 44), these "contributions" to CASI were far outweighed by the personal loans the defendant made CASI lend him (GX 110, at 38 of 44; at 32 of 37).

For example, while the defendant wrote 7 checks in 2001 transferring $37,000 from his personal account to CASI's account and accepted only 8 paychecks totaling about $35,293 out of his approved salary of $175,000, the defendant also wrote 15 checks transferring about $129,850 from CASI's business accounts into his personal bank account and paid himself $60,000 in rent payments from the CASI business accounts. (GX 110 at 38-39 of 44). Adjusting for tax withholding from payroll (Tr. 806-07),

10

the net result of all these transfers of funds in both directions was that the defendant took $200,488 from CASI's bank accounts — i.e., $25,488 more than his approved $175,000 salary, whether these excess withdrawals be characterized as "excess salary" or "personal loans."  (GX 114; Tr. 801-03, 806-07).

        Hence, Riley's analysis did not overlook the "$36,000 worth of checks from the defendant's personal bank account to CASI" with which she was "confronted" on cross examination (Br. 5).  Nor did she fail to "give Dr. Karron credit for uncollected salary" (Br. 6).  As Government Exhibit 110, page 38 of 44, shows, Riley's summary took into account the $37,000 worth of checks to which the defense referred, as well as the fact that the defendant did not accept a regular paycheck every month in Year 1 of the grant.  Nonetheless, because the defendant withdrew more money from CASI than he put in, the net result was that, aside from various miscellaneous refund checks in 2002, CASI, on net, had no other source of funding other than the ATP grant in both years of the grant.  (GX 110, at 4 of 37; GX 112, 113).[3]

_____

        [3]    This conclusion is consistent with Lee Gurfein's testimony that "the only funds we had were funds from NIST, ATP funds."  (Tr. 645).  Gurfein testified that one of his primary responsibilities at CASI was fundraising, "attempting to obtain additional funds for CASI that would be supplemental to the funds coming from NIST."  (Tr. 625).  Nevertheless, during his tenure at CASI from 2001 to 2002, "there were no other funds that I knew about that came into the company."

        Robert Benedict, the business manager at CASI from 2002 to 2003, testified to the same effect regarding funding during

With respect to the expenditure of the money in CASI's accounts, the financial records again establish that it went to pay for expenses that the defendant was repeatedly told ATP would not fund. For example, Karron used ATP funds to pay for, among other things, rent (GX 110, at 39 of 44), a cleaning lady for his condominium (GX 110, at 36 of 44), utilities such as electricity, cable, telephone, and Internet services (GX 110, at 30-35), home renovation and hardware tools (GX 110, at 20-21), and restaurant meals (GX 100, at 22-25). All told, Karron misapplied more than $268,000 in Year 1 of the grant, and more than $196,000 in Year 2 of the grant, for a total of approximately $465,000.

### 4.  Karron Misapplied ATP Funds Against The Warnings Of His Bookkeeper And Business Managers

To show that Karron's misapplication of federal grant funds was intentional, the Government presented devastating proof that Karron's own employees repeatedly told the defendant to stop doing so and also warned him about the potential consequences of openly flouting ATP grant rules.

Frank Spring, a bookkeeper the defendant hired in July 2002 to manage CASI's books, testified that, once he became familiar with the rules and regulations of the ATP grant, he had a series of conversations with the defendant after he noticed

---

Year 2 of the grant. See Tr. 1052 ("All of the money that was in all of the accounts was NIST money."); Tr. 988 ("You could tell there was no money coming in from any other source other than ATP.").

that certain non-grant-related expenses — "rent, utilities,
certain amounts of capital expenditures . . . , and medical
expenses" — were classified as ATP expenses in CASI's books and
records.  (Tr. 840-42).  In response, the defendant told Spring
that Spring did not know what he was doing and that the defendant
was "in conversation with the ATP managers in Washington to
ensure that these expenses . . . would be allowed."  (Tr. 842).
With respect to the use of ATP funds to pay rent, in particular,
the defendant also told Spring that, if asked, he would simply
"tell the ATP managers that he lived in Connecticut" to buttress
his argument that the apartment was used as an office not a home,
and, thus, rent should be allowed to be paid for using grant
money.  (Tr. 854-55).

        Furthermore, on multiple occasions, "between one dozen
and two dozen times," (Tr. 844), when Spring treated certain
expenses as non-ATP expenses in CASI's books, Karron changed them
back as allowable expenses.  When Spring confronted the defendant
about the defendant's "mucking about" in the company's books (GX
145, at 2), the defendant again told Spring he did not know what
he was doing and that the defendant "would be having meetings
with the ATP managers to clear up all of these matters."  (Tr.
843).  Spring, however, never received any written approval from
NIST approving the expenses in question.  (Tr. 853).

13

Contemporaneous e-mail involving the defendant corroborated Spring's testimony about these discussions. (GX 142-45, 147, 149). For example, in an e-mail dated November 30, 2002, the defendant wrote to Spring, "I [ ] have problems with the entire way you are splitting the costs between atp and non atp. We need to fix this. . . . I need to review all of the non program items. . . . I will work with or without you to develop new reports. . . . I prefer to do this with you." (GX 144, at 3). In another e-mail dated June 21, 2003, the defendant, in response to Spring's continuing complaints about the defendant's characterization of cleaning and home renovation expenses as grant-related expenses, wrote, "Please, you are not to make interpretations as to allowability or category. You need to be a bookkeeper, not [a] business owner. I know you like to think like an owner, but I own this little dingy, not you." (GX 147). Finally, in an e-mail to a friend dated December 18, 2002, the defendant repeated the lie about living in Connecticut that he had discussed with Spring: "I will make a lease with Windy [in Connecticut] and make like I only keep a folding bed on 33rd Street. If ATP buys into this idea, then I can charge my rent on the apartment to the grant and pay my mortgage." (GX 213).

