UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
UNITED STATES OF AMERICA                          :

    -against-                                           :        S2 07 Cr. 541 (RPP)

DANIEL B. KARRON                                        :

                                          :
-----------------------------------------------------------------------X


DEFENDANT DANIEL B. KARRON'S MEMORANDUM OF LAW
IN REPLY TO GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL
AND FOR A NEW TRIAL


RONALD RUBINSTEIN
Attorney for Daniel B. Karron
Rubinstein & Corozzo, LLP
260 Madison Avenue, 22nd Fl.
New York, New York 10016

## TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

I. RULE 29: MOTION FOR A JUDGMENT OF ACQUITTAL . . . . . . . . . . . . . . . . . . . . . . .1

    A. The ATP Rules were never simple and clear. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

    B. ATP chose to fund cooperative agreement over grants and contracts so ATP could
       exercise appropriate oversight of projects and also link ATP-funded projects to ongoing
       research and develop at NIST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    C. The Government equated "cooperative agreement" with "grant" in prosecuted Dr.
       Karron. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    D. The defendant was denied his right to administrative review. . . . . . . . . . . . . . . . . . . . . . . . .6

    E. No reasonable jury could convict based upon the lack of credible expert testimony. . . . . . .9

II. RULE 33: DEFENDANT'S MOTION FOR A NEW TRIAL. . . . . . . . . . . . . . . . . . . . . . . . .10

    A. The absence of a tracing requirement in the jury instructions confused the jury as to what
       were ATP funds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    B. The lack of credible expert testimony warrants a new trial. . . . . . . . . . . . . . . . . . . . . . . . . .12

    C. The Court improperly charged the money misapplied was grant money and not money
       received under a cooperative agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    D. 18 U.S.C. § 666 was designed to protect the integrity of the vast sums of money
       distributed through Federal programs from theft, fraud, and undue influence by
       bribery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    E. The jury instructions elevated mismanagement to criminal misapplication. . . . . . . . . . . . .15

    F. The failure to follow an administrative budget is not a crime subject to criminal
       prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA    :

  -against-         :   S2 07 Cr. 541 (RPP)

DANIEL B. KARRON      :


               :
------------------------------------------------------------------X

### DEFENDANT DANIEL B. KARRON'S MEMORANDUM OF LAW IN REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S RULE 29 MOTION FOR A JUDGMENT OF ACQUITTAL AND RULE 33 MOTION FOR A NEW TRIAL

### INTRODUCTION

Daniel B. Karron submits this memorandum of law in reply to the Government's

opposition to defendant's previous Rule 29 motion for a judgment of acquittal and Rule 33

motion for a new trial.[1]

### RESPONSE

### I. RULE 29: MOTION FOR A JUDGMENT OF ACQUITTAL

"Under [Fed.R.Crim.P.] 29, a district court will grant a motion to enter a judgment of

acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could

have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson,* 335 F.3d

170, 180 (2d Cir. 2003). Here, no rational trier of fact could have found beyond a reasonable

doubt that Dr. Karron intentionally misapplied federal funds. No funds were misappropriated

because CASI's budget was never set in stone. Both the ATP rules and the Code of Federal

Regulations provided for flexibility in the budget, and lastly, Dr. Karron had a reasonable

---

[1] *"Gov. Memo."* refers to the Government's memorandum of law in opposition to defendant's Rule 29 motion for a judgment of acquittal and Rule 33 motion for a new trial; "*Def. Memo.* refers to defendant's original Rule 29 and Rule 33 submissions; "GX" refers to Government Exhibit, and "Tr." refers to the trial transcript.

expectation under the law to believe that any and all budgeting mistakes would be subject to a final audit-resolution whereby it could be determined what, if anything was not allowed.

When the Department of Commerce began its investigation of Dr. Karron and usurped his expectation and right to administrative review, it embarked on an impossible prosecution. Then the Government mistakenly prosecuted Dr. Karron under a strict liability theory of intent, prosecuting him as though he received a *grant* with a budget set in stone and not a *cooperation agreement*. The latter, as shown below, involved substantial involvement on the part of the executive agency, which ensured administrative review of any enforcement action taken against the recipient.

Thus, because Dr. Karron accounted for all the money he received, showing he simply failed to follow a budget, does not and cannot provide evidence beyond a reasonable doubt he intentionally misapplied funds given the administrative procedures in place for the review of any and all spending under the cooperative agreement. Since the Government prevented the administrative review process from taking place, it is uncertain whether any of Dr. Karron's actions could have been considered misappropriation. Whether Dr. Karron knowingly disagreed with his employees or even those working at ATP makes no difference given he had every right to disagree with those around him until the audit resolution became final.[2]

A.  The ATP Rules were never simple and clear.

The Government claims the rules of the federal grant were clear and simple and that "ATP-specific rules trump[ed] less stringent generic regulations contained in the Code of Federal

---

[2] The jury instruction for the third element substantially read "[i]n this case, to intentionally misapply money means to intentionally apply the grant money received by CASI in a manner which the defendant *knew was unauthorized* under the terms and conditions of the grant … That is, the defendant's misapplication must have been the product of the defendant's *conscious objective to spend the money for an unauthorized purpose*, rather than the product of mistake or accident or some other reason" (*emphasis added*). Here, what expenses were or were not unauthorized was subject to review during the final audit-resolution, which the defendant anticipated, but never took place. Furthermore, the instruction assumed it was a grant and not a cooperative agreement. There was never a definition given to the jury distinguishing grants from cooperative agreements.

Regulations." *Gov. Memo.* at 3. The government cited the testimony of Hope Snowden. Tr. 299

("Your ATP rules supersede all other rules because they're program specific rules."). However,

the Government cites no legal authority for the proposition ATP rules trump the Code of Federal

Regulations, which if accurate, would lead to the absurd result whereby ATP grants could be

required to be administered in a manner inconsistent with the Code of Federal Regulations.

Moreover the Government took the position at trial that proof of Dr. Karron's non-compliance

with the Code of Federal Regulations was evidence of criminal liability.

First, the ATP rules were never clear and simple. When explaining how the slide

materials were prepared, Betty Joyce Lide explained that it was a team collaboration. "Two of us

are from Advanced Technology Program, one of us is from the grants office; and because we

have different knowledge of parts of this grants, we all put these slides together with our

knowledge. Tr. 238. She further conceded: "[i]t is our responsibility to the best of our knowledge

to understand the rules and criteria and to advise our recipients, and when in doubt our expert is

our grant *specialist* who works with us on the project." Tr. 244. Thus, the simple and clear ATP

rules required a team of practitioners in the field working to the best of their knowledge along

with a *specialist* to understand them (*emphasis added*).

Second, it is illogical to assume as the Government has that ATP-specific rules trump the

Code of Federal Regulations and the United States Code of Law. While it may be true that

administrative rules and more specifically, internal department guidelines are more specific to a

task and supply the day to day requirements and objectives of an organization, they are not the

law, because only the legislative branch of government can pass laws. GX 2 "General Terms and

Conditions Advanced Technology Program (ATP)" dated August 2001 purportedly lists the

hierarchy of referenced requirements beginning with the statute and ending with the ATP preparation kit:

> [t]he ATP Statute, 15 U.S.C. Sec. 278n; the ATP Rule, 15 CFR Part 295; the ATP Notice of Availability of Funds, 66 Fed. Reg. 96 (January 2001); and the ATP Proposal Preparation Kit (November 2000) are hereby incorporated into the award by reference.

B. **ATP chose to fund cooperative agreements over grants and contracts so ATP could exercise appropriate oversight of projects and also link ATP-funded projects to ongoing research and develop at NIST.**

The purpose of the Advanced Technology Program (ATP) was to assist United States businesses with research and the development of high risk, high pay off emerging and enabling technologies. 15 C.F.R. 295.1 (2008). ATP was authorized to provide three types of funding: Grants, cooperative agreements, and contracts. ATP chose *cooperative agreements* over grants and contracts so ATP could exercise appropriate oversight of projects and also link ATP-funded projects to ongoing research and development at the National Institute of Standards and Technology (NIST). *Id* (*emphasis added*).

C. **The Government equated "cooperative agreement" with "grant" in prosecuting Dr. Karron.**

The Government's case was presented on the mistaken belief that Dr. Karron received a grant and not a cooperative agreement. *Gov. Memo.* at 2. Therefore, the Government's claim that whether or not Dr. Karron believed his decisions would be subject to an audit review process makes no difference with respect to whether he intended to misappropriate funds is misplaced. *Gov. Memo.* at 25.[3]

---

[3] The Government erroneously claims "the crime of misapplication is complete once the defendant misapplied $5,000 or more of federal funds and did so with the requisite intent ... Because none of the elements of the crime is conditional on what may or may not happen in a later administrative proceeding, this argument is, quite simply, beside the point." Yet, whether money was misapplied was to be determined at the audit resolution, which occurs only after the funds are applied.

