UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA,
                                  :
        - v. -
                                  :    S2 07 Cr. 541 (RPP)
DANIEL B. KARRON,
                                  :
                Defendant.
                                  :
- - - - - - - - - - - - - - - - - x


**GOVERNMENT'S SURREPLY IN FURTHER OPPOSITION TO
DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AND
FOR A NEW TRIAL**


                                MICHAEL J. GARCIA
                                United States Attorney for the
                                Southern District of New York
                                Attorney for the United States
                                    of America

CHRISTIAN R. EVERDELL
CHI T. STEVE KWOK
Assistant United States Attorneys

        - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA,
                                  :
          - v. -
                                  :    S2 07 Cr. 541 (RPP)
DANIEL B. KARRON,
                                  :
                Defendant.
                                  :
- - - - - - - - - - - - - - - - - x

### GOVERNMENT'S SURREPLY IN FURTHER OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL

Pursuant to the Court's Order of September 9, 2008, the Government respectfully submits this surreply in response to arguments in the defendant's reply brief not previously raised in his original motion papers. Like the arguments in the defendant's opening brief, however, none of the defendant's eleventh-hour arguments withstands scrutiny. Accordingly, the Rule 29 and Rule 33 motions should be denied.

### POINT I

### THE EVIDENCE WAS SUFFICIENT TO CONVICT KARRON

In his opening brief, the defendant argued there was insufficient evidence to support the jury's guilty verdict because of alleged deficiencies in the various audits Joan Hayes and Belinda Riley conducted, because none of the analyses took into account personal contributions by the defendant, and because

there was no requirement that revisions to the ATP budget be made only subject to NIST's prior written approval.  (Br. 4-10).[1]

As shown in the Government's Opposition, all of these arguments fail.  The Government showed that the defendant's quibbles about the various audits are simply irrelevant because the Government proved the misapplication of ATP funds at trial, not through audits that relied on CASI's constantly changing books and records, but through independent financial records supplied by Chase Bank, American Express, and various vendors whose authenticity was never in dispute.  (Opp. 22).

Furthermore, contrary to the defendant's unsupported assertion that Belinda Riley's spreadsheets analyzing those financial records overlooked certain personal contributions the defendant made to CASI through direct contributions and foregone salaries, the Government identified specific spreadsheet entries where she took into account precisely the checks and withheld salaries to which the defendant referred.  (Opp. 24-25).[2]

---

[1]    "Tr." refers to the trial transcript; "Br." refers to the defendant's Memorandum of Law in Support of Daniel Karron's Motion for a Judgment of Acquittal, New Trial Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure; "Opp." refers to the Government's Memorandum of Law In Opposition to Defendant's Motion for a Judgment of Acquittal and for a New Trial; "Reply" refers to the defendant's Memorandum of Law In Reply to the Government's Opposition; "GX" refers to a Government exhibit at trial.

[2]    In his reply brief, while the defendant continues to assert, without any citation to the record, that the "Government's auditor never credited Dr. Karron with these repayments," he makes no attempt to respond to the Government's Opposition pinpointing precisely the spreadsheet entries where

Finally, in response to the defendant's astonishing claim that it "is simply not true" that "significant alterations to the budget required prior approval," (Br. 10), the Government cited testimonial and documentary evidence unambiguously stating that recipients "shall obtain prior written approval from the NIST Grants Officer for . . . [t]he transfer of funds among direct cost categories . . . if the transfer exceeds 10% of the approved total annual budget." (Opp. 2-5, 28-29).

Instead of engaging the Government's response on the merits, the defendant raises altogether new arguments in his reply brief.  The defendant now argues that because the money CASI received from the federal government was not made pursuant

---

the auditor took those selfsame "repayments" or "contributions" into account.   (Opp. 9-12).

