# RUBINSTEIN & COROZZO, LLP
### COUNSELORS AT LAW

RONALD RUBINSTEIN

JOSEPH R. COROZZO

———

WILLIAM R. DICENZO

260 MADISON AVENUE
22ND FLOOR
NEW YORK, N.Y. 10016

TELEPHONE (212) 545-8777
FAX (212) 679-1844

October 13, 2008

The Honorable Robert P. Patterson
United Stats District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States v. Daniel Karron*, 07 CR 541 (RPP)

Dear Judge Patterson:

      This letter is submitted on behalf of Defendant Daniel Karron, who will be sentenced before this Court on October 20, 2008. The following arguments are presented to aid the Court in calculating the correct guideline level. And to aid the Court in imposing the appropriate sentence pursuant to 18 USC §§ 3553, attached are letters of support from Dr. Karron's friends and colleagues.

## Under Federal Sentencing Guidelines Dr. Karron's Proper Offense Level is Six

      Dr. Karron's Pre Sentence Report (hereinafter "PSR") sets her offense level at twenty, with a sentence of 33-41 months. The Defense disagrees with this calculation. Dr. Karron was convicted of one count of Misapplying Grant Funds under 18 USC §666, which, pursuant to §2B1.1(a)(2) of the Federal Sentencing Guidelines, has a base offense level of six. The Probation department then incorrectly added 14 levels for a loss of more then $400,000. This loss enhancement fails to understand the distinction between misappropriation, and actual loss as defined by special loss rules which apply to Grants. §2B1.1(3)(F)(ii) The conviction was based on misappropriation. However, a proper Guideline analysis should be based on actual loss as modified by special rules. *Supra*. There is no intended loss in this case and therefore, only actual loss should be considered for sentencing. In their calculation, the Probation Department applies, without analysis, the total amount the Government's claim was misappropriated. With few exceptions, all funds were expended for the benefit of the project. §2B1.1(F) provides special rules be used to assist in determining loss in the cases indicated, i.e. government benefits, including grants. The Guidelines distinguish conduct which benefits the project from conduct that is motivated by personal gain[1].

---

[1] *See* USSG App. C, amend. 617, at 179 (Nov. 1, 2003). "The loss definition also provides for the exclusion from loss of certain economic benefits transferred to victims, to be measured at the time of detection. This provision codifies the "net loss" approach that has developed in the case law, with some modifications made for policy reasons. This crediting approach is adopted because the seriousness of the offense and the culpability of a defendant

RUBINSTEIN & COROZZO, LLP

Hon. Robert P. Patterson
October 13, 2008
Page 2

When calculating loss in a case involving government benefits, such as grants, §2B1.1 comment 3(F)(ii) states that loss in a case involving government benefits, such as grants, "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." In the instant case, Dr. Karron did not receive any funds over the amount that the she was entitled to under the award and the money was spent to aid the research, there is no loss to the government. The government received their full expectations of the grant as the research was performed. The value of this work was appropriate for the money that was awarded and the potential results from this research is significant in improving the quality of health care. (see e-mail from Dr. Gabor T. Herman, attached as Exhibit A)

Dr. Karron should be credited for the money that she returned, as well as cost of the repossessed government equipment and the value of her services rendered. When "credits against lost" under §2B1.1(3)(E)(i) are properly taken into account, the government suffered no actual loss for the purposes of sentencing. Under this guideline, loss is calculated as the greater of actual loss or intended loss, as there is no claim of intended loss in this case, only actual loss may be considered. Under the guidelines, actual lose is subject to "credits against loss," reducing the actual loss by:

> The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency

§2B1.1 (3)(E)(i)

Dr. Karron is entitled to credit for the $70,000 of her own funds deposited into CASI and the NIST ATP project between June 27, 2003 and August 13, 2003 and used for project expenses. The grant was suspended on June 27, 2003 on the grounds that CASI had not met their cost-sharing obligation. (see Tr. 172, 335) At this time, there were outstanding accrued expenses that were subsequently paid.

The award to CASI was suspended on the grounds that, in violation of Special Grant Rule Seven, CASI had not met their cost-sharing obligation. (see GX 26, Notice of Suspension, attached as Exhibit B) No communication between CASI and ATP suggested at this time that the grant was suspended on any ground other then a violation of Special Grant Rule Seven and there is no mention of misappropriation of funds in Special Grant Rule Seven (see GX

---

is better determined by using a net approach. This approach recognizes that the offender who transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not."

