```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/16/2008
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA

               - against -

DANIEL B. KARRON,

               Defendant.
------------------------------------------------------X

07 Cr. 541 (RPP)

**OPINION AND ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

    Defendant Daniel B. Karron has moved pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure for a judgment of acquittal or, in the alternative, for a new trial. Defendant was found guilty on a one count indictment, charging that, between October 2001 and June 2003, Defendant knowingly and intentionally misapplied federal assistance property valued at $5,000 and more from an organization receiving more than $10,000 of federal assistance during a one-year period, in violation of 18 U.S.C. § 666(a)(1)(A) and (b).

    In support of his motions, the defense argues that the government failed to offer sufficient proof for a jury to find that Dr. Karron knowingly and willfully intended to misapply more than $5,000 of federal grant funds in violation of 18 U.S.C. § 666. (Def.'s Mem. at 3.)[1]

    As recognized by the defense, it is well established that a criminal defendant who challenges the sufficiency of the evidence shoulders a heavy burden, but not an impossible one, United States v. Jones, 393 F.2d 107, 111 (2d Cir. 2004), and that reviewing courts are required to examine "the facts in the light most favorable to the government, drawing all reasonable

---

[1] "Def.'s Mem." refers to the Memorandum of Law in Support of Daniel Karron's Motion for a Judgment of Acquittal, New Trial Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, dated June 27, 2008.

inferences in its favor." United States v. Snow, 462 F.3d 55, 59 (2d Cir. 2006) (quoting United States v. Morgan, 385 F.3d 196, 198 (2d Cir. 2004)). "Therefore, so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the jury's legal verdict will withstand a challenge to its legal sufficiency." Jones, 393 F.2d at at 111.

### The Evidence of Defendant's Violation of 18 U.S.C. § 666(a)(1)(A) and (b)

At trial, the evidence showed that Defendant was President and Chief Technological Officer of Computed Aided Surgery Inc. ("CASI"), a small, for-profit corporation formed in 1995. (DX-10.) On July 6, 2001, Defendant applied for, and on October 5, 2001, CASI received, a two million dollar federal financial assistance award from the Advanced Technology Program ("ATP"), administered by the National Institute of Standards and Technology (NIST) for scientific research to be conducted over three years. (GX-10 at 27; GX-10A at 14-15; GX 11, 12.)[2]

In 2001, prior to receiving the grant, Defendant was provided with an ATP Proposal Kit. (GX-1; Tr. at 85.) Defendant participated in writing the grant proposal with Lee Gurfein using the ATP Proposal Preparation Kit. (Tr. at 627.) The ATP Proposal Preparation Kit states that a single for profit company, such as CASI, could apply for ATP funding "to pay only for direct costs of approved Research and Development activities" (GX-1 at 4), and that "single company recipients are responsible for funding all of their overhead/indirect costs." (Id. at 4.) The Proposal Preparation Kit for applicants for NIST-administered grants under the program also

---

[2] ATP is administered by the National Institute of Standards and Technology ("NIST"), an agency of the U.S. Department of Commerce which supports high-risk scientific research. (GX-11, 13; Tr. at 56.)

2

made clear that indirect costs of single company recipients that do not directly relate to the research are not to be paid for by the program. (GX-1 at 6). See also Instructions for Form NIST-1262, Item K.[3] "Typical examples of indirect costs ... include general administrative expenses, salaries, and expenses of executive officer, personnel administration, maintenance, library expenses, and accounting," and, the rules state that the "ATP shall interpret indirect costs in accordance with applicable federal cost principles ... b) indirect costs...." Id. Also, the ATP proposal kit made clear that ATP rules superseded regulations applicable to other federal grants. (See GX-1 at 6.) ("Regardless of whether they are allowable under Federal cost principles, the following are unallowable under ATP ... (b) indirect costs for single company recipients are unallowable for reimbursement with Federal Funds and must be absorbed by the company.")