The defendant's business manager from 2001 to 2002, Lee Gurfein, likewise testified that he tried to stop the defendant from spending taxpayers' money on disallowed expenses, but to no

14

avail.  To begin with, exactly one week after the grant was
awarded, the defendant stripped Gurfein of his signatory
authority.  (Tr. 639-41).  Furthermore, when the defendant
admitted to Gurfein that he had transferred $75,000 out of the
initial $150,000 infusion of cash from ATP to pay off "personal
obligations to his family" and credit card debts, Gurfein told
the defendant "he couldn't do that."  (Tr. 637-38).  In response,
the defendant said simply that "he had no choice; he had to get
rid of those debts."  (Tr. 638).  When the defendant continued to
spend grant funds outside of the parameters of the approved
budget, Gurfein kept confronting the defendant and reminding him
of the need to "apply for a written approval."  (Tr. 643).  The
defendant's "constant refrain" was:  "I'm the principal
investigator, and I can do anything I want" and NIST would
approve the expenditures later because "they [NIST] loved me."
(Tr. 667, 697).

        Robert Benedict, the business manager the defendant
hired to replace Lee Gurfein during Year 2 of the grant,
testified that when the defendant persisted in using ATP funds to
pay for non-grant expenses, he went before CASI's board of
directors to request that CASI's checkbooks, along with the
company's books and records, be turned over to the bookkeepers
for safekeeping.  (Tr. 978-79).  But even this drastic measure
failed to stop the defendant from misspending ATP funds.  Karron

15

began using an electronic bills-paying service called PayPal to
circumvent the restriction on his check-writing ability — i.e.,
instructing PayPal to write checks on his behalf and then paying
PayPal using the company's AMEX credit card.  (Tr. 980-81).  When
Benedict confronted the defendant about his use of ATP funds to
pay for disallowed expenses, the defendant said, "I have to pay
the bills." (Tr. 982-83).  Toward the end of Benedict's tenure at
CASI when NIST began making inquiries about CASI's accounting,
Benedict even told the defendant that "this was very serious,"
that "he could go to jail for this," and that "he could have
between 300[,000] and 500,000 of disallowed expenditures."  (Tr.
997).  Once again, as he did with previous admonitions from NIST
officials and his own employees, the defendant dismissed this
warning.  Referring to the amount that he owed NIST, Karron told
Benedict, "[D]on't worry about it, my mom's got it."  (Tr. 997).

     **B.**    **The Defense Case**

       The defense called six witnesses:  a real estate broker
who testified to the resale price of the defendant's apartment
(Tr. 1096-100); the owner of the company that renovated the
defendant's apartment who testified to the nature of the
renovation work on the apartment; (Tr. 1102-123); three character
witnesses who testified to the defendant's reputation for
truthfulness and honesty (Tr. 1135-60); and a friend who
testified that Karron never lived with her in Connecticut during

16

the time period charged in the Indictment, but lived in his own
apartment in Manhattan (Tr. 1180-85).

<div align="center">ARGUMENT</div>

<div align="center">POINT I</div>

<div align="center">THE EVIDENCE WAS SUFFICIENT TO CONVICT KARRON</div>

A.    Applicable Law

    1.    Standard Of Review

    A defendant challenging the sufficiency of the
evidence under Rule 29 bears a "heavy burden." United States v.
Autuori, 212 F.3d 105, 114 (2d Cir. 2000).  In considering a
motion for judgment of acquittal, "[t]he Court 'must determine
whether upon the evidence, giving full play to the right of the
jury to determine credibility, weigh the evidence, and draw
justifiable inferences of fact, a reasonable mind might fairly
conclude guilt beyond a reasonable doubt.'"  United States v.
Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (quoting United States
v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).

    Accordingly, a motion under Rule 29 must be denied if
"'any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.'" United States
v. Guadagna, 183 F.3d at 130 (quoting United States v. Resto, 824
F.2d 210, 212 (2d Cir. 1987)).  "In other words, the court may
enter a judgment of acquittal only if the evidence that the
defendant committed the crime is 'nonexistent or so meager that

<div align="center">17</div>

no reasonable jury could find guilt beyond a reasonable doubt.'"
Id. (citation omitted); see also United States v. Hernandez, 85
F.3d 1023, 1029 (2d Cir. 1996).

　　　　　In considering the Government's proof under Rule 29,
the Court must view the evidence in the light most favorable to
the Government, see Autuori, 212 F.3d at 114; Guadagna, 183 F.3d
at 129, and must "credit[] every inference that the jury might
have drawn in favor of the government." Hernandez, 85 F.3d at
1029; see United States v. Diaz, 176 F.3d 52, 89 (2d Cir. 1999);
United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998); United
States v. Allah, 130 F.3d 33, 45 (2d Cir. 1997); United States v.
Masotto, 73 F.3d 1233, 1241 (2d Cir. 1996). Similarly, the
Second Circuit has repeatedly emphasized that to defeat a Rule 29
motion, "the government need not 'exclude every reasonable
hypothesis other than that of guilt.'" Guadagna, 183 F.3d at 130
(quoting Holland v. United States, 348 U.S. 121, 139 (1954)); see
United States v. Sureff, 15 F.3d 225, 229 (2d Cir. 1994) ("The
government's case need not exclude 'every possible hypothesis of
innocence.'") (quoting United States v. Friedman, 998 F.2d 53, 59
(2d Cir. 1993)); United States v. Davis, 8 F.3d 923, 928-29 (2d
Cir. 1993). Even where the evidence permits an innocent
inference, the task of choosing among the permissible inferences
is for the jury, not for the Court. See United States v. Taylor,
18 F.3d 55, 57-58 (2d Cir. 1994); United States v. Matthews, 20

18

F.3d 538, 548 (2d Cir. 1994); see also United States v. Rosa, 17 F.3d 1531, 1542 (2d Cir. 1994) ("The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable"). Accordingly, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." Autuori, 212 F.3d at 114 (internal quotation marks omitted). Consistent with this approach, all issues of credibility must be resolved in the Government's favor. See United States v. Abelis, 146 F.3d 73, 80 (2d Cir. 1998).

Finally, in assessing the proof at trial, the court must analyze each piece of evidence "not in isolation but in conjunction," Matthews, 20 F.3d at 548, and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." Guadagna, 183 F.3d at 130; see also United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961). There is no requirement of what kind of evidence the Government must present to withstand a Rule 29 motion; the Government's case may in fact be based "entirely on circumstantial evidence" though it is clearly not so here. United States v. Sureff, 15 F.3d at 228 (citation omitted).