The Government erroneously claims what may or may not have happened at a later administrative proceeding is beside the point. However, what may or may not have happened at the later administrative proceeding is the distinction between a grant and a cooperation agreement, and whether Dr. Karron was authorized or unauthorized to take the actions he did. Dr. Karron believed he was authorized according to the cooperation agreement to work with ATP on matters pertaining to the budget until all questions were finally resolved at the audit-resolution. For example, Dr. Karron had continuous discussions with NIST over the payment of utility bills. Tr. 780. The Government agues Dr. Karron would be criminally liable even if ATP had agreed with his expenditures at the audit resolution. Yet, 15 C.F.R. 14.4 provides "exceptions would be addressed on a case-by-case basis." Tr. 746.

The clear distinction between a grant and a cooperative agreement, which Dr. Karron understood, is the former requires no substantial involvement from the grantor while the latter does. The term grant means:

> a Federal assistance instrument used whenever the principal of the relationship between the Federal Government and the recipient is the transfer of money, property, services, or anything of value to the recipient in order to accomplish a public purpose of support or stimulation authorized by Federal Statute, rather than acquisition by purchase, lease, or barter, of property or services for the direct benefit or use of the Federal Government; and *no substantial involvement* is anticipated between the executive agency, acting for the Federal Government, and the recipient during performance of the contemplated activity.

15. C.F.R. 295.2 (f) (*emphasis added*)

The term cooperative agreement means:

> a Federal assistance instrument used whenever the principal purpose of the relationship between the Federal Government and the recipient is the transfer of money, property, or services, or anything of value to the recipient to accomplish a public purpose of support or stimulation authorized by Federal statute, rather than

5

> acquisition by purchase, lease, or barter, of property or services for
> the direct benefit or use of the Federal Government; and
> *substantial involvement* is anticipated between the executive
> agency, acting for the Federal Government, and the recipient
> during performance of the contemplated activity.

15 C.F.R. 295.2 (c) (*emphasis added*)

Therefore, if this were a grant and money was allocated for specific purposes, i.e. the

budget, and arguendo, the monies were not spent as specifically provided for in the budget, the

Government's argument would have some merit. However, a cooperative agreement involves

substantial involvement between the executive agency and the recipient and therefore, provides

for a flexible budget subject to revision either before,[4] or after money is spent,[5] and also provides

for an administrative review process. Quite simply, one cannot misapply money knowing the

question of allowability would be determined subsequently.

D. The defendant was denied his right to administrative review.

The government claims the administrative appeals process provided for under the Code

of Federal Regulations was not available to the defendant because no administrative enforcement

action was ever taken. *Opp. Memo.* at 26. The government claims the grant was suspended, not

because of an administrative enforcement action, but because an Indictment was returned by a

Grand Jury. *Id.* The Government is mistaken on both grounds. One, Betty Joyce Lide stated the

grant was suspended June 27, 2003, effective immediately, and cited GX 26 amendment 6. *See*

---

[4] The government states that ATP funds could not be used to pay for sunk costs – i.e. "costs incurred before the start of the ATP grant period." *Gov. Memo.* at 5. However, 15 C.F.R. 14.25 (e) (1) states that "[a]ll pre-award costs are incurred at the recipient's risk (i.e., the DOC is under no obligation to reimburse such costs if for any reason the recipient does not receive an award or if the award is less than anticipated and inadequate to cover such costs). In other words, "sunk costs" are only sunk and non-repayable if for some reason the recipient does not actually receive the award or the amount expected. Clearly, the governing principle is if you spent money before it was approved you did so at your own risk and the penalty is civil; to wit, repayment.

[5] *See* Tr. 193 (Betty Joyce Lide explained the information package given at the kick-off meeting on November 8, 2001, provided for the submission of a revised budget at the close of the fiscal year after all of the costs were reviewed).

Tr. 149. *See also* testimony of Hope Snowden and Belinda Riley, Tr. 408-409, 509, respectively.

Two, the defendant was indicted June 13, 2007, almost four years later. *See* Exhibit A annexed

hereto as "GX 26 Amendment 6" and Exhibit B annexed hereto as "Indictment dated June 13,

2007."

 The defendant was denied the fair opportunity to appeal from the enforcement action

taken June 27, 2003. According to 15 C.F.R. 14.62 (a), "[i]f a recipient materially fails to

comply with the terms and conditions of an award … the Grants Office may … take one or more

of the following actions, as appropriate in the circumstances:"

> (1) Temporarily withhold payments of funds pending correction of the deficiency by the recipient or more severe enforcement action by the Grants Officer *after coordination* with the DoC operating unit.

> (2) Disallow (that is, deny both use of funds and any applicable matching credit for) all or part of the cost of the activity or action not in compliance.

> (3) Wholly or partly suspend or terminate the current award.

> (4) Withhold further awards for the project or program.

> (5) Take other remedies that may be legally available.

> (b) *Hearings and appeals*. In taking an enforcement action, the awarding agency *shall* provide the recipient an opportunity for hearing, appeal, or other administrative proceeding to which the recipient is entitled under any statute or regulation applicable to the action involved (*emphasis added)*.

 Here, as stated in Amendment 6, pursuant to 15 C.F.R. 14.62 (a) (1) and (2), the award

was suspended "until Recipient provide[d] evidence, satisfactory to the Grants Officer that it

[was] in full compliance with Special Award #7."[6] However, on October 1, 2004, sixteen

months after the initial suspension, all NIST personnel were ordered via the Department of

---

[6] 15 C.F.R. 14.62 (a) (3) also provides for termination of the grant. This grant was never terminated.

Commerce to cease contact with Computer Aided Surgery pending a grand jury investigation. Tr. 242. Furthermore, that correspondence made it apparent that neither CASI nor Dr. Karron would be afforded the opportunity to have a hearing, appeal, or administrative proceeding to address the audit resolution as mandated by the Code of Federal Regulations. Special Agent Garrison stated:

> Additionally please do not proceed with the audit resolution for CASI. It is extremely important that a bill not be generated for the funds that CASI misappropriated from the award.

*Id.*

Here, the Department of Commerce and later the Department of Justice arbitrarily usurped ATP's presence in violation of 15 C.F.R. 14.62 (a) (1), which required coordination between the DoC and the grant's office before more severe enforcement action could be taken. What began as a "cooperative agreement" became uncooperative and the substantial involvement on the part of one executive agency (ATP) was usurped by another, The Department of Commerce, which ensured no cooperation would take place and no administrative due process would be afforded to CASI as mandated under the Federal Code of Regulations.

In summary, the ATP Rules were not clear and simple. Second, the ATP Rules do not supersede the Code of Federal Regulations. Third, the expenditures were to be reviewed during an audit-review and appeals process, which improperly was never afforded to defendant. Had ATP approved of Dr. Karron's expenses via the audit resolution process, which he was entitled to under C.F.R. 14.62 (b), an indictment would have not been sustained. The failure to allow the administrative procedure to run its course deprived Dr. Karron of demonstrating his lack of intent to misappropriate federal money. Dr. Karron believed he was entitled to administrative

review of his decisions, [7] and that failure to adhere to ATP Rules would lead only to civil

sanctions.[8] As such, no reasonable trier of fact could have found sufficient evidence that Dr.

Karron intended to misappropriate federal funds.

E. No reasonable jury could convict based upon the lack of credible expert testimony.

As explained further in Section II B of this reply, the Government relied upon inaccurate

and faulty financial analysis of agent Reilly, who admittedly did not do a bank reconciliation.

Reilly's analysis reflected in GX 110 pg. 38 of 44 is two fold. First, she analyzed money

received by Dr. Karron either as salary or loans, amounting to $129,850. However, more than

half of this category resulted from a $75,000 loan (salary advance) taken by Dr. Karron soon

after receiving the ATP funds in October 2001.

This loan was converted to salary on August 2, 2002, and on September 30, 2002, prior to

the end of the first fiscal year. On August 2, 2002, payroll tax was paid and a net payroll check

was issued in the amount of $5,675. The balance of $75,000 was converted to salary on

September 30, 2002. *See* Exhibit C annexed hereto "General Journal Transaction dated

September 30, 2002) (Excerpt from Defense Trial Exhibit FFF). The Government's auditor never

---

[7] The Government cited several emails between Frank Spring and Dr. Karron to support its view that Dr. Karron intentionally misappropriated grant money:

> [T]he defendant again told Spring he did not know what he was doing and that the defendant "would have meetings with ATP managers to clear up all of these matters" "Please, you are not to make interpretations as to allowability or category."