In this connection, the defendant does add an argument not previously raised in his original papers — i.e., that the defendant was due reimbursement for purchases he made for CASI using his personal MasterCard.  (Reply 10).  There is nothing in the record to support this claim.  Although the defendant sought to introduce a defense expert witness to testify about the MasterCard records, the Court excluded this proffered witness's testimony on grounds of "late notice" and lack of competence. (Tr. 1173).  While the Government stipulated to the authenticity of certain MasterCard statements, there was neither stipulation, testimony, nor documentary evidence regarding these credit card statements, much less evidence showing that they demonstrate that the credit card expenses were grant-related, as opposed to personal or non-grant related business expenses, or that the defendant paid for the outstanding balances using non-ATP funds. (Tr. 1176).  Hence, at the end of the day, there was nothing to contradict Riley's analysis.  The defendant's arguments in his reply brief concerning these MasterCard records are just that — belated arguments unsupported by any competent evidence.

to a "grant," but pursuant to a "cooperative agreement," which
involved "substantial involvement . . . between the executive
agency [ATP]" and "the recipient during performance of the
contemplated activity," (Reply 5), the defendant was entitled to
an administrative audit review process during which deviations
from the approved budget could somehow be negotiated away.
(Reply 4-9).[3]  The defendant concedes that if the money CASI
received was awarded pursuant to a "grant," "the Government's
argument would have some merit."  (Reply 6).  Nonetheless, the
defendant argues, the fact that a cooperative agreement was
involved in this case made all the difference.  (Reply 5).
Finally, while the defendant no longer disputes that prior
written approval was required before an ATP grant recipient could
deviate from his approved budget and that ATP funds could not be
used to pay for overhead expenses and sunk costs, he takes issue
with the validity of these ATP rules, arguing that if they
trumped less stringent regulations in the Code of Federal
Regulations ("CFR"), it "would lead to the absurd result whereby

---

[3]     The defendant makes this argument notwithstanding
defense counsel's characterization of the defendant's ATP award
as a "grant" throughout the entire trial (Tr. 40-53, 1276-1316),
and notwithstanding the fact that no distinction was drawn
between a "grant" and a "cooperative agreement" throughout the
whole trial by either party.  As shown below, this is because
whatever technical distinction there is between these two types
of award has no bearing whatsoever on the issues at trial.

ATP grants could be required to be administered in a manner
inconsistent with the CFR."  (Reply 3).

All of these arguments are meritless.  Title 41, Code
of Federal Regulations, Section 31.201-2(a), states that "a cost
is allowable only when the cost complies with all of the
following requirements:  . . . (4) Terms of the contract."

Here, the "terms of the contract" were spelled out in
the ATP Financial Assistance Award (GX 12) that Dr. Karron signed
on behalf of CASI in his capacity as President and Chief
Technical Officer.  In signing that document, Karron "agrees to
comply with the Award provisions checked below and attached,"
including the following:

> – Department of Commerce Financial Assistance
> Terms and Conditions;
>
> – Special Award Conditions;
>
> – Line Item Budget;
>
> – 15 C.F.R. Part 14;
>
> – 48 C.F.R. Part 31;
>
> – ATP General Terms of Conditions;
>
> – Program Specific Audit Guidelines for ATP
> Cooperative Agreements with Single Companies.

(GX 12).

As more fully explained in the Opposition, the above-
referenced materials make clear that (i) the defendant must
obtain NIST's prior written approval before ATP money could be

spent in a way that was inconsistent with the approved budget, where the amount of the deviation exceeded 10% of the total annual budget and (ii) overhead/indirect costs and sunk costs could not be paid for using ATP funds.  (Opp. 3-5).