RUBINSTEIN & COROZZO, LLP

Hon. Robert P. Patterson
October 13, 2008
Page 3

2, Terms and Conditions, Excerpt attached as Exhibit C). The initial audit by O.I.G. did not start until December 2, 2003. (see Tr. ) As such, this is the earliest date of detection that may be used The Probation Departments position that ATP warnings not to use the grant money in this manner were a reasonable warning that the offense was about to be detected is clearly erroneous (see revised PSR at 17). The assertion that there is no ambiguity of the date of the offense for Guidelines purposes because the defendant was warned does not answer the question of detection. The issue of detection relates to the acts of the defendant once she learned of possible criminal liability. Dr. Karron's actions post June 27, 2003 were not motivated by guilty knowledge and an attempt to right a known wrong. Therefore, her monetary contributions of $70,000 through August 2003 to CASI must be credited against loss for the purposes of sentencing. Her payment of expenses accrued prior to suspension and paid subsequently should also be credited.

The initial $75,000 withdrawn by Dr. Karron was a salary advance that was repaid during the months in which she took neither paycheck or reduced paycheck. (Tr. 513, 800-802) This $75,000 constitutes additional contribution never considered in Government Exhibits 110, 114, or 115. Basing her salary on a 40 hour work week, Dr. Karron also made further contributions in kind by consistently working additional hours, sometimes even doubling her work week, without further compensation.

The Probation Department has not taken into account the fact that Dr. Karron was entitled to make changes of ten percent to the different areas of the budget, as so long as the total budget for the year did not exceed $800,000. Dr. Karron never exceeded this $800,000 total budget. Rather, she reduced some areas to compensate for the area that she felt would benefit from higher expenditure. These expenditures, i.e. equipment, were legitimate approved budget categories. Though actual expenditures exceeded the budgeted amount, they benefitted the research, and therefore, not an actual loss for Guideline purposes. §2B1.1(3)(F)(ii) Dr. Karron should also not be penalized in sentencing for a 10 percent of budget adjustments to salary. This $80,000 salary adjustment would absorb the unauthorized rent.

The Probation Department attributed loss of $249, 392 as improper non budgeted expenses. The Probation Department's position that "putting aside Karron's overspending on numerous items listed in the budget, she spent $249,392 on items that were never approved in the budget" Including expenditures such as, (1) $75,217 for subscriptions, (2) $8,219 for cleaning services, (3) $4,902 for meals, and $33,911 in utilities is unsupported. The Probation Department merely accepted the Government's conclusions without supporting them. For instance, there is no analysis of what constituted items (1) or (3). Subscriptions fall under the category of "others," which is a budgeted category in the revised budget. see GX 10 Likewise, the cleanup was a necessary expense in light of the equipment that was being used on the project. These unsupported items cannot be relied on for sentencing. §2B1.1(3)(F)(ii)

As ATP suffered no actual loss from Dr. Karron, it is inappropriate to add fourteen levels to her offense level. The proper offense level is six.

RUBINSTEIN & COROZZO, LLP

Hon. Robert P. Patterson
October 13, 2008
Page 4

### Dr. Karron's Background

Daniel Karron was born to Edward and Marianne Karron on October 25, 1956, in Brooklyn, New York. She was raised with her three siblings, Abraham, Amiee, and Nathaniel, in Long Beach, New York. (PSR at ¶31, 33) Dr. Karron's childhood was troubled by a condition that would later be diagnosed as a Gender Identity Disorder. (PSR at ¶46) Though undiagnosed for many years, this condition had a staggering effect on Dr. Karron's life from early in her child hood and continues to be a struggle today.

While all of her siblings attended public school, Dr. Karron's parents felt that due to their child's obvious distinctiveness, attendance at a private school was necessary for her safety. As such, while her siblings all attended the public school, Dr. Karron attended private school until the untimely death of her father in 1970, after which her mother placed Karron in public school with her siblings. (PSR at ¶32) Dr. Karron stuck out as child and in public school, this became much more problematic as Karron regularly became the target of teasing from her peers. (PSR at ¶32)

Though continuously an outsider, Dr. Karron was determined to make a difference in the world. Though Karron was living with a personal turmoil, she made the best out of her situation and be a positive influence in the society that seemed to turn its back on her. College opened the door for Dr. Karron to do just that. There she discovered that she could use her intelligence in mathematics to help humanity. Karron spent years learning and researching the human brain and working with computers to solve medical problems. (see letter from Edgar Coons, attached as Exhibit D)