The Defendant was also supplied with a copy of the General Terms and Conditions of the ATP program (GX-2), which stated:

Prior Approval Requirements.

In addition to the requirements specified in 15 C.F.R. 14, 25 recipients shall obtain prior written approval from the NIST Grants Officer for the following changes:

> a) the transfer of funds among direct costs categories must be approved in advance by the Grants Officer if the transfer exceeds 10% of the approved annual budget for each single recipient .... for each approved project year. Recipients are not authorized to create new budget categories without prior approval. The recipients are not authorized at any time to transfer amounts budgeted for direct costs to the indirect cost line item." (GX-2 at 3 (emphasis added).)

---

[3] It makes no difference whether the company receiving the ATP grant is working solely on the ATP funded project or whether it is working simultaneously on both ATP-funded and non-ATP funded projects. (GX-1 at 6; GX-3 at 3.)

3

In CASI's revised application of August 6, 2001, Defendant stated that CASI's facilities and equipment consisted of fully networked office space, with a website which had been running for five years. (GX 10A at 14.) The application submitted by Defendant contained a proposed federally-financed budget with fixed dollar amounts for each of the following NIST-approved category of expense, i.e., Personnel (Salaries), Fringe Benefits, Travel, Equipment, Materials/Supplies, Subcontractors, Other (1st & 3rd year audits), and no indirect costs. (GX-10 at 3; GX-10B.) Indirect costs and 3 - 4% of direct costs of the project were to be born by the Proposer. (Id.) The ATP budgets for CASI submitted by Defendant to NIST did not propose government payment for indirect costs, such as rent or utilities. (GX-10, 10A, 10B, 24.)

The ATP award to CASI dated October 4, 2001 (GX-1 at 11-12) was accompanied by Special Award Conditions (GX-13) and the approved budget for the research to be conducted (GX-14). In addition to the general Terms and Conditions specified in 15 C.F.R. 14, 25 (GX-2 at 3), the Special Award Conditions provided that for the first year of the award the NIST share of direct costs for the proposed research as set forth in the grant was $800,000, and recipient's contribution would be 3.61% ($30,000).

Government witness, BettiJoyce Lide, an ATP Program Manager for the grant to CASI, testified that Defendant was provided with the ATP Proposal Preparation Kit (GX-1; Tr. at 85); the Financial Assistance Standard Terms and Conditions (GX-3; Tr. at 86-88), and; the General Terms and Conditions of the ATP Grants (GX-2; Tr. at 85-86). Defendant accepted the Financial Assistance Award to CASI on October 5, 2001, and agreed to comply with the Award's

4

provisions, including the Financial Assistance Standard Terms and Conditions (GX-3); Special Award Conditions (GX-13; Tr. at 117); the Line Item Budget (GX-14) (15 C.F.R. Part 14, 48 C.F.R. Part 31), the General Terms and Conditions ATP (GX-2); Program Specific Audit Guidelines for ATP Cooperative Agreements with Single Companies, and notified the applicant of the requirement of prior written approval of budget or personnel charges, and the prohibition against using grant funds for indirect expenses, such as rent and utilities, or "sunk costs" (pre-grant expenses). (Tr. at 88-89, 108-09, 263). On November 8, 2001, Defendant and Elisha ("Lee") Gurfein, CASI's first year business manager, received the benefit of a slide show on the terms and conditions of the award. (GX-4.)