2.    **Elements Of The Offense**

In order to sustain its burden of proof with respect to the charge in the Superseding Indictment, the Government must prove beyond a reasonable doubt the following five elements:

> First, at the time alleged in the Superseding Indictment, the defendant was an agent of Computer Aided Surgery, Inc., or CASI;
>
> Second, in a one-year period, CASI received federal benefits in excess of $10,000;
>
> Third, the defendant intentionally misapplied money or property;
>
> Fourth, the misapplied money or property belonged to, or was under the care, custody, or control of CASI;
>
> Fifth, the value of the intentionally misapplied money or property was at least $5,000.

Adapted from L. Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 27A-2; Seventh Circuit Pattern Criminal Jury Instructions to 18 U.S.C. § 666(a)(1)(A).

B.    **Discussion**

The Government presented more than ample evidence to support the jury's finding that each and every element of the offense was satisfied.  There is no dispute between the parties that the Government presented sufficient proof to establish

> 1) that at the time alleged in the Superseding Indictment, Karron was the President and Chief Technical Officer of CASI (GX 10);
>
> 2) that CASI received federal benefits in excess of $10,000 each year from 2001 to 2003 (GX 13);
>
> 3) that the alleged misapplied money was in CASI's control and custody (GX 81, 110).

20

Hence, the only issue in dispute here, as it was at trial, is whether Karron intentionally misapplied ATP funds by repeatedly violating the terms of the grant and whether the amount of the misapplication exceeded $5,000.

As shown above, the evidence at trial overwhelmingly established the defendant's guilt. With respect to the misapplication of funds, the financial records (GX 81, 90, 100-04) and Riley's databases and graphs summarizing them (GX 110-15) unequivocally demonstrate, first, that, on net, CASI had no other source of funds aside from ATP and second, that Karron used the ATP grant funds in CASI's business accounts to pay for various expenses not included as part of the approved budget.

Neither in its arguments to the jury nor in the instant Rule 29 submission does the defense take issue with these financial records. Instead, it focuses on various audit reports prepared by Joan Hayes (an uncalled witness) and Riley at a time when neither of them had access to the financial records described above and had to rely almost exclusively on CASI's books and records, which were admittedly imperfect and in a state of flux. (Br. 4-6) (Tr. 518, 607, 1284-85, 1307). Hence, the defendant asserts, for example, that Riley's audit report relied too heavily on the audit findings reached by Hayes, who alleged lacked independence to conduct an audit for the company, and that

21

Riley could not adequately defend her audit findings on cross examination.[4]

But as the Government explained to the jury, the defense's quibble with these audit reports is a red herring because the Government did not rely on any of these audits to prove the misapplication of ATP funds. (Tr. 1262) ("You don't have to rely on Ms. Riley's on anyone else's audits in this case"). Instead, to take the guesswork out of the analysis, the Government built its case on financial records provided directly by Chase Bank and American Express to show the inflows and outflows of funds at CASI. (Id.) With these financial records in hand, Riley completed an analysis, independent of her earlier audits, that summarizes, transaction by transaction, how CASI got its money and where the money went. (GX 110-15). The defendant's extended critique of the methodology Riley used in her audits, even if true, therefore simply have no bearing on

---

[4]    The defendant also argues that he "was precluded from cross-examining [Riley] with [the underlying documentation] because she did not have them with her." (Br. 6). This argument misrepresents the record. As an initial matter, because the documents that Riley examined in the course of preparing her audit report were CASI's books and records, the defendant had access to them and could have used them effectively to cross examine the witness if he so desired. Moreover, after Riley indicated in the middle of cross examination that she would like to re-examine certain documents to refresh her recollection, those documents were furnished to her as well as to the defense for review before cross examination resumed on the next day. (Tr. 619-20, 710). Before resuming cross examination, defense counsel made no objection that he did not have an adequate opportunity to review the documents that Riley examined.

Riley's analysis based on the financial records that was crux of
the Government's case.

To the extent the defense challenges the databases
Riley prepared based on the financial records, its arguments are
demonstrably wrong.  For example, the defendant argues that Riley
erred by failing to take into account "$36,000 worth of checks,"
marked as Defense Exhibit FFF, "from the defendant[']s personal
bank account to CASI."  (Br. 5).  The defendant also faults Ms.
Riley for not "giv[ing] Dr. Karron credit for uncollected
salary."  (Br. 6).  As GX 110, page 38 of 44, shows, however,
every single one of the checks marked as Defense Exhibit FFF was
taken into account, plus an additional $1,000 not included in
Defense Exhibit FFF that increased the total contribution by the
defendant to $37,000.  And as page 39 of the same Exhibit shows,
Riley likewise did not neglect to take note of the fact that the
defendant did not accept a paycheck every month.

However, as explained above (see pp. 10-11, supra),
these transfers from the defendant to CASI were dwarfed by
transfers in the opposite direction, with the net result that,
the defendant withdrew approximately $25,488 more than the amount
to which he was entitled under the approved budget.  (GX 110, at
38 of 44; GX 114, table).

Similarly wide off the mark is the defendant's
assertion that "Ms. Riley's claim of an additional $54,850 in

23

loans [as shown in GX 110, at 38 of 44] is totally unsupported by
the evidence," and his "speculat[ion]" that these entries were
based on Riley's "uncritical" reliance on some unknown documents
the defense had never seen.  (Br. 5-6).

        To the contrary, these entries in the database are
borne out by the Chase Bank records that were admitted in
evidence and produced to the defense in discovery (GX 81).  By
way of illustration, Riley's database (GX 110, at 38 of 44) shows
that checks bearing check numbers 3144, 3145, and 10407 were
written transferring $1,000, $5,000, and $750, respectively, from
CASI's account into the defendant's personal bank account.  These
database entries are based on copies of the actual checks signed
by "DB Karron" (attached hereto as Exhibits A, B, and C, and
bearing discovery bates stamp 1663, 1664, and 2436) and the
monthly bank statements documenting the same (attached hereto as
Exhibit D, and bearing discovery bates stamp 1415-18, 1394-95).