Tr. 843 and GX 147. *Gov. Memo.* 13 – 14.

What these correspondences show is that Dr. Karron, as CEO of CASI, disagreed with the opinions of his employees and felt strongly he could resolve any budget problems via the audit resolution process entitled to him under 15 C.F.R. 14.62 (b).

[8] When warned by Robert Benedict about the potential of having some of his budget disallowed, Dr. Karron told Benedict "don't worry about it, my mom's got it." Tr. 997. This correspondence and the others show at every step of the way, Dr. Karron as CEO and chief decision-maker for CASI, was prepared to own up to any of the budgeting mistakes made if they could not be reconciled during the audit-resolution process as called for under the cooperative agreement.

credited Dr. Karron with these repayments. Furthermore, a number of items listed as loans were in fact reimbursements to Dr. Karron for allowable expenses credited to his MasterCard (Defendant's trial Exhibit ZZZ-1). *See also* Exhibit D attached hereto as "Register Report 2." In light of the foregoing, no reasonable trier of fact could have found guilt beyond a reasonable doubt in reliance upon the insufficient credible evidence adduced at trial.

## II. RULE 33: DEFENDANT'S MOTION FOR A NEW TRIAL

A court must "look to the 'charge as a whole' to determine whether it 'adequately reflected the law' and 'would have conveyed to a reasonable juror' the relevant law." *United States v. Mulder,* 273 F.3d 91, 105 (2d Cir. 2001) *quoting United States v. Jones,* 30 F.3d 276, 284 (2d Cir. 1994). Here, however, such a review of the jury instructions does not convey to a reasonable juror the relevant law. As discussed in greater detail in the original submission, the third and fifth elements charged were ambiguous and contradictory. On the one hand, the third element suggests the money intentionally misapplied had to be grant money. On the other hand, the fifth element states the government did not have to prove the particular money misapplied was grant money.

A. <u>The absence of a tracing requirement in the jury instructions confused the jury as to what were ATP funds.</u>

The Government argues if tracing was required the verdict would still be the same. *Gov. Memo.* at 44. The Government claims all funds expended by CASI were ATP funds and the defendant contributed no other funds. *Id.* at 41. Hence, the tracing issue is moot because the defendant's contribution did not cover the rent expenses. *Id.* As explained in counsel's original submission, this is factually erroneous. *Def. Memo.* at 8.

In addition, the Government disputes defendant's unclaimed salary qualifies as a separate source of funds. *Gov. Memo.* at 42, footnote 12. The Government argues an anomaly. Taxes

were paid on this salary. If the defendant receives a salary check the money is not attributable to ATP funds but if there is a bookkeeping entry showing the defendant received salary but no check is issued (defendant converted prior loan into salary) then the money spent is ATP money and not the defendants. This is the problem with the charge. The charge leads to confusion as to what are ATP funds and when does money cease being ATP funds. The jury may have believed that salary whether paid or applied was still ATP funds. The Court recognized the spending restrictions placed on ATP grant funds extended only to those funds; not to money CASI had from other sources. There can be no intentional misapplication of funds unless the defendant misspent ATP funds. *See Gov. Memo.* at 39 ("The Court determined that there could be no intentional misapplication of funds unless the defendant misspent the ATP funds").

B. The lack of credible expert testimony warrants a new trial.

The Government's expert, Belinda Riley, never reconciled CASI's books,[9] and Dr.

Karron was never afforded credit for many of his contributions to CASI. For example, while GX

110 provided for loans Dr. Karron gave to CASI, it did not show contributions Dr. Karron made

to ATP funds when he withheld salary near the end of the first fiscal year. GX 110 pg. 38 of 44.

Dr. Karron's last paycheck (check 10401) issued 8/13/02 was for $5,675.03. GX 110 pg. 39 of

44. This check represented the amount received out of $30,000 net salary. For that payroll period

Dr. Karron paid $30,029.74 in Federal Employment Tax (check 10402) and $6,880.66 in NYS

Employment Tax (check 10403) *See* GX 110 pg. 13 of 44 and pg. 11 of 44 respectively.[10] Then

---

[9] *See* Tr. 473 – 474; 712 – 713.

> Q. Yes. There were checking accounts, CASI had a number of checking
> accounts, did it not?
> A. Yes.
> Q. Did you do a bank reconciliation of the various bank accounts of CASI?
> A. For this, for this audit?
> Q. Right.
> A. No.

Tr. 473 – 474.

> Q. Didn't you tell us yesterday that you relied upon the books and records that
> you received from CASI and Ms. Hayes?
> A. For the June 2003 report, the short report, I relied on the records that were
> submitted in June. For the December report I relied on the books and records
> submitted by Mr. Spitz in December. On some of the things I might have looked
> back to see, if I needed additional clarification, how they were booked, because
> the check registers provided by the June 2003 records were – you know, I didn't
> question whether Dr. Karron's books paid the person that these checks were
> written to; it was just the allocation of the cost between the budget categories.
> Q. Are you saying that the reports that Mr. Spitz presented to you were different
> than the financial reports that you had previously received from CASI?
> A. Certain of the budget categories were different. The personnel categories
> should have been similar.
> Q. Well, was it?
> A. I didn't reconcile between the two sets of books. I used the ones submitted by
> Mr. Spitz December 2003 for that report. The cost claimed on the December
> 2003 report reconciles back to the Mel Spitz books.

Tr. 712 – 713.

[10] Note all checks, 10401, 10402, and 10403 were written the same day.

on 9/30/02 the remainder of the loan was adjusted as salary and Dr. Karron forwent a salary of $37,334.19. *See* Exhibit C.[11] These contributions were never accounted for by the Government since no check was traceable to money withheld by Dr. Karron.[12] Likewise, after the grant was suspended, Dr. Karron deposited $60,000 into the CASI account because many CASI expenditures were due when the grant was suspended. Betty Joyce Lide verified this information from the ATP file. Tr. 172.

The Government never accounted for all of CASI's expenditures. Neither the Government nor its auditor considered Defense Exhibit ZZZ-1, Dr. Karron's MasterCard statements when conducting the audit. Dr. Karron charged various business expenses on his MasterCard including fees for office depot, homefront true value, Kip's Bay Optical, Duane Reed, New York Sports Club, Data Vision NY, etc. Many of these charges were reimbursable under budgeted categories including equipment, other, or fringe benefits. Exhibit D. As the third element of the jury instructions read, "[m]isapplication of money, however, does not apply to bona fide salary, wages, fringe benefits, or other compensation paid, or expenses paid or reimbursed, in the usual course of business. The Government's auditor never accounted for these expenses, many of which were repaid but classified as loans by Belinda Reilly. E.g., *See* GX 110 pg. 38 of 44. Because the Government never reconciled CASI's accounts and was also not required to trace how money was spent or credited, the jury did not consider many of the

---

[11] GX 81 supports this analysis. GX 81 shows CASI check 10490. GX 110 pg. 12 of 44 shows check 10490 in the amount of – $18, 899.62 payable to Chase Manhattan Bank for federal withholding taxes. GX 110 pg. 10 of 37 shows CASI check 10491 written 9/30/02 in the amount of $-6,582.00. Defense Trial Exhibit FFF reflecting the General Journal Transaction dated September 30, 2002, shows a NYS Employment Tax paid in the amount of $6,582.00; precisely the amount of CASI check 10941.

[12] *See* GX 110 pg. 39 of 44. Despite a budged $175,000 salary according to Belinda Reilly, Dr. Karron was only paid $35,293.58, which did not include the loan amounts converted to salary in the amount of $61, 659.16. *See* Exhibit C; $30,000 on August 2, 2002 minus the net salary check of $5,675.03 on August 13, 2002, = $24, 324 plus the $37,334.19 transferred on September 30, 2002 for a total net salary of $96,952.74.

contributions Dr. Karron made to CASI and reimbursements CASI made to him. Had the jury

instructions required this proof, it would have changed the outcome of the trial.

C. The Court improperly charged the money misapplied was grant money and not money received under a cooperative agreement.