Contrary to the defendant's claim, these ATP rules and regulations do not conflict with existing law.  Rather, the governing statute's and the CFR's explicit delegation of authority to ATP, as well the CFR's repeated cross-references to ATP's rules and regulations, leave no room for doubt that ATP was authorized to tailor funding conditions to accomplish the program's objectives.  Indeed, this sort of delegated authority is just what one would expect from a program designed to fund high-risk scientific research.  See, e.g., 15 U.S.C. § 278n (The ATP "Director shall promulgate regulations . . . establishing procedures regarding financial reporting and auditing to ensure that awards are used for the purposes specified in this section . . . ."); 15 C.F.R. § 295.2(d) ("Because of the diverse characteristics and accounting practices of different organizations, it is not possible to specify the types of costs which may be classified as direct costs in all situations. . . . ATP shall determine the allowability of direct costs in accordance with Federal cost principles."); 15 C.F.R. § 295.10 ("Each award by the [ATP] Program shall contain procedures regarding technical, business, and financial reporting and

auditing requirements to ensure that awards are being used in
accordance with the [ATP] Program's objectives. . . .  The audit
standards to be applied to ATP awards are the Government Auditing
Standards . . . and the ATP program-specified audit guidelines");
15 C.F.R. § 295.7 ("Proposals must be submitted in accordance
with the guidelines in the ATP Proposal Preparation Kit.") (all
emphases added).

      Despite having signed the Financial Assistance Award
(GX 12) and thereby "agreed to comply with the Award provisions"
set forth in the above-cited materials, the defendant argues for
the first time he was actually exempt from these requirements
because he received a "cooperative agreement," not a "grant."
The defendant says that the "cooperative agreement" in his case
gave him a "flexible budget," allowing him, in essence, to spend
first and worry about his noncompliance later.  (Reply 4-6).

      This argument is frivolous.  ATP's General Terms and
Conditions (GX 2) — a document that applied "to all recipients of
the ATP" award (id.) — made clear that all ATP awards, not just
the award to Dr. Karron, were in the form of "cooperative
agreements," not "grants."  Contrary to the defendant's self-
serving interpretation of the terms "cooperative agreements" and
"substantial involvement," however, these terms mean something
altogether different as they are defined in paragraph 6 of the
ATP General Terms and Conditions:

6.   Substantial Involvement

NIST has selected a cooperative agreement as the funding instrument for this project. Accordingly, the NIST Project Management Team will be substantially involved in the following areas:

a.   Approval of go/no go decision points at various project stages before subsequent stages of a project may continue, if specified in the Special Award Conditions;

b.   Concurrence with sole source procurement in excess of $100,000;

c.   Approval of key personnel specified in the proposal . . . ; and

d.   Approval of changes in Joint Venture membership.

(GX 2, at 1-2).

Nothing in the above lends any support to the defendant's claim that he was given a "flexible budget" with the opportunity to revise the budget entries "after money is spent." (Br. 6).  Far from giving the defendant a free pass to ignore his approved budget, ATP's "substantial involvement" in the "cooperative agreement" imposed on the defendant <u>additional</u> obligations to obtain ATP's "approval" and "concurrence" when specified technical and financial issues arose.

Indeed, just two pages after the above-quoted passage, the following requirements are reiterated:

9.   Prior Approval Requirements

In addition to the requirements specified in 15 CFR 14.25, Recipient shall obtain <u>prior</u>

8

<u>written</u> approval from the NIST Grants Officer for
the following changes:

    a.   The transfer of funds among direct cost
categories must be approved in advance by the
Grants Officer if the transfer exceeds 10% of the
approved total <u>annual</u> budget for each single
Recipient . . . .  Recipients are not authorized
to create new budget categories without prior
approval.  The Recipients are not authorized at
any time to transfer amounts budgeted for direct
costs to the indirect cost line item.

10.   Unallowable Project Costs

    Those costs that are designated as being
unallowable in Chapter 1, Sections C.4 and C.5 of
the November ATP Proposal Preparation Kit [which
state, among other things, that "[i]ndirect costs
for single company recipients are unallowable
. . . and must be absorbed by the company"] will
be unallowable under this award.