Dr. Karron became known for not only her intelligence, but also her kind soul. (see letter from James L. Cox, attached as Exhibit E)  Dr. Karron is known to her friends as trustworthy and dependable in difficult times. Karron is known as someone who can be counted on for moral support and also true acts of kindness. Dr. Karron has felt ostracized for most of her life, but never lost her compassion for others and was always willing to help a friend. In his letter, Dr. Henry Lee, who has known Dr. Karron for 37 years, remembers that when he returned to this county with nothing, his friend Karron shared is small apartment with him and helped him find employment and get back on his feet. (letter from Dr. Henry Lee, attached as Exhibit F) Rev. Christopher Taylor also recalls how Dr. Karron is always available for emotional support. When Rev. Taylor's home was destroyed by a fire, Dr. Karron was there to help his family throughout their difficult time. (letter from Christopher Taylor, attached as Exhibit G). Karron further showed her compassionate and generous nature to Dr. Martin Dudziak. Karron met Dr. Dunziak in college and in the years that he has known Dr. Karron, he has witnessed her go out of her way to offer assistance to those in need. For instance, when Dr. Dudziak's daughter visited New York City, she was stranded and alone late at night. Dr. Dudziak could not make it to New York immediately and so Dr. Karron went out in the middle of the night to find the girl at Grand Central Station and kept her safe at her apartment until Dr. Dudziak could arrive. (see letter from Martin Dudziak, attached as Exhibit H)

Rubinstein & Corozzo, LLP

Hon. Robert P. Patterson
October 13, 2008
Page 5

   Dr. Karron has continued to show her compassion for others through her work. Using her intellect and education, she continued the quest of her collegiate years and formed CASI, a company whose goal is to make a difference in society by helping soldiers who have been wounded while fighting for our country. Dr. Karron has spent years formulating ways to treat soldiers with traumatic brain injuries and allow these men and women to recover from their injuries once again live a healthy life. In fact, Dr. Karron continued on this mission even after the grant was suspended, using her own money to ensure that this important work would be a success. (see Exhibit E)

   In 1987, Karron married Gail Schupak and the pair had a daughter, Sara, together. (PSR at ¶35) For ten years, Dr. Karron attempted to live as a typical man in society. Karron tried to keep her gender issues under control and private during this time, but was not successful. Dr. Karron's ex-wife believes that these gender issues were apparent throughout the marriage. Dr. Karron's focus on work and absent mindedness in other areas were also problematic in the marriage. (PSR at ¶38) Dr. Karron spent so much time on her research that she practically live at the office. In time, these factors lead the marriage's termination.

   Dr. Karron cares deeply for her family. Due to her gender issues, she did not have the best relationship with her own father and struggles to have a better bond with her own daughter. (PSR at ¶ 32, 35) She is a loving father, who continues to work on her relationship with her nineteen year old daughter. This relationship is admittedly strained, as it was obviously difficult for a teenage girl to understand and cope with the fact that her father is now a woman. As a young teenager, Sarah would often lash out and demonstrate her anger by being hurtful towards her father. Dr. Karron would not be pushed out of her daughter's life, rather she remained a "constant positive presence" and as Sara becomes an adult and experiences her own independence, the relationship between her and Dr. Karron continually improves. (letter from Lee Goldberg, attached as Exhibit I)

   Dr. Karron also shows her dedication to her family by her devotion to her ailing mother, who is presently in a nursing home on Staten Island, unable to care for herself. Dr. Karron has visited her weekly since her admittance into this home. Further, Dr. Karron has moved back to her mother's house in Long Beach with hopes to bring her home and care for her mother personally. She has taken steps towards this goal by learning how to work the equipment that her mother needs to survive. (see letter from William Nicolai, attached as Exhibit J; Exhibit F)

   The letters from Dr. Karron's friends and colleagues share a common theme: that Dr. Karron is a kind, compassionate, and generous human being, whose motives are always sincere even if is actions are confused. She is described as a genius, but with a brilliance that is often absent minded and lacks a true understanding of the ways of the world. Dr. Karron is unconventional, but motivated by a genuine desire to give back to society more then she took. Today, as Karron continues to struggle with her own gender issues, she is an active member of the transgender community, attending events and giving her support to others who are experiencing the same turmoil that she is all to familiar with. (see letter of David Israelstam, attached as Exhibit K)

Rubinstein & Corozzo, LLP

Hon. Robert P. Patterson
October 13, 2008
Page 6

## Conclusion

Title 18 USC §3553 provides, "the court shall impose a sentence sufficient, but, not greater than necessary." An analysis of this statute leads to one conclusion: Dr. Karron is a respected scientist with no prior criminal conflicts. She knowingly disregarded the spending restrictions. She did so not to benefit herself, but in her belief she knew better then the ATP officials. She did wrong but the punishment must be just. All her waking hours were devoted to the project. Her conviction has been widely publicized. She has now lost the ability to get future government funding. Not only has she received this message, but so has the entire scientific community. No further good can come from sentencing Dr. Karron to a term of imprisonment. Therefore, I respectfully request that the Court sentence her to a non-custodial sentence.

Respectfully submitted,

Ronald Rubinstein