Hope Snowdon, the grant specialist in charge of CASI's grant and who was responsible for reviewing CASI's budget submissions, testified that beginning in October 2001 and continuing past the November 8, 2001 kickoff meeting, she frequently spoke on the phone with both Defendant and Mr. Gurfein (GX-21; Tr. at 300). In response to their inquiries, Snowden confirmed to each of them that the budget must be adhered to and that ATP funds could not be used for indirect expenses, such as rent or utilities. (Tr. at 257-59; 303-304.) Gurfein also testified that he had helped Defendant write the grant proposal based on the Proposal Kit (GX-1), and that when Defendant had suggested to him that the grant could pay Gurfein's expenses for preparation of the grant proposal, Gurfein advised him that those expenses were not reimbursable. (Tr. at 627.) Defendant relieved him of his responsibility to cosign checks within a week after he received notice of the Award; in an October 11, 2001 letter to NIST, Defendant advised NIST that Gurfein could not sign checks. (GX-21 at 3; Tr. at 299-301.) Gurfein testified

5

also that, when the initial payment of $150,000 from the award was received by CASI's bank account at Chase Bank, Defendant told him he had transferred $75,000 to his own account to pay for money he owed to his family and for credit card debts. (Tr. at 637, 664.) Gurfein told Defendant that "he couldn't do that"; Defendant's response was that he "had no choice, he had to get rid of those debts" and that "he had to take those funds immediately." (Tr. at 637-38.)

Gurfein further testified that he attended the kick-off meeting with Defendant and that at the meeting, they were told that rent, utilities, accounting, legal, and maybe some other items of expense were not allowed to be paid for by the grant. (Tr. at 632.) Later, when Defendant would spend grant funds outside the parameters of the approved budget, Gurfein kept confronting Defendant with the need to get prior written approval from the grant officer. (Tr. at 643.) Defendant repeatedly paid him no heed. (Tr. 643, 667, 679.) Gurfein also testified that, at Defendant's direction, he prepared quarterly financial statements for CASI, reflecting the funds applied for, instead of the actual expenditures of CASI, and reflecting contributions by CASI when CASI didn't contribute anything. (GX-40; Tr. at 683-85.) In response to defense counsel's inquiry if he ever told Defendant he might be committing a crime, Mr. Gurfein answered, "Maybe not in those words, but along those lines." (Tr. at 695.)

Frank Spring, a bookkeeper, was hired in July 2002 to come in and assist in preparing CASI's books for the first year's audit ending September 30, 2002. (Tr. at 835.) Spring was asked by Defendant to examine his personal records on Quicken, a software program, going back to April 2001, six months before the October 1, 2001 start of the award, to extract certain kinds of expenses and to charge them to the ATP project. (Tr. at 837-38.) Spring testified that once he

6

familiarized himself with the rules and regulations of the ATP grant, he brought to Defendant's attention that certain non-grant related expenses, "rent, utilities, certain amounts of capital expenditures and medical expenses," were improperly classified as ATP expenses on CASI's books and records. (Tr. at 840-42.) On multiple occasions, Spring found that, when he classified expenses as not ATP-related expenses in CASI's books, while preparing for the first-year annual budget report to NIST, Defendant changed them back as allowable expenses. (Tr. at 842-44.) When Spring confronted Defendant about these matters, Defendant told Spring on several occasions that Spring did not know what he was doing and that Defendant was in conversation with the ATP managers to ensure that these expenses would be allowed and that he would be having meetings with ATP managers to clear up all these matters." (Tr. at 843.) Spring, however, never received any written approval from NIST approving the expenses Defendant insisted on. (Tr. at 853.) Defendant's emails to Spring during November-December 2002 confirm Spring's testimony that Defendant refused to accept Spring's allocations of expenses to non-ATP-related categories. (GX-114-15; 149.)

Robert Benedict, a CASI employee hired in December 2002 to replace Gurfein during year two of the grant, gave similar testimony. (Tr. at 969.) Benedict testified that he found CASI expenses were commingled with grant funds and that Dr. Karron had control of all the documentation (Tr. at 973-75); that the only income coming in was the money coming in from ATP (Tr. at 976), and; that CASI had contributed no money to the grant. (Tr. at 988). When Defendant persisted in using ATP funds to pay for non-grant expenses, Benedict went to CASI's Board of Directors to request that CASI's checkbooks, along with the company's books and

7

records, be placed in the custody of Mr. Spring so that Spring could draw the checks and present them to Defendant to sign. (Tr. at 978-79.) He testified that Defendant then resorted to using PayPal, an electronic bill paying service, to circumvent the restrictions on his check writing ability by instructing PayPal to write CASI checks for expenses, and then, reimburse PayPal using his company American Express credit card. (Tr. at 980-81.) When Benedict confronted Defendant about using ATP funds for non-ATP expenses, particularly rent bills, Defendant responded, "I have to pay the bills." (Tr. at 981-83.)