        As the above examples show, the simple and irrefutable
fact established at trial is that, on top of the various
expenditures the defendant made using ATP funds, the defendant
took cold, hard cash from CASI's account and deposited it into
his own personal account.  In Year 1, such withdrawals totaled
approximately $25,000 more than the amount of his approved
salary.  (GX 114).  In Year 2, the amount was close to $15,000.
(GX 115).  Based on the above, and in light of the repeated

warnings voiced by NIST personnel and the defendant's own
managers and bookkeeper, a reasonable jury could certainly
conclude that the defendant intentionally diverted cash belonging
to CASI, and funded by ATP, to his own use.[5]

Citing Title 14, Code of Federal Regulations, Section
62,[6] the defendant nonetheless complains that he was unfairly
"denied" the opportunity to "negotiate" changes to the budget in
a "post-audit appeals process." (Br. 7). This argument fails
for three reasons. First, the crime of misapplication is
complete once the defendant misapplied $5,000 or more in federal
funds and did so with the requisite intent. See Sand, Modern

---

[5]    The defendant's other assertions about the use of ATP
funds are similarly belied by the documentary evidence. For
example, without any citation to the record, the defendant baldy
states that "the rent paid was paid out of Dr. Karron's
legitimately earned salary."

As documented in GX 110, at page 39 of 44, and copies
of the actual checks (attached herein as Exhibit E), rent was
paid out of CASI's business accounts, not from "Dr. Karron's
legitimately earned salary." For example, in check number 2977,
the payor was shown as "Computer Aided Surgery, Inc."; the payee
was "D.B. Karron"; the amount of the check was $2,000; the memo
line read: "Rent on office: 300 East 33rd Street, Suite 4N"; the
signature was "DB Karron."

[6]    The pertinent part of the regulation reads as follows:

In taking an enforcement action, the awarding
agency shall provide the recipient an opportunity
for hearing, appeal, or other administrative
proceeding to which the recipient is entitled
under any statute or regulation applicable to the
action involved.

15 C.F.R. § 14.62(b).

25

Jury Instr., 27A-2.  Because none of the elements of the crime is
conditional on what may or may not happen in a later
administrative proceeding, this argument is, quite simply, beside
the point.

Second, the administrative appeal process provided for
under the Code of Federal Regulations was not available to the
defendant because no administrative enforcement action was ever
taken; instead, the case was referred to the Department of
Justice for criminal prosecution.  Likewise, the grant was
suspended, not because of any administrative enforcement action,
but because an Indictment was returned by a Grand Jury.  (See
Defense Exhibit B; Tr. 242).  Once the criminal process was
initiated, the defendant was afforded all the rights — indeed,
the more extensive rights — of a criminal defendant, including
the right to a jury trial that he exercised.  In short, no
administrative rights were applicable, and none was "denied,"
because the enforcement process was not administrative in nature.

Third, to the extent the defendant's argument is that
the misapplication of the grant funds was not intentional because
the defendant thought, albeit mistakenly, he could participate in
an administrative audit resolution process where he could
"negotiate" the disallowed expenses (Br. 8), the argument also
fails.  As even the defendant appears to concede, the defendant's

belief, even if mistaken, has to be in "good faith" to vitiate intent. (Br. 8).

However, the Government introduced an email written by the defendant to a person named Professor Schwartz, dated August 20, 2003, that belies any claim of "good faith" belief on the defendant's part. Instead, what the defendant had in mind was nothing less than financial blackmail that further underscores his intent to cheat the Government:

> I am weigh[]ing abandoning the grant at this point, and forcing the government to try to collect 1.4M from me and make the grant enough of a train wreck that they have to cooperate on finding a liveable solution for all of us. It is that bad and I am ready to shove the situation to such a unpalatable end that we get some cooperation from them.

(GX 203, at 3; Tr. 1083-86).[7]

---

[7]    In addition, contrary to the defendant's argument, the defendant never "successfully negotiated with NIST over the payment of utility bills" that could have given him a reasonable basis to believe that the ATP rules were somehow "negotiable." (Br. 7).    There is no evidence in the record to show that any such negotiation reached fruition.    The defendant's citation to page 780 of the transcript shows simply that the defendant attempted to engage NIST in such discussions, not that NIST agreed with the defendant's position.    (Br. 7; Tr. 780).

Indeed, as Lide and Snowden both testified, while NIST does engage in discussions with recipients about revising an approved budget, those revisions are on a prospective basis only. (Tr. 236, 266-68, 436).    As they explained to grant recipients at the kick-off meeting (Tr. 267), "[I]f you need changes" for the "next period of funding," "you have to request approval of a revised budget.    Other than that, the budget that was approved is the budget that you have to abide by."    (Tr. 267).    In light of this presentation, the jury was entitled to conclude that no reasonable person could have believed, as the defendant appears

27

Finally, citing 15 C.F.R. § 14, the defendant argues that there is in fact no requirement that a grant recipient seek prior approvals before deviating from his approved budget.  (Br. 9-13).  Because the Government's case was purportedly based on the "defendant's failure to comply with administrative rules embodied in 15 CFR 14," the defendant urges this Court to set aside his conviction. (Br. 9).

This argument fails because of its faulty premise:  The Government's case was <u>not</u> premised on the "defendant's failure to comply" with the Code of Federal Regulations.  As demonstrated by the documentary proof introduced at trial, the Government's case was based instead on the defendant's failure to comply with the rules and regulations specific to the ATP grant, which were explained to him by Bettijoyce Lide, Hope Snowden, and others, and which impose obligations more stringent than those contained in the CFR.  (GX 1-4).  In discussing the prior approval requirement, the ATP rules are explicit on this point:

> PRIOR APPROVAL REQUIREMENTS
>
> <u>In addition to the requirements specified in 15 CFR 14.25</u>, Recipients shall obtain <u>prior written</u> approval from the NIST Grants Officer for the following changes:
>
> a.    The transfer of funds among direct cost categories must be approved in advance by the

---

to suggest (Br. 8-9), that ATP rules could be broken at will because those violations could somehow be negotiated away at a later time through the so-called "audit resolution process."