The Court improperly charged grant funds instead of funds received as part of a

cooperative agreement. The jury instruction for the fifth element substantially read:

> so long as you find that each act of intentional misapplication was
> part of a single scheme by the defendant to misapply *grant money*
> under the care, custody, and control of casi. The government does
> not have to prove that the particular *money misapplied* by the
> defendant was the money received by CASI as a *federal grant*. In
> other words, it is not necessary for the government to show that the
> intentionally misapplied money was traceable to the actual *federal
> grant received* by the organization. Thus, if the government
> establishes that CASI received more than $10,000 in federal aid
> during a one-year period, and that, during that period, the
> defendant misapplied funds valued at more than $5,000 under the
> care, custody, and control of CASI, the government will have
> satisfied its burden with respect to this element. Money is fungible,
> and the government need not trace the $5,000 or more alleged to
> be intentionally misapplied back to the *federal grant*

*See Def. Memo*. at 16 (emphasis added).

D. 18 U.S.C. § 666 was designed to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery.

In *Sabri v. United States,* the United States Supreme Court explained the purpose of §

666:

> For those of us who accept help from legislative history, it is worth
> noting that the legislative record confirms that § 666 (a)(2) is an
> instance of necessary and proper legislation. The design was
> generally to "protect the integrity of the vast sums of money
> distributed through Federal programs from theft, fraud, and undue
> influence by *bribery*," See S. Rep. No. 98-225, p 370 (1983), in
> contrast to prior federal law affording only two limited
> opportunities to prosecute such threats to the federal interest: 18
> U.S.C. § 641, the federal theft statute, and § 201, the federal
> bribery law. Those laws had proven inadequate to the task. The

14

former went only to outright theft of unadulterated federal funds, and prior to this Court's opinion in *Dixson v. United States,* 465 U.S. 482 (1984), which came after passage of § 666, the bribery statute had been interpreted by lower courts to bar prosecution of bribes directed at state and local officials. Thus we said that § 666 "was designed to extend federal bribery prohibitions to *bribes* offered to state and local officials employed by agencies receiving federal funds (citations omitted) (*emphasis added*).

541 U.S. 600, 606 – 607 (2004).

E.   The jury instructions elevated mismanagement to criminal misapplication.

Here, the facts are different from those in *Sabri* and are unlike any other case prosecuted before it under 18 U.S.C. § 666.[13] 18 U.S.C. § 666 was a "catch-all" statute designed to "extend federal bribery prohibitions to *bribes* offered to state and local officials employed by agencies receiving federal funds." *Id* (*emphasis added*). The prosecution of Dr. Karron had nothing to do with the provisions of 18 U.S.C. § 666, which was to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." *Id.* Here, Dr. Karron was accused of misappropriation; not theft, fraud, bribery or improper influence.

F.   The failure to follow an administrative budget is not a crime subject to criminal prosecution.

At the close of the evidence, defense counsel cited *United States v. Thompson,* 484 F.3d 877 (7th Cir. 2007) to aid the court at arriving at the appropriate Rule 29 resolution of this matter. Tr. 1233-1234. In *Thompson,* which was decided after *Sabri,* the defendant presided over a bidding contest for selection of a travel agency to handle about 40% of Wisconsin's annual travel budget. 484 F.3d at 878. Wisconsin had elaborate regulations in place for the bidding selection. *Id.* Ultimately, Thompson was accused of not adhering strictly to the state's regulations and steering the winning bid. The prosecutor maintained that "Thompson deflected the decision from

---

[13] Counsel has not found any cases of criminality by receipt of ATP funds under a cooperative agreement or grant.

the one that should have been made under the administrative process," and that the knowing

deviation from state procurement rules was a federal felony, no matter why the employee chose

to bend the rules, as the employee gained in the process. *Id.*

The Seventh Circuit reversed Thompson's conviction. The court reasoned:

> [A]n error-even a deliberate one, in which the employee winks at
> the rules in order to help out someone he believes deserving but
> barely over the eligibility threshold—is a civil rather than a
> criminal transgression. Likewise the sin is civil (if it is any wrong
> at all) when a public employee manipulates the rules, as Thompson
> did, to save the state money or favor a home-state producer that
> supports elected officials. Public employees often implement rules
> with which they disagree, and they are tempted to bend these rules
> to achieve what they deem better outcomes. As long as the state
> gets what it contracts for, at the market price, no funds have been
> misapplied, even if the state's rules should have led it to buy
> something more expensive…"

*Id.* at 881.

The lesson the Seventh Circuit imposed was that simple violations of administrative rules

should not become crimes. *Id.* at 883. The court stated: "[h]aziness designed to avoid loopholes

through which bad persons can wriggle can impose high costs on people the statute was not

designed to catch." *Id.* at 884. When forced between a broad reading or a narrow reading of §

666, the Seventh Circuit chose a narrow reading that limited § 666 to theft, extortion, bribery,

and similarly corrupt acts, insisting that the Rule of Lenity provided that ambiguity in criminal

legislation was to be read against the prosecutor. *Id.* at 881.

The question here is whether 18 U.S.C. § 666 was designed to ensnare individuals like

Dr. Karron who failed to follow an administrative budget, and who under the belief his decisions

would be reviewed at the audit resolution, strayed from that budget but met the milestones of

CASI's cooperative agreement. In *Thompson,* the Seventh Circuit could have read "misapplies"

to mean any disbursement that would not have occurred had all state laws been enforced, but it

chose not to read the term so broadly. *Id.* at 881. Likewise, this Court should not read the term "misappropriate" so broadly to mean any disbursement Dr. Karron made above a budgeted category or for questioned items within a budgeted category without considering the unique circumstances relating to CASI and ATP's cooperative agreement. The expenditures were not concealed and there purpose was clearly stated. Dr. Karron arguably believed they were allowed. The final decision on allowability is ATP via the audit-resolution.

Similar to the defendant in *Thompson,* Dr. Karron's actions allowed his company, CASI, to remain intact long enough to achieve the scientific milestones initially enacted under the cooperative agreement.[14] In the instant case, Betty Joyce Lide testified that CASI met its required scientific bench marks with respect to its research. Tr. 190. The sin here, if at all, is civil as it was in *Thompson,* as the Government received its research but then refused to cooperate with Dr. Karron as a result of the Department of Commerce intervention, which cut short the proper civil solution to this matter.

## CONCLUSION

For the reasons set forth above, as well as arguments present on the record, the Court must have a real concern an innocent person may have been convicted. It is respectfully

---

[14] *See* GX 62 Appendix III "Response to Draft Audit Report on Computer Aided Surgery, Inc. Received May 11, 2004," at 11. "The accompanying OIG draft audit report is ignoring additional information on balance sheet type accounts such as inter-company transfers and PI repayment of faulty advances and co-payments separately attached to the consolidated statement of fund receipts and expenditures. (See Exhibit III). The PI requires without question a face to face meeting, where both sides are flexible on settling this matter on an amicable basis acceptable to all. Above all, the research was the main purpose of the project, and should remain so. Unfortunately, ignorance of and inexperience with government grant technical guidelines led to mistakes at the very beginning of the project. These mistakes as to the literal interpretation of program guidelines should not have been allowed to wreck the aim of the project through its suspension. People worked hard, for nothing, and *the government saved a lot of money.* If this work were to be done in a government research laboratory, the cost of the project would have been multiple millions of dollars. Many attempts at revising the budget were met with no response from the NIST ATP sponsor. Our timeline (Exhibit IV) shows that we began this attempt at revision fairly early in the process and our financial appendix (Exhibit I) shows that had the budget been properly adjusted the research results would have come in at an acceptable cost (*emphasis added*).

submitted that this Court grant Dr. Karron's motion in its entirety, enter a judgment of acquittal

as to Count One, or grant the defendant a new trial.

Dated:        New York, New York
              August 15, 2008

                                          Respectfully submitted,


                                          RONALD RUBINSTEIN
                                          Attorney for Daniel B. Karron
                                          Rubinstein & Corozzo, LLP
                                          260 Madison Avenue, 22nd Fl.
                                          New York, New York 10016

**EXHIBIT A**



# SPECIAL AWARD CONDITIONS
## ADVANCED TECHNOLOGY PROGRAM – SINGLE RECIPIENT
## COMPUTER AIDED SURGERY, INC.
## COOPERATIVE AGREEMENT NO. 70NANB1H3050
## AMENDMENT #06

**THE FOLLOWING SPECIAL AWARD CONDITION IS INCORPORATED:**

**12. SUSPENSION**

Pursuant to OMB Circular A-110 Section___.51 and Department of Commerce regulations at 15 CFR sec. 14.62 (a) (1) and (3), this cooperative agreement is suspended effective as of the date of this amendment. Based upon preliminary audit information, you are in non-compliance of Special Award Condition #7 "Cost Share". **No further costs shall be incurred under this award without the express written approval of the NIST Grants Officer, pursuant to 15 CFR sec. 14.62 (c).**

**This award will remain suspended until Recipient provides evidence, satisfactory to the Grants Officer that it is in full-compliance with Special Award Condition #7.**



PRIOR TERMS AND CONDITIONS REMAIN THE SAME.