Hence, the clear terms and conditions of the ATP
program negate the defendant's willful insistence to his business
manager that "I'm the principal investigator and can do anything
I want," and NIST would approve the expenditures later because
"they loved me."  (Tr. 667, 697).  To the contrary, the
defendant's award, just like other ATP awards, is fully subject
to the budgetary and spending constraints established at trial.

Similarly unavailing is the defendant's claim that
because he was unexpectedly deprived of a purported "right" to
administrative review in which he thought he would have a chance
to persuade ATP to accept his fait accompli, no reasonable juror
could find that he had the requisite intent to misappropriate
federal funds.  (Reply 6-9).  Contrary to the defendant's claim,

the defendant did not have an absolute "right" to any particular

process.   The pertinent part of the regulation states:

> (a)  If a recipient materially fails to comply
> with the terms and conditions of an award,
> whether stated in a Federal statute, regulation,
> assurance, application, or notice of award, the
> Grants Officer <u>may</u> . . . take one or more of the
> following actions, as appropriate in the
> circumstances:
>
> (1) Temporarily withhold payments of funds
> pending correction of the deficiency by the
> recipient or more severe enforcement action by
> the Grants Officer after coordination with the
> DoC [Department of Commerce] operating unit.
>
> (2) Disallow . . . all or part of the cost
> of the activity or action not in compliance.
>
> (3)  Wholly or partly suspend or terminate
> the current award.
>
> (4)  Withhold further awards for the project
> or program.
>
> (5)  <u>Take other remedies that may be legally
> available.</u>
>
> (b)  In taking an enforcement action, the
> awarding agency shall provide the recipient an
> opportunity for hearing, appeal or other
> administrative proceeding <u>to which the recipient
> is entitled under any statute or regulation
> applicable to the action involved</u>.

15 C.F.R. § 14.62 (emphases added).

In this case, in light of clear indications of willful

and repeated misapplications of federal funds, the Government

decided to "take other remedies" — <u>i.e.</u>, initiating a grand jury

investigation into the defendant's use of ATP funds, including

the issuance of multiple grand jury subpoenas for documents and

10

records.  As a result of this criminal investigation, and after
the Government and the defendant, through prior counsel, were
unable to reach a disposition, the Government sought, and a grand
jury in this District returned, an Indictment that began the
criminal process.  Because the remedy the Government ultimately
pursued was judicial and criminal in nature, the defendant was
afforded the fuller panoply of rights that attached to a criminal
defendant, including the right to a jury trial that he exercised.
The choice among possible remedies — administrative, civil, or
criminal — was one for the Government to make as the complaining
party, not the defendant.  So long as the defendant was afforded
all the rights "applicable to the action involved," as he was
here, the defendant has no cognizable claim that he was deprived
of some other rights "applicable to" other administrative or
civil remedies the Government did not pursue.

        In any event, as noted in the Government's Opposition,
because the crime of misapplication under 18 U.S.C. § 666 is
complete once the defendant misapplied $5,000 or more in federal
funds and did so with the requisite intent, what may or may not
happen in a later administrative proceeding is simply irrelevant.
(Opp. 25-26).  In his reply, the defendant appears to concede the
point with respect to a "grant."  (Reply 5) ("What may or may not
have happened at the later administrative proceeding is the
distinction between a grant and a cooperation agreement. . . .

[If] this were a grant and money was allocated for specific purposes . . . , the Government's argument would have some merit."). The defendant insists, however, that his "cooperative agreement" calls for a different result. As demonstrated above, however, all ATP grants are in the form of "cooperative agreements"; the defendant's award was in accord with the usual arrangement. Because the distinction between a "cooperative agreement" and "grant" is a distinction without a difference with respect to the recipient's rights and obligations under the award, the defendant's concession forecloses his own argument.