Benedict told Defendant that "this was very serious," that "he could go to jail for this," and that he could have between $300,000 and $500,000 of disallowed expenses. (Tr. at 993.) Defendant dismissed Benedict's warnings, saying: "Don't worry about it, my Mom's got it." (Id.)

Ms. Lide also testified that the NIST program officers received Estimated Multi-Year Budget statements from CASI on October 20, 2002 (GX-32), December 2, 2002 (GX-33), December 20, 2002 (GX-34), December 24, 2002 (GX-35), and February 25, 2002 (GX-36). (Tr. at 136-140.) The last four of these budgets should have reported actual research costs for the first fiscal year of the grant (Tr. 136-140), but contained discrepancies the NIST program officers found difficult to reconcile with each other and with CASI's Amendments to Financial Assistance Award approved by the grants officer during the first fiscal year of the grant. (GX-21, 22, 23, 24; Tr. at 136-147.) Because of their difficulties in reconciling the expenditures in the first fiscal year on April 16, 2003, the program officers requested that the Inspector General's Office of the Department Commerce conduct an audit of CASI. (GX-30; Tr. at 140-41.) A preliminary audit was performed in May and June 2003.

On June 27, 2003, CASI was notified by Marylyn Goldstein, the NIST Grants Officer, that "based on preliminary audit information," CASI was "in non-compliance with Special Award Condition #7 'cost share'"; as a result, Goldstein suspended the award. (GX-26; Tr. at 149-150.)

On July 25, 2003, the Regional Officer of the Inspector General reported to NIST, with a copy sent to Defendant, that CASI had not contributed any of its required cost share, which totalled $54,008, had drawn down $205,126 in excess of the federal share of ATP project costs identified in its project records, and had filed inaccurate Financial Status Report with NIST, falsely showing that the company had contributed the required matching funds as well as overstating the company's ATP project expenses. (GX-60.)

In December 2003, the Office of Inspector General initiated a draft audit of CASI for the periods October 1, 2001 to June 27, 2003. (Tr. at 509.) The Office of Inspector General issued a draft final audit report on March 31, 2004 for Defendant to review. (GX-61; Tr. at 511.) On August 25, 2004, the Office of Inspector General issued its Final Audit Report of CASI for the same period. (GX-62; Tr. at 516.)

By stipulation (GX-900), the government also placed in evidence the bank account records of Defendant at J.P. Morgan Chase Bank ("Chase Bank") from October 2001 to on or about August 2003 (GX-80); CASI's bank account records at Chase Bank from October 2001 to on or about August 2003 (GX-81); CASI's American Express credit card statements for Defendant from October 2001 to April 2003 (GX-90); records for CASI's purchases at Home Front Hardware Store from September 2002 to September 2003 (GX-101); CASI's purchases at

9

General Computers and Service from October 2001 to May 2003 (GX-102); CASI's purchases at Silicon Graphic Inc. from December 2001 to January 2003 (GX-103; Tr. at 459), and; the Inspector General's final audit (GX-62), based on GX-80-81, and spread sheets of the auditor reflecting entries in CASI's bank accounts and the Defendant's bank accounts. (GX-110, 111; Tr. at 526.)

## Discussion

In his motion papers, Defendant argues that the evidence was insufficient to sustain Dr. Karron's conviction because the government failed to prove that Defendant, knowingly and willfully, intended to misapply ATP funds. Defendant further contends that the Court's failure to charge the jury that it must trace each of his unauthorized expenses to the actual payments made to CASI by ATP entitles Defendant to a new trial.