28

> Grants Officer if the transfer exceeds 10% of the approved total <u>annual</u> budget for each single Recipient . . . participant for each approved project year. Recipients are not authorized to create new budget categories without prior approval. The Recipients are not authorized at any time to transfer amounts budgeted for direct costs to the direct cost line item.

(GX 2, at 3).

Lide and Snowden both testified to the same effect regarding the primacy of ATP rules and the prior approval requirement. <u>See</u>, <u>e.g.</u>, Tr. 232 ("[ATP rules] overrule[] any other federal cost principles."); Tr. 299 ("Your ATP rules supersede all other rules because they're program-specific rules.").

Furthermore, the testimony is clear that while the NIST is open to negotiating changes to the budget in subsequent years, those changes have to be approved beforehand before ATP funds could be used. NIST's flexibility in negotiating prospective changes does not, in any way, vitiate the prior approval requirement:

> Question: Just to be clear, second bullet point there ["Review costs at the end of each year and submit a revised budget and narrative if changes have occurred"] is not overruling the prior approval requirement?
>
> Answer: No.

(Tr. 236) (Lide's testimony, discussing GX-4, at 11).

29

POINT II

**A NEW TRIAL IS NOT WARRANTED**
**BASED ON THE CONTESTED JURY INSTRUCTION**

A.    **Applicable Law**

1.    **Standard Of Review**

Rule 33 of the Federal Rules of Criminal Procedure authorizes a district court to grant a new trial "if required in the interest of justice." F. R. Crim. P. 33. Because motions for a new trial are disfavored in this Circuit, "the standard for granting such a motion is strict," United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995), and it should be granted only with "great caution and in the most extraordinary circumstances." United States v. Stewart, 433 F.3d 273, 296 (2d Cir. 2006); see also United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993); United States v. Spencer, 4 F.3d 115, 118 (2d Cir. 1993); United States v. Imran, 964 F.2d 1313, 1318 (2d Cir. 1992). It is well settled that a motion for a new trial should not be granted unless, after evaluating all of the evidence, the district court is left with a "real concern that an innocent person may have been convicted." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992). Ultimately, the relevant test is whether "it would be a manifest injustice to let the verdict stand." United States v. Ferguson, 246 F.3d 129 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d at 1414).

30

## 2.    Challenge to Jury Instructions

A defendant challenging a jury instruction bears the burden of demonstrating both that he requested a charge that "accurately represented the law in every respect" and that the charge delivered was erroneous and prejudicial.  United States v. Nektalov, 461 F.3d 309, 313-14 (2d Cir. 2006); United States v. Wilkerson, 361 F. 3d 717, 732 (2d Cir. 2004); United States v. Mulder, 273 F.3d 91, 105 (2d Cir. 2001).  A jury instruction is erroneous if it "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." United States v. Nektalov, 461 F.3d at 313 (quoting United States v. Wilkerson, 361 F.3d at 732).  In reviewing jury instructions, this Court does not look only to the particular words or phrases questioned by the defendant, but must "'review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law.'"  United States v. Carr, 880 F.2d 1550, 1555 (2d Cir. 1989) (quoting California v. Brown, 479 U.S. 538, 541 (1987)); see also United States v. Mulder, 273 F.3d at 105 (court must "look to 'the charge as a whole' to determine whether it 'adequately reflected the law' and 'would have conveyed to a reasonable juror' the relevant law") (quoting United States v. Jones, 30 F.3d 276, 284 (2d Cir. 1994)). Furthermore, "[r]eversal is only required if the instructions,

viewed as a whole, caused the defendant prejudice." <u>United States</u> v. <u>Naiman</u>, 211 F.3d 40, 51 (2d Cir. 2000).[8]

### B.    Discussion

#### 1.    The Jury Instructions Were Not Erroneous

Here, the defendant cannot show that the jury instructions were erroneous, much less prejudicial.  The defendant attempts to argue, without citing any authority in support, that in this case, where the defendant was charged under the intentional misapplication/theft prong of Section 666 – 18 U.S.C. § 666(a)(1)(A) – as opposed to either of the two bribery prongs – 18 U.S.C. §§ 666(a)(1)(B) and (a)(2) – the Government was required to prove that the misapplied funds were "directly traceable to the ATP grant." (Br. 15, 19-23).  The defendant further argues that the description of the third and fifth elements of the crime contained in the jury instructions set up "conflicting standards" because the third element incorporated a tracing requirement, while the fifth element did not. (<u>Id.</u> at 17).  These arguments are meritless.

First, the case law is absolutely clear that there is no tracing requirement for prosecutions under 18 U.S.C. 666; that

_____

[8]    The case law cited above outlines the relevant analysis on appellate review.  However, District Courts have found this framework helpful in determining whether "manifest injustice" existed to grant a new trial pursuant to Rule 33 on the basis of a challenged jury instruction. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Funaro</u>, 222 F.R.D. 41, 46-47 (D. Conn. 2004).

is, the Government need not specifically trace the flow of
federal moneys to link them dollar-for-dollar to the
misappropriated funds.  See United States v. Coyne, 4 F.3d 100,
109 (2d Cir. 1993) ("The language [of Section 666] neither
explicitly nor implicitly requires that the $10,000 [of federal
funds] be directly linked to the program that was the subject of
the bribe."); United States v. Urlacher, 784 F. Supp. 61, 63-64
(W.D.N.Y. 1992) ("There is no requirement that the property
actually embezzled be federal money or traceable to federal
money."), aff'd, 979 F.2d 935 (2d Cir. 1992); see also United
States v. Valentine, 63 F.3d 459, 464 (6ᵗʰ Cir. 1995) ("[T]here
is no need for the United States to trace the stolen money.");
United States v. Simas, 937 F.3d 459, 463 (9ᵗʰ Cir. 1991) ("By
enacting section 666, Congress plainly decided to protect federal
funds by preserving the integrity of the entities that receive
the federal funds rather than requiring the tracing of the
federal funds to a particular illegal transaction."); United
States v. Westmoreland, 841 F.2d 572, 577 (5ᵗʰ Cir. 1988)
("Congress specifically chose to [preserve the integrity of
federal funds] by enacting a criminal statute that would
eliminate the need to trace the flow of federal moneys . . .").