Special Award Conditions/ATP

B²-16

**EXHIBIT B**

# JUDGE PATTERSON



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                :

                -v.-                    :

                                        :

DANIEL B. KARRON,                       :
                                        07 Cr.
                Defendant.              :

                                        :

- - - - - - - - - - - - - - - - - -x

## COUNT ONE

The Grand Jury charges:

From at least in or about October 2001, up through and including in or about June 2003, in the Southern District of New York and elsewhere, DANIEL B. KARRON, the defendant, being an agent of an organization, which organization received, in any one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, unlawfully, willfully and knowingly, did embezzle, steal, obtain by fraud, and otherwise without authority knowingly convert to the use of persons other than the rightful owner, and intentionally misapply, property valued at $5,000 and more that was owned by, and was under the care, custody, and control of such organization, to wit, KARRON, who was the President and Chief Technical Officer of Computer Aided Surgery, Inc. ("CASI"), knowingly misapplied more than $5,000 in Federal funds from an Advanced Technology Program grant awarded to CASI by the National

Institute of Standards and Technology toward the payment of

unauthorized expenses.

(Title 18, United States Code, Section 666.)

_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

2

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### DANIEL B. KARRON,

Defendant.

## INDICTMENT

07 Cr.

(18 U.S.C. § 666.)

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

Foreperson.

**EXHIBIT C**

3:20 AM
07/10/03
**Accrual Basis**

Computer Aided Surgery Incorporated
General Journal Transaction
September 30, 2002

| Num | Name | Memo | Account | Class | Debit | Credit |
|-----|------|------|---------|-------|-------|--------|
| | Karron, D. B. | Gross salar... | Payroll Expenses | ATP Pr... | 61,918.00 | |
| | Karron, D. B. | FICA | Payroll Expenses | ATP Pr... | 897.81 | |
| | Karron, D. B. | Fed w/holding | Payroll Expense (... | ATP Pr... | | 17,104.00 |
| | Karron, D. B. | Medicare | Payroll Expense (... | ATP Pr... | | 1,795.62 |
| | Karron, D. B. | NYS w/hold... | Payroll Expense (... | ATP Pr... | | 4,351.00 |
| | Karron, D. B. | NYC w/hold... | Payroll Expense (... | ATP Pr... | | 2,231.00 |
| | Karron, D. B. | Net pay, DB... | Salary | ATP Pr... | | 37,334.19 |
| TOTAL | | | | | 62,815.81 | 62,815.81 |
| | | | | | 62,815.81 | 62,815.81 |

**EXHIBIT D**

Register Report:2
9/1/2001 through 8/1/2003

| Date | Account | Num | Description | Memo | Category | Tag | Clr | Amount |
|------|---------|-----|-------------|------|----------|-----|-----|--------|
| **CASI COMMUNICATION TELEPHONE:NIST ATP EXPENSE** | | | | | | | | **-7.00** |
| 10/19/2001 | CHASE MC … | | Cyber Cove | | Travel:comm… | CASI_COMMUNICATION… | R | -7.00 |
| **CASI COMPUTER HARDWARE:NIST ATP EXPENSE** | | | | | | | | **-584.49** |
| 9/17/2001 | CHASE MC … | | Kips Bay Har… | Kips Bay Ha… | Household | CASI_COMPUTER_HARD… | R | -17.29 |
| 9/24/2001 | CHASE MC … | | Kips Bay Har… | keys and bat… | ProfessionalC… | CASI_COMPUTER_HARD… | R | -25.95 |
| 10/9/2001 | CHASE MC … | S | Columbia Ho… | | ProfessionalC… | CASI_COMPUTER_HARD… | R | -500.00 |
| | | | | | Tax:Sales:NYC | CASI_COMPUTER_HARD… | R | -41.25 |
| **CASI COMPUTER HARDWARE PROGRAM:NIST ATP EXPENSE** | | | | | | | | **657.97** |
| 10/10/2001 | CHASE MC … | | American Me… | American M… | ProfessionalC… | CASI_COMPUTER_HARD… | R | 288.00 |
| 10/10/2001 | CHASE MC … | | American Me… | return shippi… | ProfessionalC… | CASI_COMPUTER_HARD… | R | 34.99 |
| 11/1/2001 | CHASE MC … | | Datavision | return mode… | ProfessionalC… | CASI_COMPUTER_HARD… | R | 334.98 |
| **CASI COMPUTER SOFTWARE:NIST ATP EXPENSE** | | | | | | | | **-127.39** |
| 9/24/2001 | CHASE MC … | | Dr *Scansoft… | paperport 8 … | ProfessionalC… | CASI_COMPUTER_SOFT… | R | -49.99 |
| 10/3/2001 | CHASE MC … | | Dr *Symante… | norton syste… | ProfessionalC… | CASI_COMPUTER_SOFT… | R | -77.40 |
| **CASI CONFERENCE** | | | | | | | | **-449.58** |
| 3/20/2003 | CHASE MC … | | Hmshost-Nj-… | to ifge confe… | Travel:toll | CASI_CONFERENCE | R | -7.52 |
| 3/20/2003 | CHASE MC … | | Hmshost-Nj-… | to ifge confe… | Travel:toll | CASI_CONFERENCE | R | -4.85 |
| 3/22/2003 | CHASE MC … | | Hmshost-Nj-… | IFGE Philad… | Travel:toll | CASI_CONFERENCE | R | -5.69 |
| 3/23/2003 | CHASE MC … | | Hilton Philad… | ifge | Travel:hotel | CASI_CONFERENCE | R | -425.29 |
| 3/23/2003 | CHASE MC … | | Hms Host Nj…| ifge | Travel:toll | CASI_CONFERENCE | R | -2.31 |
| 3/28/2003 | CHASE MC … | | Hmshost-Nj-… | Hmshost-Nj-… | Travel:toll | CASI_CONFERENCE | R | -3.92 |
| **CASI ENTERTAINMENT** | | | | | | | | **-44.00** |
| 7/25/2003 | CHASE MC … | | Museum Natl… | David Kerlic…| M & E | CASI_ENTERTAINMENT | R | -44.00 |
| **CASI HEALTH GYM-insurance reimbursable gym fees** | | | | | | | | **-79.00** |
| 9/4/2001 | CHASE MC … | | New York Sp… | Paid Monthl… | Gym | CASI_HEALTH_GYM-insu… | R | -79.00 |
| **CASI MEAL** | | | | | | | | **-18.30** |
| 7/25/2003 | CHASE MC … | | La Bella Pizz… | dr kerlick, m…| M & E | CASI_MEAL | R | -18.30 |
| **CASI MEAL:NIST ATP EXPENSE** | | | | | | | | **-195.30** |
| 9/29/2001 | CHASE MC … | | Mee Noodle … | pre-award jit… | M & E | CASI_MEAL:NIST_ATP_E… | R | -21.40 |
| 10/1/2001 | CHASE MC … | | Mee Noodle … | working wit… | M & E | CASI_MEAL:NIST_ATP_E… | R | -13.95 |
| 11/26/2001 | CHASE MC … | | El Nuevo Flor… | dinner after t…| M & E | CASI_MEAL:NIST_ATP_E… | R | -21.40 |
| 11/28/2001 | CHASE MC … | | Mee Noodle … | Mee Noodle …| M & E | CASI_MEAL:NIST_ATP_E… | R | -9.80 |
| 12/5/2001 | CHASE MC … | | Mee Noodle … | margret dinner| M & E | CASI_MEAL:NIST_ATP_E… | R | -9.15 |
| 1/14/2002 | CHASE MC … | | Mee Noodle … | with Charles…| M & E | CASI_MEAL:NIST_ATP_E… | R | -23.25 |
| 1/28/2002 | CHASE MC … | | Mee Noodle … | Mee Noodle …| M & E | CASI_MEAL:NIST_ATP_E… | R | -8.70 |
| 2/14/2002 | CHASE MC … | | Mee Noodle … | | M & E | CASI_MEAL:NIST_ATP_E… | R | -11.40 |