Finally, to the extent the defendant argues that his misapplication of federal funds was unintentional and non-willful because he thought, albeit mistakenly, that he would have one last shot at convincing ATP to accept and forgive his violations, the defendant's claim of good-faith belief is undercut by defendant's email to Professor Schwartz unambiguously stating his intention to engage in financial blackmail, not good-faith negotiation as he now claims:

> I am weighing abandoning the grant at this point and forcing the government to try to collect 1.4M from me and make the grant enough of a train wreck that they have to cooperate on finding a liveable solution for all of us. It is that bad and I am ready to shove the situation to such a unpalatable end that we get some cooperation from them.

(GX 203, at 3; Tr. 1083-86).

12

This email does not stand alone.  The defendant's claim of good-faith belief is also belied by his multiple attempts to tamper with CASI's books and records, and surreptitiously circumvent the controls put in place by his bookkeeper and both of his business managers.  (Tr. 637-41, 840-42, 844, 978-79).

Of course, in a Rule 29 motion, the question is not whether the evidence permits a more innocent inference as to the defendant's intent, but whether the evidence was sufficient to support the jury's factual finding that the defendant did in fact have the requisite intent when he misappropriated federal funds. See, e.g., United States v. Sureff, 15 F.3d 225, 229 (2d Cir. 1994); United States v. Davis, 8 F.3d 923, 928-29 (2d Cir. 1993).

In this case, the above email describing the defendant's intent in his own words; the defendant's decision to strip his business manager Lee Gurfein of his signatory authority exactly one week after ATP funds came into CASI's accounts (Gx 21, at 3; Tr. 639); the defendant's unrelenting attempts to cover his wrongdoing by altering CASI's books over the objections of his bookkeeper (Tr. 844); and the testimony of ATP program managers and the defendant's own employees that they pleaded with the defendant on multiple occasions to stop flouting ATP rules, including Bob Benedict's explicit warning to the defendant that "he could go to jail for this" (Tr. 997), are more than

sufficient to support the jury's finding that when the defendant
misapplied federal funds, he did so willfully and intentionally.

**POINT II**

**THE COURT'S JURY INSTRUCTIONS ARE ENTIRELY PROPER**

As argued in the Government's Opposition, the Court's
jury instructions to the jury are correct in every respect.  The
law is clear that there is no tracing requirement for
prosecutions under 18 U.S.C. § 666 — i.e., the Government need
not trace the flow of federal moneys to link them, dollar for
dollar, to the misappropriated funds.  United States v. Sabri,
541 U.S. 600 (2004).  In fact, it is precisely to eliminate the
tracing requirement and to enable prosecution of cases, as here,
where federal and non-federal funds were co-mingled that Section
666 was enacted in the first place.  See United States v.
Westmoreland, 841 F.2d 572, 576 (5th Cir. 1988).

Furthermore, every federal court that has considered
the issue since Sabri consistently applied Sabri's reasoning to
other portions of the statute concerning conduct other than
bribery, including Section 666(a)(1)(A) at issue in this case.
(Opp. 36-37) (citing cases).  In doing so, they rejected
precisely the distinction the defendant seeks to draw between
bribery and other types of misuse of funds.  As the Seventh
Circuit stated after analyzing the issue at length in United
States v. Spano, 401 F.3d at 840 n.2 (7th Cir. 2005), "we note

14

that the petitioner in Sabri challenged only § 666(a)(2) and that
the defendants challenge § 666 as a whole, having been convicted
under, variously, §§ 666(a)(1)(A), (a)(1)(B), and (a)(2).
However, we see no reason for any differentiation in analysis
among the (a)(1) and (a)(2) charges, which are basically two
sides of the same coin." Against this overwhelming authority
interpreting § 666 and Sabri, the defendant cites not a single
case to support his novel reading of the statute.