In considering the validity of Defendant's lack of *scienter* argument, one has to take into consideration that the Defendant in this case is an educated American citizen who has a Ph.D. from New York University's School of Applied Science and Bio-Medical Engineering. (GX-10A.) In his grant proposal, he described himself as having entrepreneurial experiences ranging from building a trucking company to renovation and development of real estate, and being a patent owner. (GX-10A at 14-15.) He is President of CASI, a New York Class C Corporation (a for-profit corporation) formed in 1995, which had previously received two subcontracts. (Id. at 16.)[4]

---

[4] "The crash in CASI income in 2000 was due to two disastrous military and academic subcontracts." (GX-10A at 17).

10

On October 23, 2001, CASI's opening bank balance at JP Morgan Chase Bank was $613.70. (GX-81 (Oct. 23-Nov. 23, 2001 bank statement).) There were no deposits in the account until October 26, 2001 when Defendant deposited the initial payment of $150,000 from NIST in CASI's account at Chase Bank. (Id.) That same day he drew a check for $75,000 payable to himself as a salary advance, which, he explained to Gurfein, he had to do to pay loans and credit card advances. (Id.; Tr. at 513, 637.) On that same date, Defendant also drew nine checks payable to himself for $2,000 each; the checks contained notations designating each as back rent payments for the months January through September of 2000. (GX-81; Gov't.'s Mem.Ex. E;[5] Tr. at 513-14, 755). These checks were deposited in Defendant's personal account at Chase Bank on October 26, 2001. (GX-80.) Additionally, nine more checks for $2,000 each were drawn on CASI's account and subsequently made payable to Defendant; these checks were designated on CASI's general ledger as back rent for other months prior to October 1, 2001, constituting a total amount of $36,000. (GX-81; Tr. at 757.) Thus, those rent payments to Defendant were for costs prior to the award ("sunk costs"), as well as for rent, an unapproved category of expense in CASI's budget submitted by Defendant approved by NIST. And During the first year of the grant, another twelve checks for $2,000 were made payable to Defendant for rent for those months for a total of $60,000 paid as rent to Defendant from the federal assistance funds (GX-81, 110).[6]

---

[5] Government's Memorandum in Opposition dated July 21, 2008.

[6] Although the auditor assigned by the Inspector General's office to perform the audits of CASI, Belinda Riley, was a weak witness (she had never testified previously), her spread sheets (GX-110, 111) showing each item of expense and reimbursement were backed up by the bank records of CASI and of the Defendant (GX-80, 81), which show clear evidence of the payment of $18,000.00 to Dr. Karron for rent reimbursements in October 2001. (See Gov't. Mem., Ex. E.)

11

The uncontradicted evidence is that in November/December 2001, Ms. Snowden and Ms. Lide of NIST each advised Defendant that, under CASI's budget, the federal assistance funds could not be used for rent or utilities, and that prior written approval was required before any expenditure outside the approved budget could be made. (Tr. 122-23; 257-59; 634-35). In addition, Defendant had received similar advice from Bob Benedict, whom he had met at an ATP Proposers Conference in the Spring of 2001, where Benedict explained that "grant money is to be spent only as the budget allows and the grant specifies." (Tr. at 963-64.) Later, in the fall of 2001, in response to Defendant's inquiry, Benedict advised Defendant that rent is an indirect expense and it is not usually allowed in a single grant. He also told Defendant that if expenses were not in the budget, Defendant would "have to get an ATP budget amendment and ATP authorization to include it." (Tr. at 967.)