          As the legislative history of Section 666 makes clear,
Congress specifically designed the statute to eliminate a tracing
requirement in order to circumvent the problems, such as co-

mingling of federal and non-federal funds, that prosecutors had

faced using pre-existing statutes to charge crimes involving

bribery and embezzlement of federal funds.  See United States v.

Westmoreland, 841 F.2d at 576 ("[Senate Report 225] indicates

that one of the purposes for enacting the new provisions in

section 666 was to fill a gap caused by the difficulty of tracing

federal monies.").  As the Senate Report states:

> [T]here is no statute of general applicability
> in this area, and thefts from other
> organizations or governments receiving Federal
> financial assistance can be prosecuted under
> the general theft of Federal property statute,
> 18 U.S.C. § 641, only if it can be shown that
> the property stolen is property of the United
> States.  In many cases, such prosecution is
> impossible because title has passed to the
> recipient before the property is stolen, or
> the funds are so commingled that the Federal
> character of the funds cannot be shown.  This
> situation gives rise to a serious gap in the
> law, since even though title to the monies may
> have passed, the Federal Government clearly
> retains a strong interest in assuring the
> integrity of such program funds.

United States v. Coyne, 4 F.3d at 109 (quoting S. Rep. No. 225,

98th Cong., 2d Sess. 369, reprinted in 1984 U.S. Code Cong. &

Admin. News 3182, 3510) (emphasis added); Westmoreland, 841 F.2d

at 576-77 (same).  In eliminating the tracing requirement from

Section 666, "Congress decided that the most effective way to

insure the integrity of the federal funds disbursed to sub-

national agencies was to change the enforcement paradigm from one

that monitored federal funds to one that monitored the integrity

34

of the recipient agencies." <u>United States</u> v. <u>Sabri</u>, 326 F.3d
937, 944 (8th Cir. 2003), <u>aff'd</u> <u>Sabri</u> v. <u>United States</u>, 541 U.S.
600 (2004); <u>see also</u> <u>United States</u> v. <u>Simas</u>, 937 F.2d at 463
(same); <u>Westmoreland</u>, 841 F.2d at 578 (same).

  Recently, the Supreme Court affirmed this line of
reasoning in response to a constitutional challenge to Section
666, holding even more broadly that Section 666 does not require
any connection whatsoever between "forbidden conduct and federal
funds." <u>Sabri</u> v. <u>United States</u>, 541 U.S. at 604.  As the Supreme
Court explained,

> It is true, just as Sabri says, that not
> every bribe or kickback offered or paid to
> agents of governments covered by § 666(b)
> will be traceably skimmed from specific
> federal payments, or show up in the guise of
> a <u>quid</u> <u>pro</u> <u>quo</u> for some dereliction in
> spending a federal grant. . . . But this
> possibility portends no enforcement beyond
> the scope of federal interest, for the reason
> that corruption does not have to be that
> limited to affect the federal interest.
> Money is fungible, bribed officials are
> untrustworthy stewards of federal funds, and
> corrupt contractors do not deliver
> dollar-for-dollar value.  Liquidity is not a
> financial term for nothing; money can be
> drained off here because a federal grant is
> pouring in there.

<u>Sabri</u>, 541 U.S. at 605 (citation omitted).

  The defendant asserts that the reasoning and holding of
<u>Sabri</u> and the other cases relied upon by the Government, most of
which involved defendants charged with bribery under 18 U.S.C. §§
666(a)(1)(B) or (a)(2), apply only to the bribery prongs of

35

Section 666 and not to the intentional misapplication/theft prong
(18 U.S.C. § 666(a)(1)(A)) under which Karron was charged.  (Br.
19-20).  However, since <u>Sabri</u> was decided, every federal court
that has considered the issue has decided that in light of <u>Sabri</u>,
the Government need not prove a connection between the federal
funding and the bribery or embezzlement that a defendant has
allegedly committed, including cases where the defendant was
charged under 18 U.S.C. § 666(a)(1)(A).  <u>See, e.g.</u>, <u>United States</u>
v. <u>Caro-Munoz</u>, 406 F.3d 22, 26-27 (1st Cir. 2005) (Section
666(a)(1)(B) case, stating that "after <u>Sabri</u>, section 666 does
not require a nexus between the alleged bribery and the receipt
of federal funds"); <u>United States</u> v. <u>Spano</u>, 401 F.3d 837, 840
(7th Cir. 2005) (Section 666(a)(1)(A), (a)(1)(B), and (a)(2)
case, recognizing that under <u>Sabri</u>, "no nexus between the bribe
and federal funds is required"); <u>United States</u> v. <u>Mirikitani</u>, 380
F.3d 1223, 1225 (9th Cir. 2004) (Section 666(a)(1)(A) and
(a)(1)(B) case, recognizing that "in <u>Sabri</u>, the Supreme Court not
only held that a federal nexus was not an element of the crime,
but it held that no federal nexus must be shown at all"); <u>United</u>
<u>States</u> v. <u>Kranovich</u>, 401 F.3d 1107, 1111 (9th Cir. 2005) (Section
666(a)(1)(A) case, noting that under <u>Sabri</u> and <u>Mirikitani</u>, "the
government was not required to establish any connection between
the embezzled funds and a federal interest").

Indeed, the Seventh Circuit specifically rejected the argument that the defendant asserts here: "We note that the petitioner in Sabri challenged only § 666(a)(2) and that the defendants challenge § 666 as a whole, having been convicted under, variously, §§ 666(a)(1)(A), (a)(1)(B), and (a)(2). However, we see no reason for any differentiation in analysis among the (a)(1) and (a)(2) charges, which are basically two sides of the same coin (agents stealing federal funds/accepting bribes versus giving bribes to agents). . . . We therefore conclude that the Supreme Court did not intend to limit its holding to § 666(a)(2) . . . and would similarly find no nexus requirement for § 666(a)(1) offenses." United States v. Spano, 401 F.3d at 840 n.2.