8/15/2008

Register Report.2
9/1/2001 through 8/1/2003

| Date | Account | Num | Description | Memo | Category | Tag | Clr | Amount |
|------|---------|-----|-------------|------|----------|-----|-----|--------|
| 2/17/2002 | CHASE MC ... | | Mee Noodle ... | | M & E | CASI_MEAL:NIST_ATP_E... | R | -8.70 |
| 2/24/2002 | CHASE MC ... | | Mee Noodle ... | Mee Noodle ... | M & E | CASI_MEAL:NIST_ATP_E... | R | -17.50 |
| 3/17/2002 | CHASE MC ... | | Mee Noodle ... | take out with...| M & E | CASI_MEAL:NIST_ATP_E... | R | -18.65 |
| 5/1/2002 | CHASE MC ... | | Mee Noodle ... | Mee Noodle ... | M & E | CASI_MEAL:NIST_ATP_E... | R | -16.95 |
| 5/29/2002 | CHASE MC ... | | Mee Noodle ... | Mee Noodle ... | M & E | CASI_MEAL:NIST_ATP_E... | R | -7.00 |
| 1/18/2003 | CHASE MC ... | | Mee Noodle ... | Mee Noodle ... | M & E | CASI_MEAL:NIST_ATP_E... | R | -7.45 |
| **CASI OFFICE SUPPLIES:NIST ATP EXPENSE** | | | | | | | | **-91.80** |
| 9/7/2001 | CHASE MC ... | | Office Depot | dds2 tapes | ProfessionalC... | CASI_OFFICE_SUPPLIES:... | R | -43.26 |
| 9/22/2001 | CHASE MC ... | | Office Depot | cell phone p... | Office | CASI_OFFICE_SUPPLIES:... | R | -6.37 |
| 10/6/2001 | CHASE MC ... | S | Office Depot | | Office | CASI_OFFICE_SUPPLIES:... | R | -33.97 |
| | | | | | Tax:Sales:NYC | CASI_OFFICE_SUPPLIES:... | R | -2.80 |
| 10/6/2001 | CHASE MC ... | S | Office Depot | | Office | CASI_OFFICE_SUPPLIES:... | R | -4.99 |
| | | | | | Tax:Sales:NYC | CASI_OFFICE_SUPPLIES:... | R | -0.41 |
| **CASI PARKING** | | | | | | | | **-44.00** |
| 5/1/2003 | CHASE MC ... | | 115 East 87T... | 115 East 87... | Auto:Parking | CASI_PARKING | R | -17.00 |
| 5/4/2003 | CHASE MC ... | | 148 E 33rd St... | 148 E 33Rd ... | Auto:Parking | CASI_PARKING | R | -27.00 |
| **CASI TRAVEL_MEAL** | | | | | | | | **-16.90** |
| 8/1/2003 | CHASE MC ... | | Hms Host-Gs... | Hms Host-G... | Travel:meal | CASI_TRAVEL_MEAL | R | -10.55 |
| 8/1/2003 | CHASE MC ... | | Hms Host-Gs... | Hms Host-G... | Travel:meal | CASI_TRAVEL_MEAL | R | -6.35 |
| **CASI TRAVEL_MISC:NIST ATP EXPENSE** | | | | | | | | **-25.84** |
| 4/12/2003 | CHASE MC ... | | CVS Pharmacy | shampoo, tra... | Travel:misc | CASI_TRAVEL_MISC:NIS... | R | -25.84 |
| **CASI TRAVEL_SUBWAY:NIST ATP EXPENSE** | | | | | | | | **-20.00** |
| 10/31/2001 | CHASE MC ... | | MTA NYC T... | metro card r... | Wages:fringe... | CASI_TRAVEL_SUBWAY... | R | -20.00 |
| **CASI TRAVEL_TAXI** | | | | | | | | **-100.00** |
| 7/22/2002 | CHASE MC ... | | Manhattan Ca... | long beach | Travel:taxi | CASI_TRAVEL_TAXI | R | -100.00 |
| **NIST ATP EXPENSE** | | | | | | | | **-33,377.88** |
| 9/6/2001 | CHASE MC ... | | Patricia Dalia... | Zapping | Wages:karron... | NIST_ATP_EXPENSE | R | -150.00 |
| 9/7/2001 | CHASE MC ... | | American Me... | replacement ... | ProfessionalC... | NIST_ATP_EXPENSE | R | -322.99 |
| 9/7/2001 | CHASE MC ... | | Ves Pro | Ves Pro | Wages:karron... | NIST_ATP_EXPENSE | R | -99.90 |
| 9/10/2001 | CHASE MC ... | | Pacific Data S... | tape autoloa... | ProfessionalC... | NIST_ATP_EXPENSE | R | -359.61 |
| 9/20/2001 | CHASE MC ... | | Patricia Dalia... | Zapping | Wages:karron... | NIST_ATP_EXPENSE | R | -150.00 |
| 9/24/2001 | CHASE MC ... | | Intuit *Softwr... | Quick Book... | ProfessionalC... | NIST_ATP_EXPENSE | R | -189.38 |
| 9/25/2001 | CHASE MC ... | | Intuit *Softwr... | quicken 2002 | ProfessionalC... | NIST_ATP_EXPENSE | R | -90.82 |
| 9/28/2001 | CHASE MC ... | | Vespro | somato/nitro... | Wages:karron... | NIST_ATP_EXPENSE | R | -136.85 |
| 9/30/2001 | CHASE MC ... | | Rn *Real.Co... | real jutebox | ProfessionalC... | NIST_ATP_EXPENSE | R | -14.99 |
| 10/1/2001 | CHASE MC ... | | DUANE RE... | batteries | ProfessionalC... | NIST_ATP_EXPENSE | R | -13.51 |
| 10/1/2001 | CHASE MC ... | | I R I S Inc | iris OCR | ProfessionalC... | NIST_ATP_EXPENSE | R | -408.22 |

8/15/2008

Page 3

Register Report:2
9/1/2001 through 8/1/2003

| Date | Account | Num | Description | Memo | Category | Tag | Clr | Amount |
|------|---------|-----|-------------|------|----------|-----|-----|--------|
| 10/2/2001 | CHASE MC ... | | Office Depot ... | paper boxes... | Office | NIST_ATP_EXPENSE | R | -61.00 |
| 10/3/2001 | CHASE MC ... | | Datavision | voice modems | ProfessionalC... | NIST_ATP_EXPENSE | R | -229.47 |
| 10/3/2001 | CHASE MC ... | | NY Sports Cl... | NY Sports C... | Wages:karron... | NIST_ATP_EXPENSE | R | -79.00 |
| 10/4/2001 | CHASE MC ... | | Patricia Dalia... | Zapping | Wages:karron... | NIST_ATP_EXPENSE | R | -150.00 |
| 10/6/2001 | CHASE MC ... | | Kips Bay Opt... | eyeglasses n... | Wages:karron... | NIST_ATP_EXPENSE | R | -5.00 |
| 10/6/2001 | CHASE MC ... | | Homefront H... | work gloves | ProfessionalC... | NIST_ATP_EXPENSE | R | -29.00 |
| 10/7/2001 | CHASE MC ... | | Datavision | voice modems | ProfessionalC... | NIST_ATP_EXPENSE | R | -940.60 |
| 10/13/2001 | CHASE MC ... | S | Office Depot | | Office | NIST_ATP_EXPENSE | R | -2.49 |
| | | | | | Office | NIST_ATP_EXPENSE | R | -0.21 |
| 10/23/2001 | CHASE MC ... | | Office Depot ... | tapes, paperc... | Office | NIST_ATP_EXPENSE | R | -81.11 |
| 10/29/2001 | CHASE MC ... | | Le Mond Rest... | | M & E | NIST_ATP_EXPENSE | R | -68.90 |
| 11/5/2001 | CHASE MC ... | | NY Sports Cl... | NY Sports C... | Wages:karron... | NIST_ATP_EXPENSE | R | -79.00 |
| 11/13/2001 | CHASE MC ... | | Ra *Real.Co... | netzip, shoul... | ProfessionalC... | NIST_ATP_EXPENSE | R | -69.98 |
| 11/15/2001 | CHASE MC ... | | Patricia Dalia... | laser and ele... | Wages:karron... | NIST_ATP_EXPENSE | R | -677.00 |
| 11/19/2001 | CHASE MC ... | | Mindmaker, Inc | speaking sof... | ProfessionalC... | NIST_ATP_EXPENSE | R | -69.90 |
| 11/27/2001 | CHASE MC ... | | New York Sp... | sweats | Wages:karron... | NIST_ATP_EXPENSE | R | -104.96 |
| 11/28/2001 | CHASE MC ... | | Patricia Dalia | Patricia Dali... | Wages:karron... | NIST_ATP_EXPENSE | R | -677.50 |
| 11/30/2001 | CHASE MC ... | | Vespro | somato | Wages:karron... | NIST_ATP_EXPENSE | R | -109.90 |
| 11/30/2001 | CHASE MC ... | | Vespro | somao med f... | Wages:karron... | NIST_ATP_EXPENSE | R | -109.90 |
| 12/3/2001 | CHASE MC ... | | NY Sports Cl... | monthly | Wages:karron... | NIST_ATP_EXPENSE | R | -79.00 |
| 12/4/2001 | CHASE MC ... | | Corner Drug ... | | Wages:karron... | NIST_ATP_EXPENSE | R | -172.05 |
| 12/6/2001 | CHASE MC ... | | Patricia Dalia | zapping | Wages:karron... | NIST_ATP_EXPENSE | R | -840.00 |
| 12/14/2001 | CHASE MC ... | | Qpass | 1 206 694 4... | ProfessionalC... | NIST_ATP_EXPENSE | R | -54.07 |
| 12/16/2001 | CHASE MC ... | | New York Sp... | black long sl... | Wages:karron... | NIST_ATP_EXPENSE | R | -15.00 |
| 1/1/2002 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -79.00 |
| 1/2/2002 | CHASE MC ... | | Vespro | hgh | Wages:karron... | NIST_ATP_EXPENSE | R | -109.90 |
| 1/10/2002 | CHASE MC ... | | MTA | subway travel | Wages:fringe... | NIST_ATP_EXPENSE | R | -20.00 |
| 1/10/2002 | CHASE MC ... | | Temporary Cr... | QPASS credit | ProfessionalC... | NIST_ATP_EXPENSE | R | 54.07 |
| 1/17/2002 | CHASE MC ... | | Patricia Dalia... | | Wages:karron... | NIST_ATP_EXPENSE | R | -2,112.50 |
| 1/18/2002 | CHASE MC ... | | IEEE Comptr... | ieee confere... | Conference | NIST_ATP_EXPENSE | R | -300.00 |
| 1/29/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron... | NIST_ATP_EXPENSE | R | -109.90 |
| 1/31/2002 | CHASE MC ... | | QPass | online reprin... | ProfessionalC... | NIST_ATP_EXPENSE | R | -54.07 |
| 2/1/2002 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -79.00 |
| 2/13/2002 | CHASE MC ... | | Wmata Catf#9... | Wmata Catf... | Travel:trainfare | NIST_ATP_EXPENSE | R | -2.20 |
| 2/13/2002 | CHASE MC ... | | Wmata Cat#9... | Wmata Catf... | Travel:trainfare | NIST_ATP_EXPENSE | R | -3.20 |
| 2/21/2002 | CHASE MC ... | | Patricia Dalia | | Wages:karron... | NIST_ATP_EXPENSE | R | -277.50 |
| 3/1/2002 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -79.00 |