        Nor did the Court's instruction with respect to the
third element (the defendant intentionally misapplied money or
property) conflict with the instruction with respect to the fifth
element (the value of intentionally misapplied money was at least
$5,000). As the Court correctly noted, there could be no
intentional misapplication unless the defendant misspent ATP
funds, as opposed to non-ATP money, since ATP rules did not
purport to limit how CASI could spend non-grant funds. (Tr.
706). Hence, the Court instructed the jury, with respect to the
third element, that "to intentionally misapply money" under the
statute means "to intentionally apply the grant money received by
CASI in a manner which the defendant knew was unauthorized under
the terms and conditions of the grant." (Tr. 1351).

        However, once it is shown that $5,000 or more of ATP
funds was misapplied toward unauthorized expenses (here, through
a showing that, on net, CASI had no other source of funding aside

15

from ATP), the Government need not be put to the impossible burden of unscrambling commingled funds and trace the particular sums alleged to be misapplied back to the original grant, dollar-for-dollar. Hence, the Court instructed the jury, with respect to the fifth element, "the government does not have to prove that the particular money misapplied by the defendant was the money received by CASI as a federal grant. In other words, it is not necessary for the government to show that the intentionally misapplied money was traceable to the actual federal grant received by the organization. . . . Money is fungible, and the government need not trace the $5,000 or more alleged to be intentionally misapplied back to the federal grant." (Tr. 1353).

The Court's jury instructions were legally sound, scrupulously fair to both parties, and suitably tailored to the facts of this case. In his reply brief, the defendant has no coherent response to the Government's arguments or to the authorities cited in the Opposition. The defendant does appear, however, to raise three new arguments.

First, in arguing that the auditor, Belinda Riley, failed to take into account various personal financial contributions the defendant made to CASI, the defendant again makes reference to the defendant's MasterCard records. As explained above, see pp. 2-3 n.2, supra, these MasterCard records pertain to the defendant's personal credit card. The Court

16

excluded the expert witness proffered by the defense on grounds
of late notice and lack of competence.  The defendant thus failed
to offer any admissible evidence as to whether the MasterCard
expenses were related to the ATP research project as opposed to
personal or non-ATP related expenses, or how the outstanding
credit balances were paid for.  In the end, there was no contrary
evidence in the record undermining Riley's analysis.

          In any event, whether Ms. Riley's analysis was
trustworthy and whether the Government met its burden to prove
$5,000 or more in misappropriated funds were factual questions
for the jury, which decided the issue in the Government's favor.
It is unclear how purported deficiencies in Riley's analysis have
anything to do with the correctness of the Court's jury
instructions that forms the basis of the defendant's Rule 33
motion for a new trial.

          Second, the defendant argues that he is entitled to a
new trial because the Court erroneously used the word "grant"
instead of "cooperative agreement" in its instructions.  (Reply
14).  This argument is simply absurd.  As an initial matter, it
was defense counsel who requested the Court to use the word
"grant" and to insert it in the jury instructions to distinguish
between ATP and non-ATP funds:

> Mr. Rubinstein:  Well, would your Honor
> consider "misapplied grant money"?
>
> . . .

17

The Court:  If you want me to say "the grant money" --

Mr. Rubinstein:  Yes.

(Tr. 1196, 1205) (emphases added).

In requesting that the Court insert the word "grant" in the jury instructions at the charge conference, the defendant waived any possible objection to this issue.  There can be no "manifest injustice" warranting a new trial when the defendant invited the selfsame alleged error of which he now complains. United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).

In any event, there was no error.  As explained above, see pp. 7-9, supra, whatever technical distinction there is between a "grant" and a "cooperative agreement" does not bear on any of the issues at trial and, for the sake of simplicity, was used interchangeably to mean, simply, the ATP award. Furthermore, as discussed at p. 8, supra, the term "cooperative agreement" as defined in the ATP documents does not comport with the self-serving interpretation the defendant now puts upon it.