There is no evidence that Defendant, even after having been advised by Mr. Snowden and Ms. Lide, the grant program officers, as well as Gurfein, Benedict, and Frank Spring, that grant money could not be applied for rent, ever repaid CASI for his withdrawals of grant funds to pay himself rent or ever attempted to do so. In his summation, Defendant conceded that the last payment of rent to Dr. Karron from CASI's bank account was on October 19, 2002 (Tr. at 1312), and that there were no checks for rent in 2003. So once it finally went through his head that you can't do it, it's not allowable, this arrogant guy, according to them, listens to nobody, stopped taking rent." (Tr. at 1311.)[7] Accordingly, based on the October 26, 2001 Chase Bank records

---

[7] There is evidence that, after the grant was suspended, Defendant contributed $47,000 to the project in August 2003, but that contribution was for outstanding expenses to keep the project going (Tr. at 1304), not as reimbursement for rent.

12

alone, a reasonable jury had sufficient evidence before it to conclude that Defendant had intentionally and knowingly misapplied grant funds from CASI to himself, totaling more than $5,000 in a one year period in violation of 18 U.S.C. § 666. (GX-111 at 4-5; GX-81 (Oct. 23-Nov. 23, 2001 bank statement).)

Further, there were other non-research expenses Defendant tried to include as expenses chargeable to the grant, which a reasonable jury could have found benefited CASI or Defendant rather than the research project, such as the expenses for utilities, materials and supplies (over budget), bookkeeping, lawyers, dues, subscriptions, equipment cost (over budget), Defendant's salary and net withdrawals (over budget),[8] cleaning services, a GPS navigational device, restaurant meals, Starbucks coffee, and household items, such as a blender, vacuum cleaner, camera, and power drill. (GX-101, GX-110, GX-114, GX-115.) Additionally, based on the testimony of Spring and Benedict, a jury could find Defendant was intent on charging many unallowable expenses to the ATP budget, e.g., asking Spring to find for APT reimbursement items of his personal expenditures among his records for months prior to the grant. (Tr. at 838.)

Evidence bearing on Defendant's knowledge and intent to misapply the federal assistance funds was also provided by Mr. Gurfein's testimony that Defendant instructed him to prepare false quarterly Financial Status Reports with NIST, showing compliance with the amounts in the budget CASI submitted to NIST rather than revealing CASI's actual expenditures in each category of expense allowed. (Tr. at 663-64.)

---

[8] The defense offered DX-FFF to show Dr. Karron did not draw some of his salary and loaned money to CASI; however, the auditors spreadsheets showed that these credits were more than offset by his advance of $75,000 and other loans taken by him from CASI bank accounts at Chase Bank.

13

Evidence bearing on Defendant's knowledge and intent was also contained in an email in December 2002 from Defendant to Tili Lorraine, suggesting that he planned to enter into a residential lease agreement with Windy Farnsworth for space in her house in New Milford, Connecticut, while he continued to live in the apartment, so that he could falsely claim the apartment was solely used for research. This email provided grounds for the jury to conclude that Defendant was not unwilling to deceive NIST. (GX-213.)[9] An email to Professor Schwartz of CASI's board of directors dated August 20, 2003, stating that ATP wanted the co-payment paid and showing Defendant's concern over possibly paying $64,000 of pending grant bills and then getting a bill for $200,000 of disallowed expenditure or forcing the government to try and collect $1.4 million "so they have to cooperate in finding a livable solution for all of us." (GX-203; Tr. at 1086.)

Since it is clear that the balance in CASI's account on October 26, 2001 was only $613.70, and since, on October 26, 2001, Defendant deposited $150,000 in grant funds in CASI's account and that same day withdrew $75,000 as an advance, and also withdrew $18,000 in checks payable to himself for back rent, which he was warned repeatedly was clearly not an allowable expense, and since there was no evidence that Defendant ever repaid the $18,000, the jury had ample grounds to find that, in a single year, Defendant intentionally and knowingly misapplied over $5,000 of federal grant funds for an unauthorized purpose in violation of 18 U.S.C. § 666a(1)(A) and (b).[10]

---

[9] Windy Farnsworth confirmed that the Defendant entered into the lease but the parties never honored it. (Tr. at 1184.)