Although the Second Circuit has not specifically addressed whether the holding of Sabri extends to defendants charged under Section 666(a)(1)(A), there is nothing in the Court's prior decisions to suggest it would incorporate a tracing requirement into this charge, especially given the Court's recognition of the reasons why a tracing requirement was eliminated from the statute in the first place. See Coyne, 4 F.3d at 109 (discussing the legislative history of Section 666, including the need to eliminate a tracing requirement to address the problem of co-mingling funds). Furthermore, in United States v. Naiman, 211 F.3d 40 (2d Cir. 2000), a case decided before

Sabri where the defendant was charged with, among other things, intentional misapplication of federal funds under Section 666(a)(1)(A), the Court indicated that the Government was not required to trace the misapplied money directly back to the federal funds.  See United States v. Naiman, 211 F.3d at 48 ("We reject appellant's contention that the government was obligated to trace the cash obtained from the [misapplied funds] or show how Naiman used the cash.").[9]

In light of the overwhelming case law in this Circuit and elsewhere recognizing that there is no dollar-for-dollar tracing requirement for offenses charged under any prong of Section 666, and the complete absence of authority supporting the defendant's position, the Court was absolutely correct in instructing the jury, with respect to the fifth element of the offense, that "it [was] not necessary for the Government to show that the intentionally misapplied money was traceable to the

---

[9]    The defendant's attempt to distinguish Naiman on factual grounds misses the mark.  (See Br. 21).  The reason that Congress eliminated a dollar-for-dollar tracing requirement from Section 666, as recognized by the Second Circuit in Coyne, is that the previous enforcement scheme was ill-equipped to deal with situations where, for example, the federal character of the misapplied funds could no longer be shown because of co-mingling. See Coyne, 4 F.3d at 109.  That rationale applies regardless of whether the company receiving the federal funds was a for-profit or a not-for-profit organization, and regardless of how egregious the misapplication was.  For the same reasons, the defendant's argument that tracing is required in cases charged under 18 U.S.C. § 666(a)(1)(A) because of the different definitions of "theft" versus "bribery" is also unpersuasive.  (See Br. 22-23).

federal grant received by the organization," and further that
"[m]oney is fungible, and the Government need not trace the
$5,000 or more alleged to be intentionally misapplied back to the
federal grant."   (Jury Instructions at 22, attached as Ex. F).

        The Court's instruction with respect to the third
element of the offense, which stated that the Government must
prove that the defendant "intentionally misapplied the grant
money" (Ex. F at 18), did not inject a dollar-for-dollar tracing
requirement, nor did it conflict with the Court's instruction
regarding the fifth element that the Government need not trace
the $5,000 back to the federal grant funds.  The Court recognized
that in this case, the spending restrictions placed on the ATP
grant funds extended only to those funds, not to any money that
CASI might have had from other sources.  Accordingly, the Court
determined that there could be no intentional misapplication of
funds unless the defendant misspent the ATP funds, as opposed to
other CASI funds, in a manner that violated the rules of the ATP
grant.  As an example, the Court noted that if the defendant
bought the projector screen (GX 124), which was not provided for
in the ATP budget, but paid for it using CASI funds from a source
independent from the ATP funds, then it would not be intentional
misapplication (as long as it was not a personal purchase and
CASI benefitted from the projector in some way) because the ATP
spending rules did not affect how these non-ATP funds could be

39

spent.  (See Tr. 706).  For this reason, after a lengthy
discussion at the charging conference, the Court included the
word "grant" in the both the short and long descriptions of the
third and fourth elements to clarify that the misapplied money
had to be grant money.  (See Tr. 1193-1220; Ex. F at 18-21).
However, the Court did not include the word "grant" in its
description of the fifth element in recognition of the
Government's point that, even assuming that CASI had independent
non-ATP funds to draw from (i.e., the defendant's "emergency
loans" to CASI), the evidence showed that those funds were co-
mingled with the ATP funds; hence, the Government need not trace
dollar-for-dollar the misapplied funds back to the ATP grant
moneys.  (See Tr. 1211-1231; Ex. F at 18, 21-22).

        Under these jury instructions, if the evidence at trial
showed that the expenditures that the Government alleged were
unallowable under the ATP grant rules were paid for using funds
that were entirely separate from the ATP funds, then that would
not establish intentional misapplication, as explained in the
third element.  However, if the evidence showed, as it in fact
did, that the improper expenditures were paid for using a co-
mingled source of funds that included ATP funds and other non-ATP
funds (GX 110, 112-13; Tr. 973-75),[10] that would establish

_____

        [10]    The only non-ATP funds in the CASI bank accounts that
are identified by the defendant – his loans to CASI and his
unclaimed salary in Year One of the grant – are discussed below

intentional misapplication, but the Government would not have to trace the misspent funds dollar-for-dollar back to the federal grant moneys, as explained in the fifth element. Accordingly, the Court's instructions with respect to the third and fifth elements were consistent and appropriately did not incorporate a tracing requirement as part of the Government's burden of proof.[11] Moreover, the jury instructions adhered to the reasoning of the case law in this area which recognized that Section 666 had been specifically designed to eliminate a tracing requirement to address this very issue of co-mingling of funds, which had frustrated attempts to prosecute these crimes under pre-existing statutes. See Coyne, 4 F.3d at 109; Westmoreland, 841 F.2d at 576-77.

### 2. The Defendant Was Not Prejudiced By The Jury Instructions

Not only were the jury instructions correct on the law, but the defendant cannot establish that he was prejudiced by the lack of a tracing requirement. As discussed above, the evidence at trial clearly established that, on net, CASI had no other source of funds aside from the ATP funds. The Chase Bank records

---

in subsection 2.

[11]    The jury instructions were also consistent with the Court's original formulation of these issues prior to trial, as cited in the defendant's brief. (See Br. 18) (citing Tr. 10) ("I don't think you have to trace the amount, but I think you have to show that the expenditure was made by using [grant] funds.").