8/15/2008

Register Report:2
9/1/2001 through 8/1/2003

Page 4

| Date | Account | Num | Description | Memo | Category | Tag | Clr | Amount |
|------|---------|-----|-------------|------|----------|-----|-----|--------|
| 3/3/2002 | CHASE MC ... | | Paragon Sport... | polar heart ... | Wages:karron...NIST_ATP_EXPENSE | | R | -248.96 |
| 3/12/2002 | CHASE MC ... | | Performance ... | water filters | Wages:fringe...NIST_ATP_EXPENSE | | R | -173.10 |
| 3/13/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron...NIST_ATP_EXPENSE | | R | -109.90 |
| 3/13/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron...NIST_ATP_EXPENSE | | R | -55.94 |
| 3/21/2002 | CHASE MC ... | | Qpass *Ww... | research | Profl Services  NIST_ATP_EXPENSE | | R | -19.95 |
| 3/24/2002 | CHASE MC ... | | Kips Bay Opt... | prescription ... | Wages:karron...NIST_ATP_EXPENSE | | R | -100.00 |
| 3/28/2002 | CHASE MC ... | | Patricia Dalia... | laser and ele... | Wages:karron...NIST_ATP_EXPENSE | | R | -897.50 |
| 3/28/2002 | CHASE MC ... | | Enterprise Par... | dr wheeler a... | Wages:karron...NIST_ATP_EXPENSE | | R | -13.00 |
| 4/1/2002 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron...NIST_ATP_EXPENSE | | R | -79.00 |
| 4/1/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron...NIST_ATP_EXPENSE | | R | -139.85 |
| 4/11/2002 | CHASE MC ... | | Patricia Dalia... | laser | Wages:karron...NIST_ATP_EXPENSE | | R | -570.00 |
| 4/11/2002 | CHASE MC ... | | Kips Bay Opt... | sunglasses | Wages:karron...NIST_ATP_EXPENSE | | R | -235.00 |
| 4/12/2002 | CHASE MC ... | | Www.R-Tt.C... | recovery stu... | ProfessionalC...NIST_ATP_EXPENSE | | R | -179.99 |
| 4/24/2002 | CHASE MC ... | | Patricia Dalia | laser test and... | Wages:karron...NIST_ATP_EXPENSE | | R | -20.00 |
| 4/30/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron...NIST_ATP_EXPENSE | | R | -139.85 |
| 5/1/2002 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron...NIST_ATP_EXPENSE | | R | -79.00 |
| 6/1/2002 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron...NIST_ATP_EXPENSE | | R | -79.00 |
| 6/4/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron...NIST_ATP_EXPENSE | | R | -139.85 |
| 6/6/2002 | CHASE MC ... | | Patricia Dalia | laser treatment | Wages:karron...NIST_ATP_EXPENSE | | R | -2,334.00 |
| 6/27/2002 | CHASE MC ... | | Patricia Dalia | laser treatment | Wages:karron...NIST_ATP_EXPENSE | | R | -833.00 |
| 7/1/2002 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron...NIST_ATP_EXPENSE | | R | -79.00 |
| 7/3/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron...NIST_ATP_EXPENSE | | R | -139.85 |
| 7/19/2002 | CHASE MC ... | | Kips Bay Cin... | take staff out... | Wages:fringe...NIST_ATP_EXPENSE | | R | -30.00 |
| 7/23/2002 | CHASE MC ... | | Park Ave Rad... | c/t scan for i... | Wages:karron...NIST_ATP_EXPENSE | | R | -350.00 |
| 8/1/2002 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron...NIST_ATP_EXPENSE | | R | -79.00 |
| 8/1/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron...NIST_ATP_EXPENSE | | R | -139.85 |
| 8/2/2002 | CHASE MC ... | | Kips Bay Opt... | | Wages:karron...NIST_ATP_EXPENSE | | R | -405.00 |
| 8/9/2002 | CHASE MC ... | | The Elliott &... | The Elliott... | Wages:karron...NIST_ATP_EXPENSE | | R | -650.00 |
| 8/9/2002 | CHASE MC ... | | Elliott & True... | Elliott & Tr... | Wages:karron...NIST_ATP_EXPENSE | | R | -350.00 |
| 8/16/2002 | CHASE MC ... | | Elliott & True... | Elliott & Tr... | Wages:karron...NIST_ATP_EXPENSE | | R | -1,500.00 |
| 8/19/2002 | CHASE MC ... | | Borders Book... | with jim cox | M & E       NIST_ATP_EXPENSE | | R | -5.20 |
| 8/23/2002 | CHASE MC ... | | Arthur J Bran... | dermatology... | Wages:karron...NIST_ATP_EXPENSE | | R | -1,350.00 |
| 8/24/2002 | CHASE MC ... | | La Bella Pizza | lunch with ... | M & E       NIST_ATP_EXPENSE | | R | -9.59 |
| 8/26/2002 | CHASE MC ... | | Todd Berman... | oral surgery | Wages:karron...NIST_ATP_EXPENSE | | R | -1,700.00 |
| 8/31/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron...NIST_ATP_EXPENSE | | R | -139.85 |
| 9/1/2002 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron...NIST_ATP_EXPENSE | | R | -81.50 |
| 9/3/2002 | CHASE MC ... | | NY Sports Cl... | NY Sports C... | Wages:karron...NIST_ATP_EXPENSE | | R | -81.50 |