Third, and finally, citing United States v. Thompson, 484 F.3d 877 (7th Cir. 2007), the defendant claims he is entitled to a new trial because the Court's instruction elevated mismanagement to criminal misapplication.  The defendant's reliance on Thompson, a government procurement case, is inapposite.  In that case, the defendant was a state official who was charged with steering a procurement contract for traveling

18

services to an allegedly inferior bidder.  Id. at 878.  There was

no allegation that she received any kickbacks for awarding the

contract to her favored bidder, or that her relatives, friends,

or associates benefitted from her decision in any way.  Id. at

881.  Confronted with the question whether any error in applying

the procurement rules contrary to state law is a crime, the

Seventh Circuit answered no.  Id. at 880.  The Court explained

that the evidence was insufficient to show the requisite intent

because Thompson might legitimately have been attracted by the

winning bidder's lowest bidding price despite its comparatively

poorer services and its lower rankings under other criteria.  The

Court wrote:

> Many a person runs for office on a platform of
> cutting the cost of government.  Bureaucrats may
> call a preference for low price over high levels
> of service a form of 'political interference'
> with their operations . . . but no party has a
> monopoly on opposing gold-plated wastebaskets and
> other excesses.   Low prices may advance the
> public interest even if they discomfit public
> employees, and recognition that driving down the
> cost  of  government  is  good  politics  for
> incumbents  does  not  transgress  any  federal
> statute of which we are aware.

Id. at 880.

The Court's jury instructions in this case did not

conflict with Thompson and, contrary to the defendant's argument,

did not construe Section 666(a)(1)(A) as a strict liability

statute.  In contrast, the Court took pains to inform the jury

that, to return a guilty verdict, it must find that the defendant

19

misused "grant money received by CASI in a manner which the
defendant <u>knew</u> was unauthorized under the terms and conditions of
the grant" and that the decision was the "product of the
defendant's <u>conscious objective</u> to spend the money for an
unauthorized purpose." (Tr. 1351-52) (emphasis added).

Furthermore, unlike in <u>Thompson</u>, the overwhelming
evidence at trial showed that the defendant personally benefitted
from his diversion of ATP funds to pay for, among other things,
his mortgage, a cleaning lady for his home, restaurant meals,
Starbucks coffee, and miscellaneous household items such as
blenders, vacuum cleaners, power drills, and a GPS navigation
device. (GX 101, 110, 114, 115).

Finally, the Court's explanation of the term
"misapplication" — "wrongful use of the money for a purpose the
defendant knew was unauthorized, even if such use benefitted CASI
in some way" — was entirely consistent with the Second Circuit's
decision in <u>United States</u> v. <u>Urlacher</u>, 979 F.2d 935, 938 (2d Cir.
1992), a case charging a violation of Section 666(a)(1)(A), and
Sand's Model Jury Instructions Instrs. 27A-5 and 3A-4.

In sum, the Court did not err in instructing the jury,
much less err in a way that gave rise to "manifest injustice"
requiring a new trial. Accordingly, the defendant's Rule 33
motion based on the Court's purportedly erroneous jury
instructions should be denied.

CONCLUSION

For the foregoing reasons, the defendant's Rule 29 motion for a judgment of acquittal, and his Rule 33 motion for a new trial should both be denied.

Dated:    New York, New York
          September 15, 2008

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

By: _____
    Christian R. Everdell
    Chi T. Steve Kwok
    Assistant United States Attorneys
    Tel: (212) 637-2556/2415
    Fax: (212) 637-2937

21

CERTIFICATE OF SERVICE

CHI T. STEVE KWOK deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York.

That on September 15, 2008, he caused to be served a copy of the foregoing Government's Surreply in Further Opposition to Defendant's Motion for a Judgment of Acquittal and for a New Trial by Federal Express on:

> Ronald Rubinstein, Esq.
> Rubinstein & Corozzo, LLP
> 260 Madison Avenue, 22nd Floor
> New York, NY 10016
> (917)626-8003

I declare under penalty of perjury that the foregoing is true and correct.   28 U.S.C. Section 1746.

_____
CHI T.  STEVE KWOK

Executed on:   September 15, 2008
               New York, New York