[10] In fact, the records show that Defendant withdrew $60,000 from CASI's account in the first year in rent payments

14

c

Defendant next asserts that the Court's charge on "tracing" misled the jury. The Court's charge made clear that the jury had to find that Defendant intentionally misapplied the grant money received by CASI in a manner Defendant knew was unauthorized under the terms and conditions of the grant. (Tr. at 135.) However, due to the Government's claim that many items of expense were misapplications, the Court, following Sabri v. United States, 541 U.S. 600 (2004), advised the jury that it did not have to trace the misapplied funds to the deposits of ATP funds in CASI's account. (Tr. at 1353.) See also United States v. Kranovich, 401 F.3d 1107, 1111 (9th Cir. 2005); United States v. Spano, 401 F.3d 837, 840 (7th Cir. 2005). Here, of course, the back rent payments to Defendant of $18,000 on October 26, 2001 did not require tracing because those funds had to constitute a misapplication of over $5,000 in Federal funds since CASI's prior balance was $613.70.

**Defendant's Non-Criminality Argument**

In the Defense's reply memorandum, and then again at oral argument on October 3, 2008, defense presented an argument that was not directly raised at trial. Namely, that ATP, instead of making a grant, chose to fund a cooperative agreement so ATP could exercise appropriate oversight of projects and also link ATP-funded projects to ongoing research and development at NIST. (Def.'s Reply Mem. at 4) (citing 15 C.F.R. 295 (2008)).[11] Defendant states that the

---

to himself.
[11] "Def.'s Reply Mem." refers to Defendant Daniel B. Karron's Memorandum of Law in Reply to the Government's Opposition to Defendant's Motion for a Judgment of Acquittal and for a New Trial, dated August 15, 2008.

government mistakenly equated "cooperative agreement" with "grant" in prosecuting Dr. Karron. (Id.) Defendant cites the language of both 15 C.F.R. 292.2(f) and 15 C.F.R. 295.2(c) and argues that "a cooperative agreement involves substantial involvement between the executive agency and the recipient and therefore, provides for a flexible budget subject to revision either before, or after money is spent, and also provides for an administrative review process" which Defendant did not receive. (Def.'s Reply Mem. at 6.) Defense argues also that, under 15 C.F.R. 14.62(a)(1), pre-award costs are incurred at recipient's risk and that the Defendant was entitled to administrative review and audit resolution, which did not receive and that he relied on this process and should not have been prosecuted for a crime. (Def.'s Reply Mem. at 6, fn. 4.)

The defense argument that Defendant relied not on the ATP contract provisions, but upon the provisions of the C.F.R. in determining how to apply the Federal Assistance funds for CASI, has no evidentiary support. Nevertheless, the C.F.R. clearly states that a "cost is allowable only when the cost complies with all of the following requirements," and included in these requirements are "the terms of the contract." 48 C.F.R. § 31.201-2(a)(4). The contract here is the ATP Financial Assistance Award signed by the Defendant (GX-12), which incorporated ATP's General Terms and Conditions (GX-2) and the Financial Assistance Special Standard Terms and Conditions (GX-3), and Special Award Conditions (GX-13) and the line item budget. The ATP General Terms and Conditions state that "recipients must obtain prior written approval from the NIST grants Officer for ... transfer of funds among direct cost categories ... if the amount of the transfer exceeds 10% of the approved annual budget ..." but also that "recipients are not authorized to create new budget categories without prior approval." (GX-2 at 3.) The

16

contract also states that "those costs that are designated as being unallowable in Chapter 1, Section D.2 of the November 2000 ATP Proposal Preparation Kit will be unallowable under this award." (Id. at ¶ 10 (ATP General Terms and Conditions).) Notice of these unallowable costs was distributed to Defendant with the ATP Proposal Preparation Kit (GX-1) and were explained to Defendant in detail, and crucially, included all overhead/indirect costs such as rent, utilities. (Tr. at 88-89, 108-09, 263.)