41

from the CASI company accounts and the testimony of Belinda Riley
established that, with the exception of approximately $1,170 in
refund checks in Year Two of the grant, the ATP grant funds were,
on balance, the only source of funds for CASI.  (GX-112, GX-113;
Tr. 517, 519, 543, 548-49).  This was corroborated by both Lee
Gurfein and Robert Benedict, who testified that CASI had no other
funds besides ATP funds.  (Tr. 645, 976, 988, 1052).  The
defendant points out that made several transfers from his
personal account to CASI's business accounts (GX 110, at 38 of
44; at 32 of 37) and did not claim a portion of his first year
salary (GX 110, at 39 of 44).  (See Br. 17).  However, these
"contributions" were far outweighed by the personal loans and
other disbursements that he paid himself out of the CASI business
accounts (GX 110, at 38 of 44; at 32 of 37), and therefore did
not, on net, add any funds to these accounts.

Taking Year One of the grant as an example, the
defendant transferred $37,000 from his personal account to CASI's
business account and accepted only $35,293 of his approved salary
of $175,000.  (GX 110, at 38-39 of 44).  Assuming, arguendo, that
these could both be considered non-ATP funds and therefore not
subject to the grant requirements,[12] the defendant's total

_____

[12]    The Government disputes that the defendant's unclaimed
salary qualifies as a separate source of funds that would not be
subject to the ATP spending requirements.  The Government does
not dispute that once ATP funds are paid out as salary, those
funds are no longer subject to the ATP spending restrictions and

42

"contribution" to CASI in Year One of the grant was $176,707.
However, the defendant also made CASI lend him $129,850 and pay
him $60,000 in rent over course of Year One of the grant (GX 110,
at 38-39 of 44), for a total of $189,850.  In other words, the
defendant took more money out of the CASI bank accounts than he
put in.  Even if the rent payments were treated separately, the
defendant's total "contribution" to CASI in Year One would be
$46,857 ($176,707 - $129,850).  If the entire $46,857 were put
towards the $60,000 of rent payments for Year One of the grant,
that would still leave $13,143 of rent payments that were paid
for using ATP funds.  Accordingly, even taking into account the
defendant's so-called "contributions" to CASI, ATP funds had to
have been used to pay for disallowed expenditures, rendering the
tracing issue moot.[13]

        Furthermore, the defendant's argument that the omission
of a tracing requirement from the jury charge caused the
Government to alter its Government's theory of the case is simply
false.  (See Br. 17-19).  As is evident from the Government's
request to charge, which was submitted to the Court well before

---

the recipient is free to spend the money as he chooses.  However,
if certain ATP funds are budgeted for salary, but are never paid
out as such, those unclaimed funds are simply surplus ATP funds
and remain subject to the grant requirements.

        [13]    This example highlights the problem of tracing co-
mingled funds, and perfectly illustrates why Congress decided not
to include a tracing requirement in Section 666.

trial, the Government maintained from the beginning that it did not need to show that the misapplied funds were directly traceable back to the federal grant moneys. (Government's Request to Charge at 10-11, attached as Ex. G). The Court's comment just prior to the start of the trial that it did not think the Government had to "trace the amount," but did have to show that "the expenditure was made using [grant] funds," did not alter the Government's conception of its burden of proof. (Tr. 10). Indeed, the Government maintained that there was no tracing requirement and that the jury should be so instructed, but that in this case it did not matter because virtually all of the CASI funds were ATP funds. (Tr. 9-10). Hence, the opening and closing statements were entirely consistent with the Government's theory of the case, which remained constant throughout the course of the trial.

Accordingly, the defendant cannot claim that the jury instruction prejudiced him in any way. A new trial is therefore unwarranted.

### 3.    Letting The Verdict Stand Would Not Result In "Manifest Injustice"

For the reasons discussed above, it cannot credibly be asserted that allowing the verdict to stand would result in "manifest injustice." Furthermore, two additional points undermine the defendant's claim that he should be granted a new trial in the interests of justice. First, although the defendant

44

claims that the jury charge was incorrect and conflicting, he did
not provide the Court with an alternative jury instruction that
he found satisfactory.  See United States v. Torres, 845 F.2d
1165, 1171 (2d Cir. 1988) (noting that the defendant did not
submit proposed language for a requested jury charge and
therefore the court could not evaluate whether it accurately
reflected the law).

Second, defense counsel flip-flopped his position about
the need for a tracing requirement.  At first, defense counsel
had no objection to the proposed jury charge, agreeing that it
did not need to include a tracing requirement and that he would
not press that argument in summation.  (Tr. 1214) ("Judge, [the
Government has] no concern, because I'm not going to argue it.
I'm not going to argue tracing of funds and what have you.").
Only minutes later, defense counsel abruptly changed his position
in midstream after "reconsidering" the issue, and for the first
time argued that tracing was required.  (Tr. 1223-34).  Despite
his new position, when the final jury charge was handed out to
the parties and the Court noted that it had included language
about the fungibility of money in the fifth element, defense
counsel did not object (Tr. 1257), nor did he object at the close
of the jury charge when the Court asked the parties if they had
any further objections to the charge as read.  (Tr. 1364).  Under
these circumstances it can hardly be said that the jury charge

45

was so defective that it would be "manifest injustice" to allow the defendant's guilty verdict to stand.

<div align="center">CONCLUSION</div>

For the foregoing reasons, the evidence is more than sufficient to support the jury's guilty verdict. Accordingly, the defendant's Rule 29 motion should be denied.

Dated:    New York, New York
          July 21, 2008

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

By: _____
    Christian R. Everdell
    Chi T. Steve Kwok
    Assistant United States Attorneys
    Tel: (212) 637-2556/2415
    Fax: (212) 637-2937

## CERTIFICATE OF SERVICE

CHRISTIAN R. EVERDELL deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York.

That on July 21, 2008, he caused to be served a copy of the foregoing Government's Memorandum of Law in Opposition to Defendant's Motion for a Judgment of Acquittal and for a New Trial by Federal Express on:

> Ronald Rubinstein, Esq.
> Rubinstein & Corozzo, LLP
> 260 Madison Avenue, 22nd Floor
> New York, NY 10016
> (917)626-8003

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. Section 1746.

CHRISTIAN R. EVERDELL

Executed on:    July 21, 2008
                New York, New York