Page 5

**Register Report.2**
9/1/2001 through 8/1/2003

| Date | Account | Num | Description | Memo | Category | Tag | Clr | Amount |
|------|---------|-----|-------------|------|----------|-----|-----|--------|
| 9/3/2002 | CHASE MC ... | | Oo    F134... | Oo    F134... | Wages:karron... | NIST_ATP_EXPENSE | R | 81.50 |
| 9/3/2002 | CHASE MC ... | S | Andromeda C... | | Professional:C... | NIST_ATP_EXPENSE | R | -70.27 |
| | | | | currency con... | Professional:C... | NIST_ATP_EXPENSE | R | -1.41 |
| 9/30/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron... | NIST_ATP_EXPENSE | R | -109.90 |
| 9/30/2002 | CHASE MC ... | | NY Sports Cl... | NY Sports C... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |
| 10/3/2002 | CHASE MC ... | | Vespro | Vespro | Wages:karron... | NIST_ATP_EXPENSE | R | -29.95 |
| 10/17/2002 | CHASE MC ... | | Patricia Dalia... | laser zapping | Wages:karron... | NIST_ATP_EXPENSE | R | -1,405.00 |
| 11/4/2002 | CHASE MC ... | | NY Sports Cl... | NY Sports C... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |
| 11/29/2002 | CHASE MC ... | | Lir Tvm | pick up car f... | Travel:trainfare | NIST_ATP_EXPENSE | R | -4.75 |
| 12/1/2002 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |
| 12/17/2002 | CHASE MC ... | | Valentine Res... | | Professional:C... | NIST_ATP_EXPENSE | R | -235.97 |
| 1/1/2003 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |
| 1/8/2003 | CHASE MC ... | | NY Medical ... | NY Medical ... | Professional:C... | NIST_ATP_EXPENSE | R | -1,147.50 |
| 1/20/2003 | CHASE MC ... | | Time Archive... | time archive ... | Professional:C... | NIST_ATP_EXPENSE | R | -54.07 |
| 1/22/2003 | CHASE MC ... | | Carl'S Jr #230... | newport bea... | Travel:meal | NIST_ATP_EXPENSE | R | -4.08 |
| 2/1/2003 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |
| 2/3/2003 | CHASE MC ... | | Innovation Lu... | Innovation L... | Travel | NIST_ATP_EXPENSE | R | -88.74 |
| 2/9/2003 | CHASE MC ... | | Lir Tvm | ...drop off car | lb Travel:trainfare | NIST_ATP_EXPENSE | R | -4.75 |
| 2/16/2003 | CHASE MC ... | | Princeton Jun... | rush home f... | Travel:trainfare | NIST_ATP_EXPENSE | R | -9.80 |
| 2/20/2003 | CHASE MC ... | | NY Medical ... | laser | Wages:karron... | NIST_ATP_EXPENSE | R | -2,403.44 |
| 2/21/2003 | CHASE MC ... | | Recession Cafe | meeting wit... | M & E | NIST_ATP_EXPENSE | R | -26.80 |
| 3/1/2003 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |
| 3/5/2003 | CHASE MC ... | | New York Sp... | t-shirt | Wages:karron... | NIST_ATP_EXPENSE | R | -12.00 |
| 3/11/2003 | CHASE MC ... | | Ruveri'S | visit to How... | M & E | NIST_ATP_EXPENSE | R | -9.98 |
| 3/15/2003 | CHASE MC ... | | Moonstruck E... | meeting wit... | M & E | NIST_ATP_EXPENSE | R | -29.50 |
| 3/17/2003 | CHASE MC ... | | Masa'S | ...grand centra... | M & E | NIST_ATP_EXPENSE | R | -11.10 |
| 3/17/2003 | CHASE MC ... | | Starbucks 083... | Starbucks | ...M & E | NIST_ATP_EXPENSE | R | -3.53 |
| 3/18/2003 | CHASE MC ... | | La Bella Pizz... | with Rothma... | M & E | NIST_ATP_EXPENSE | R | -10.01 |
| 3/25/2003 | CHASE MC ... | | Datavision | amies netw... | Professional:C... | NIST_ATP_EXPENSE | R | -275.00 |
| 3/25/2003 | CHASE MC ... | | Starbucks 083... | with Benedict | M & E | NIST_ATP_EXPENSE | R | -3.57 |
| 3/27/2003 | CHASE MC ... | | Jeffrey I Me... | Jeffrey I Me... | Wages:karron... | NIST_ATP_EXPENSE | R | -190.00 |
| 3/28/2003 | CHASE MC ... | | Patricia Dalia | laser treatment | Wages:karron... | NIST_ATP_EXPENSE | R | -2,029.56 |
| 4/1/2003 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |
| 4/4/2003 | CHASE MC ... | | Astor Place T... | hamish and ... | M & E | NIST_ATP_EXPENSE | R | -132.00 |
| 4/8/2003 | CHASE MC ... | | Labella | with Hamish... | M & E | NIST_ATP_EXPENSE | R | -20.89 |
| 4/11/2003 | CHASE MC ... | | Fox And Hou... | with dr. Kou... | Travel:meal | NIST_ATP_EXPENSE | R | -49.30 |
| 4/12/2003 | CHASE MC ... | | La Tomate | with dr. Kou... | Travel:meal | NIST_ATP_EXPENSE | R | -79.28 |

8/15/2008

Page 6

Register Report:2
9/1/2001 through 8/1/2003

| Date | Account | Num | Description | Memo | Category | Tag | Clr | Amount |
|------|---------|-----|-------------|------|----------|-----|-----|--------|
| 4/12/2003 | CHASE MC ... | | Annies Prmnt... | DC/Dr. Kou... | Travel:meal | NIST_ATP_EXPENSE | R | -36.14 |
| 4/13/2003 | CHASE MC ... | | Wokngrill | return from ... | Travel:meal | NIST_ATP_EXPENSE | R | -53.53 |
| 4/16/2003 | CHASE MC ... | | CVS Pharmacy | meds | Wages:karron... | NIST_ATP_EXPENSE | R | -18.89 |
| 4/16/2003 | CHASE MC ... | | Gmc Garage -... | Gmc Garage... | Auto:Parking | NIST_ATP_EXPENSE | R | -84.00 |
| 4/17/2003 | CHASE MC ... | | LaGuardia Ai... | Laguardia P... | Travel:parking | NIST_ATP_EXPENSE | R | -3.00 |
| 4/17/2003 | CHASE MC ... | | Starbucks Cof... | conference ... | M & E | NIST_ATP_EXPENSE | R | -3.43 |
| 5/1/2003 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |
| 5/5/2003 | CHASE MC ... | | Mee Noodle ... | Mee Noodle ... | M & E | NIST_ATP_EXPENSE | R | -7.55 |
| 5/7/2003 | CHASE MC ... | | Wokngrill | return from ... | Travel:meal | NIST_ATP_EXPENSE | R | -15.37 |
| 5/8/2003 | CHASE MC ... | | S and M Park... | parking at de... | Wages:karron... | NIST_ATP_EXPENSE | R | -8.00 |
| 5/17/2003 | CHASE MC ... | | Hyatt Hotels ... | Hyatt Hotels... | Travel:meal | NIST_ATP_EXPENSE | R | -13.20 |
| 5/17/2003 | CHASE MC ... | | Hyatt Hotels ... | DC meeting ... | Travel:meal | NIST_ATP_EXPENSE | R | -72.70 |
| 5/20/2003 | CHASE MC ... | | Starbucks | jim, matt cof... | M & E | NIST_ATP_EXPENSE | R | -4.76 |
| 5/20/2003 | CHASE MC ... | | Intelligence E... | Intelligence ... | Wages:karron... | NIST_ATP_EXPENSE | R | -180.11 |
| 6/1/2003 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |
| 6/14/2003 | CHASE MC ... | | Starbucks | 0...meeting wit... | M & E | NIST_ATP_EXPENSE | R | -5.76 |
| 6/21/2003 | CHASE MC ... | | Y & N Enterp... | Y & N Enter... | Travel:fuel | NIST_ATP_EXPENSE | R | -24.00 |
| 7/1/2003 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |
| 7/8/2003 | CHASE MC ... | | Ghandi Cafe I... | Rothman, Dr... | M & E | NIST_ATP_EXPENSE | R | -45.70 |
| 7/9/2003 | CHASE MC ... | | Mee Noodle ... | Mee Noodle ... | M & E | NIST_ATP_EXPENSE | R | -22.20 |
| 7/12/2003 | CHASE MC ... | | Radio Shack | remote site p... | Professional:C... | NIST_ATP_EXPENSE | R | -17.46 |
| 7/16/2003 | CHASE MC ... | | Jin Go Gae Inc | trip to Wilmi... | Travel:meal | NIST_ATP_EXPENSE | R | -6.50 |
| 7/17/2003 | CHASE MC ... | | Rite Aid Stor... | praveen visit | Travel:meal | NIST_ATP_EXPENSE | R | -4.89 |
| 7/17/2003 | CHASE MC ... | | Ess A Bagel | lunch for Ud... | M & E | NIST_ATP_EXPENSE | R | -22.90 |
| 7/21/2003 | CHASE MC ... | | Vespro | Vespro | Wages:karron... | NIST_ATP_EXPENSE | R | -109.90 |
| 8/1/2003 | CHASE MC ... | | New York Sp... | montly mem... | Wages:karron... | NIST_ATP_EXPENSE | R | -81.50 |

**OVERALL TOTAL** -34,523.51