Further, the C.F.R. ensures that "Each award by the Program shall contain ... financial reporting and auditing requirements to ensure that awards are being used in accordance with Program's objectives ... the audit standards to be applied to ATP awards are the Government Auditing Standards ... and the ATP program specified audit guidelines." 15 C.F.R.§ 295.10. Thus, it is clear from CFR regulations that the highly educated Defendant should have been aware that CFR Guidelines incorporated the terms of the ATP guidelines, and did not exclude the terms of the ATP contract and were subject to audit.

Defendant next argues that, since this was a cooperative agreement, not a grant, he was entitled to an administrative review of his expenditure, rather than being subject to a criminal proceeding. The distinction between a cooperative agreement and a grant (as defined in 15 CFR § 295.2) is a distinction without a difference. All ATP grants are cooperative agreements. However, Defendant was not entitled to administrative review of his grant whether or not the ATP contract was a "cooperative agreement" or a "grant." 15 CFR § 14.62(a) states that the Grant officer "may, in addition to imposing any of the special conditions outlined in CFR § 14.14, take one or more of the following actions, as appropriate in the circumstances," including

17

"take other remedies that may be legally available." Thus, the section specifically warns that the government may "take other remedies that may be legally available," which would include criminal proceedings.

It is true that subsection (b) of that same section of the C.F.R. states that "in taking an enforcement action, the awarding agency shall provide the recipient an opportunity for hearing, appeal, or other administrative proceeding to which the recipient *is entitled* under any statute or regulation applicable to the action involved." To show that Defendant was entitled to such a hearing or appeal under a regulation or statute, the defense, by letter to the Court dated October 2, 2008, points to page 8 of the Standard Terms and Conditions for Financial Assistance of the Department of Commerce (GX-3), which provide for an Audit Resolution Determination Letter, an Appeal from that letter, and an Appeal Determination Letter. However, although the defense did show that Ms. Garrison of the Inspector General's Office asked NIST on October 1, 2004 not to proceed to audit resolution with CASI (DX-2), no evidence was presented at trial that the Defendant ever took steps to seek. Although the trial record reflects that on May 10, 2004, CASI filed a response to the draft Audit Report dated March 31, 2004 (GX-61 (see Appendix III to Final Audit Report dated August 25, 2004); GX-62), the record does not reflect that, after August 25, 2004, CASI or Defendant filed a response to the Final Audit Report (GX-62) as provided for in subparagraph (b) 2 or 3 of the Financial Assistance Standard Terms and Conditions at page 8 (see enclosure to Defendant's post argument letter to the Court dated October 2, 2008).

Accordingly, the record does not show that Defendant or CASI completed a response to the Final Audit Report within 30 days or filed an appeal from any Audit Resolution

18

Determination Letter issued by the Department of Commerce. Nor is there any evidence before the Court or the jury that Defendant was in fact, interpreting the CFR to rebut the government's proof that he knowingly and intentionally misapplied $5,000 in federal assistance funds in a one-year period.

Under these circumstances, these arguments of the defense fail, and Defendant's motions for a judgment of acquittal and for a new trial are denied.

IT IS SO ORDERED.

Dated: New York, New York
October 16, 2008

Robert P. Patterson, Jr.
U.S.D.J.

Copies of this Order were sent to:

*For the Government:*
Michael J. Garcia, U. S. Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
Attn: Chi T. Steve Kwok, Christian R. Everdell
Tel:   212-637-2415/2556
steve.kwok@usdoj.gov
christian.everdell@usdoj.gov


*For Defendant:*
Rubinstein & Corozzo, LLP
260 Madison Avenue, 22nd Fl.,
New York, NY 10016
Attn:   Ronald Rubinstein
Tel:    212-545-8777
rcorozzo@aol.com

19