UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – –  X
                               :

DANIEL B. KARRON,

                               :

          Petitioner,              :          **11 Civ. 1874 (RPP)**

                               :          **07 Cr. 541 (RPP)**

    -v.-

                               :

UNITED STATES OF AMERICA,

                               :

          Respondent.

                               :

– – – – – – – – – – – – – – – – – – – – – – – – –  X

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE, SET ASIDE, OR CORRECT HIS SENTENCE UNDER 28 U.S.C. § 2255

                                           PREET BHARARA
                                           United States Attorney
                                           Southern District of New York
                                           One Saint Andrew's Plaza
                                           New York, New York 10007

Christian R. Everdell
Assistant United States Attorney
    – Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.......................................................................................1

BACKGROUND..........................................................................................................1

    A.    The Government's Case.................................................................2

    B.    The Defense Case.................................................................................10

    C.    Conviction, Sentencing, and Direct Appeal............................................10

ARGUMENT.............................................................................................................11

    I.    Karron's Claim of Ineffective Assistance of Counsel Is Meritless.......................11

        A.    Applicable Law...............................................................................12

        B.    Discussion.....................................................................................13

    II.    Karron's Claim of Alleged Brady Violations is Procedurally Defaulted and Otherwise Without Merit.............................................................17

        A.    Karron Is Barred from Raising Her Brady Claim Because She Did Not Raise It on Direct Appeal ....................................................17

        B.    Karron's Allegations of Brady Violations Are Baseless............................20

    III.    Karron's Claim of Actual Innocence is Without Merit...........................................25

    IV.    This Court Should Deny Petitioner's Motion Without An Evidentiary Hearing...................................................................................................26

CONCLUSION...........................................................................................................28

## PRELIMINARY STATEMENT

The Government respectfully submits this motion in opposition to petitioner Daniel B. Karron's Memorandum of Law in support of her motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255 dated April 28, 2011 ("Karron Br."). In her motion, Karron argues that she received ineffective assistance of counsel for a litany of reasons, including that her counsel (i) adopted an unreasonably poor defense strategy that did not make use of forensic accounting evidence, (ii) failed to make a number of factual arguments that Karron argues would have established that she did not misappropriate the government grant funds that she received, (iii) failed to impeach the Government's witnesses and discredit its key evidence, and (iv) did not prepare effectively for trial. Karron also argues that the Government violated her constitutional rights under Brady v. Maryland, 373 U.S. 83 (1963). Finally, Karron argues that she was factually innocent of the crime of conviction.

For the reasons stated herein, Karron's claims are mertiless and the Court should dismiss Karron's motion in its entirety without an evidentiary hearing.

## BACKGROUND

Indictment S2 07 Cr. 541 (RPP) was filed on May 21, 2008, in one count. Count One charged Daniel B. Karron with intentionally and knowingly misapplying more than $5,000 of funds under the care, custody, and control of Computer Aided Surgery, Inc. ("CASI"), a company that received more than $10,000 in federal funds during a one-year period, and of which Karron was the President and Chief Technical Officer at all relevant times, in violation of Title 18, United States Code, Section 666. Trial commenced on June 2, 2008, and ended on June 11, 2008, when Karron was convicted of the sole count in the Indictment.

A.      **The Government's Case**

The evidence at trial overwhelmingly showed that, from October 2001 to June

2003, Daniel B. Karron, a Ph.D. scientist, intentionally misapplied more than $5,000 of funds

under the care, custody, and control of CASI, a company that received more than $10,000 in

federal funds during a one-year period, and of which the defendant was the President and Chief

Technical Officer.  (GX 10, 11).  The defendant diverted the federal grant money entrusted to

CASI and intended for high-risk scientific research to pay rent, utilities, home renovation

expenses, meals, and miscellaneous household items.  (GX 114, 115).  The defendant did so

despite repeated warnings from federal officials who administered the grant (Tr. 122-23, 259),

and over the objections of the defendant's own business managers, bookkeeper, accountants, and

other employees (Tr. 637-38, 840-42, 978-79).  As a result of the defendant's willful

misapplication of the federal grant, which totaled over $1.3 million from October 2001 until it

was shut down in June 2003, the Government suffered a loss of at least $120,000.  (Sent. Tr. at

57-58).

The Government's proof at trial included testimony from representatives of the

National Institute of Science and Technology ("NIST"), the federal agency that administered the

federal grant; an auditor who analyzed CASI's books and financial records; and CASI's business

managers and a bookkeeper whom the defendant hired to handle the company's finances.  The

proof also included documentary evidence, including CASI's application for the Advanced

Technology Program ("ATP") grant award, documents signed by the defendant in which she

indicated her understanding of the rules governing the grant and her agreement to abide by them,

CASI's budgets as approved by NIST, CASI's financial records, and various e-mails between the

defendant and other individuals concerning the defendant's spending of the grant money and her attempts to change various accounting entries in CASI's books and records.

### 1.     CASI and the ATP Rules

In October 2001, CASI received a $2 million federal grant, to be disbursed over the course of three years, that was designed to support high-risk scientific research.  (GX 11, 13; Tr. 56).  In her application for the grant, known as the Advanced Technology Program, Karron stated that the money would be used for researching medical imaging technologies that would aid in the diagnosis and treatment of various diseases.  (GX 10).

The basic spending rules of the ATP grant were straightforward:  Recipients of the grant "must adhere to the budget" as approved by NIST, the office that administered ATP.  (Tr. 87, 265).  A fixed dollar amount was allocated to each category in the approved budget (e.g., "Equipment," "Personnel," etc.), with each category further broken down in a detailed budget narrative that spelled out exactly how the money was to be spent.  (GX 10B).  Grant recipients could not use federal funds to pay for items or services not included within the approved budget.  (Tr. 87, 265).  The reason for this basic principle is self-evident — to ensure that federal taxpayers' money would be spent only to further the high-risk scientific research ATP was designed to fund, and nothing else.  (Tr. 265).

While NIST recognized that changes to the approved budget might become necessary as the research progressed, prior written approval was mandatory before federal funds could be used in a way different from that provided for in the approved budget.  (GX 2 at 3; GX 4 at 7; Tr. 87, 94, 108-09, 265, 267).  The only exception to this requirement was where the transfer of funds among approved budget categories was de minimis — defined as 10% or less of the total annual budget.  (GX 2 at 3; Tr. 87, 348).

In addition to the basic requirement that a grant recipient had to adhere to her approved budget, the ATP grant followed certain basic funding principles.  One such principle was that ATP would not pay for "indirect costs," i.e., overhead expenses that did not directly relate to the research.  This is because the goal of the ATP grant, supported by scarce taxpayers' dollars, was to support high-risk scientific research only, not to subsidize administrative expenses that every business has to bear.  (Tr. 279)  Typical examples of such indirect costs include rent, utilities, facility renovations, legal fees, and general administrative costs.  (Tr. 88; GX 1, Instructions For Form NIST-1262, Item K)  This rule made no distinction between companies that were working solely on ATP-funded projects and companies that were working simultaneously on both ATP-funded and non-ATP-funded projects.  (GX 1 at 6; GX 3 at 3; Tr. 122-23, 256-57).

Another basic funding principle was that ATP funds could not be used to reimburse a company for sunk costs — i.e., costs incurred before the start of the ATP grant period.  (Tr. 88, 298)  This prohibition is a direct corollary of the general requirement that recipients use ATP funds only in accordance with the approved budget.  Since ATP budget submissions were forward-looking, pre-grant costs were necessarily excluded from the approved ATP budget and, hence, could not be paid for using ATP money.  (GX 14, GX 22 at 3; Tr. 298).

## 2.    The Defendant Knew about the Applicable ATP Rules

These terms and conditions governing the ATP grant were explained to Karron on multiple occasions.  Bettijoyce Lide, the ATP manager responsible for the grant awarded to CASI, testified that she met Karron at a "kick-off meeting" in November 2001 during the beginning of the grant period.  Lide testified that she and her colleagues prepared a slide-show

presentation for Karron and Karron's employees that set forth the basic terms and conditions of

the grant, including, most notably, the "prior approval" requirement (Tr. 108) and the prohibition

against using ATP funds to pay indirect costs such as rent (Tr. 88, 109).  After the meeting, in

response to the defendant's inquiries about using ATP funds to pay for rent based on CASI's

"unique circumstances" — namely, that Karron ran CASI's research out of her apartment —

Lide kept saying no (Tr. 122-23), and kept reiterating the need for obtaining prior approval

before any expenditure outside of the approved budget could be made.  (Tr. 123).  In response to

Lide's insistence on obtaining prior approval, Karron replied, "no approval would be needed if

[s]he would just come and schmooze and take us to lunch."  (Tr. 130).

   Hope Snowden, the grant specialist responsible for reviewing CASI's budget

submissions to the ATP program, also testified at trial.  (Tr. 262-65).  Indeed, Snowden testified

that her conversations with the defendant about the ATP rules preceded even the kick-off

meeting.  (Tr. 257-59).  Snowden testified that "right after Karron was told [s]he . . . would be

receiving this federal fund" in October 2001, Karron called her to ask whether ATP funds could

be used to pay rent and utilities.  (Tr. 258).  Snowden told the defendant that "the answer was no,

time and time again."  (Tr. 259).  Nonetheless, according to Snowden, Karron and her business

manager, Lee Gurfein, kept calling, "like a day apart, and they would consistently get the same

exact answer," which was that rent and utilities "were unallowable costs, and, no, you cannot use

federal funds."  (Tr. 259).

   Snowden gave the same response to Karron and Gurfein again during the kick-off

meeting in November 2001 when Lide and Snowden conducted the slide-show presentation.

Snowden testified that the topics covered in the slide-show presentation included the importance

of adhering to the approved budget (Tr. 265), the need to obtain prior written approval for any changes to the budget greater than 10% of the total annual budget (Tr. 298), and the rule against using ATP funds to pay for indirect and pre-grant expenses (GX 4 at 6; Tr. 298).

Finally, Snowden testified that the phone calls from Karron and her manager Gurfein kept coming even after the slide-show presentation.  Karron and Gurfein persisted in calling Snowden asking to use "federal funds to pay for rent and utilities."  (Tr. 303).  Once again, Snowden's response to them "was always no.  No matter what [Karron] said, how [s]he said it to me, it's no, these are taxpayers' money and we do not use that to pay for rent and utilities."  (Tr. 303).  Her response to Gurfein was the same: "No, again and again, absolutely not."  (Tr. 303-04).

### 3.    Karron Misapplied Federal Funds

Despite being told on multiple occasions in person, over the telephone, and through her business manager Lee Gurfein that she could not deviate from her research budget as approved by NIST, Karron did exactly that, and did so repeatedly.  Over the course of a year and a half, the Government's proof at trial showed that the defendant misapplied close to half a million in federal funds toward the payment of unauthorized expenses, including rent, utilities, a cleaning lady for his apartment, restaurant meals, and miscellaneous household items such as blenders, vacuum cleaners, power drills, and a GPS navigation device.  (GX 101, 110, 114, 115).

The evidence that established Karron's guilt at trial was overwhelming.  First, there was no dispute that Karron alone had signatory authority at CASI, and thus, no question that Karron was the person who was ultimately responsible for the misapplication of the grant

funds.  (Tr. 299-301).  Although Lee Gurfein was initially hired on the understanding that he would have dual signatory authority with Karron, Gurfein's authority was stripped away one week after CASI was awarded the ATP grant, as documented by a letter Karron sent to NIST to that effect, dated October 11, 2001.  (*See* GX 21 at 3; Tr. 300-02, Tr. 639) (testimony of Lee Gurfein) ("Within a week exactly on October 11th . . . , I was stripped of my ability to control the business as I was told I would have.").  Furthermore, as shown by CASI's bank account records (GX 81), the only signature that ever appeared on the canceled checks was the defendant's.

Second, CASI's financial records — including bank statements pertaining to CASI's business accounts at Chase Bank (GX, 80, 81), American Express ("AMEX") statements for various credit cards issued to CASI (GX 90), and invoices from various vendors relating to purchases made on behalf of CASI — proved beyond a reasonable doubt that virtually all of CASI's source of funding came from the ATP grant and that a substantial amount of the grant money was spent toward unauthorized expenses.

To facilitate the jury's review of the voluminous financial records, the Government called Belinda Riley, a Department of Commerce auditor who analyzed CASI's financial records, and qualified her, without any objection from the defense, as an expert in accounting and auditing procedures.  (Tr. 464-65).  Riley testified that, based on the Chase Bank records (GX 81), she created a database listing every transaction in CASI's bank accounts that covered the time period from October 1, 2001 to June 2003.  (GX 110; Tr. 516-17, 533-38).  Riley then supplemented her database with information obtained from the AMEX credit card statements that listed the date of every credit card transaction made on CASI's credit cards and

the vendors where the purchases were made (GX 110; Tr. 538-47).

   With respect to CASI's source of funding, Riley testified that her analysis showed that, with the exception of about $1,170 in miscellaneous refund checks in Year 2 of the grant, the ATP grant was, on balance, CASI's only source of funding.  (GX 112, 113).  While the defendant made a number of transfers from her own personal bank account to CASI's business accounts (GX 110, at 32 of 37 & 38 of 44) and accepted a reduced salary for a period of time (GX 110, at 39 of 44), these monetary "contributions" from the defendant were far outweighed by the personal loans the defendant took out from CASI that she never repaid (GX 110, at 38 of 44; at 32 of 37).

   With respect to the expenditure of money in CASI's business accounts, Riley testified that the financial records established that it went to pay for, among other things, rent (GX 110 at 39 of 44), a cleaning lady for her condominium (GX 110 at 36 of 44), utilities such as electricity, cable, telephone, and Internet services (GX 110 at 30-35), home renovation and hardware tools (GX 110 at 20-21), and restaurant meals (GX 100 at 22-25).  Riley's analysis showed that Karron misapplied more than $268,000 in Year 1 of the grant, and more than $196,000 in Year 2 of the grant, for a total of approximately $465,000.

    **4.**  **Karron Misapplied ATP Funds Against The Warnings Of His Bookkeeper And Business Managers**

   To show that Karron's misapplication of federal grant funds was intentional and willful, the Government presented devastating proof that Karron's own employees repeatedly told her to stop doing so and also warned her about the potential consequences of openly flouting ATP grant rules.

   Frank Spring, a bookkeeper the defendant hired in July 2002 to manage CASI's

books, testified that, once he became familiar with the rules and regulations of the ATP grant, he had a series of conversations with the defendant after he noticed that certain non-grant-related expenses — "rent, utilities, certain amounts of capital expenditures . . . , and medical expenses" — were classified as ATP expenses in CASI's books and records.  (Tr. 840-42).  In response, Karron scolded Spring for not knowing what he was doing and told Spring that she was "in conversation with the ATP managers in Washington to ensure that these expenses . . . would be allowed."  (Tr. 842).  With respect to the use of ATP funds to pay rent, in particular, Karron also told Spring that, if asked, she would simply "tell the ATP managers that he lived in Connecticut" — a flat-out lie — to buttress her argument that her apartment was used as an office to run CASI's operations, not a home, and, thus, rent should be allowed to be paid for with grant money.  (Tr. 854-55).

Furthermore, on multiple occasions, "between one dozen and two dozen times," (Tr. 844), when Spring re-classified certain expenses as non-ATP expenses in CASI's books, Karron changed them back as allowable ATP expenses.  When Spring confronted Karron about her "mucking about" in the company's books (GX 145 at 2), Karron again told Spring he did not know what he was doing and that Karron "would be having meetings with the ATP managers to clear up all of these matters."  (Tr. 843).  Spring, however, never received any written approval from NIST approving the expenses in question.  (Tr. 853).

Contemporaneous e-mails to and from Karron corroborated Spring's testimony. (GX 142-45, 147, 149).  For example, in an e-mail dated November 30, 2002, Karron wrote Spring:  "I [ ] have problems with the entire way you are splitting the costs between atp and non atp.  We need to fix this. . . .  I need to review all of the non program items. . . .  I will work with

-7-

or without you to develop new reports. . . .  I prefer to do this with you."  (GX 144 at 3).

   In another e-mail dated June 21, 2003, Karron, in response to Spring's continuing

complaints about Karron's characterization of cleaning and home renovation expenses as

grant-related expenses, wrote, "Please, you are not to make interpretations as to allowability or

category.  You need to be a bookkeeper, not [a] business owner.  I know you like to think like an

owner, but I own this little dingy, not you."  (GX 147).

   Finally, in an e-mail to a friend dated December 18, 2002, Karron repeated the lie

about living in Connecticut that she had discussed with Spring:  "I will make a lease with Windy

[in Connecticut] and make like I only keep a folding bed on 33rd Street.  If ATP buys into this

idea, then I can charge my rent on the apartment to the grant and pay my mortgage."  (GX 213)

(emphases added).

   Karron's business manager from 2001 to 2002, Lee Gurfein, likewise testified

that he tried to stop Karron from spending federal money on disallowed expenses, but to no

avail.  Gurfein testified that, exactly one week after the grant was awarded, Karron stripped him

of his signatory authority, even though the initial understanding between Karron and Gurfein

was that they would have dual signatory authority.  (Tr. 639-41).  Furthermore, when Karron

admitted to Gurfein that she had transferred $75,000 out of the initial $150,000 infusion of cash

from ATP to pay off "personal obligations to his family" and credit card debts, Gurfein told

Karron "[s]he couldn't do that."  (Tr. 637-38).  In response, Karron said simply that "[s]he had

no choice; [s]he had to get rid of those debts."  (Tr. 638).  When Karron continued to spend grant

funds outside of the parameters of the approved budget, Gurfein kept confronting the defendant

and reminding her of the need to "apply for a written approval."  (Tr. 643).  Karron's "constant

refrain," however, was:  "'I'm the principal investigator, and I can do anything I want'" and NIST would approve the expenditures later because "'they [NIST] loved me.'"  (Tr. 667, 697).

Robert Benedict, the business manager Karron hired to replace Lee Gurfein during Year 2 of the grant, testified that when Karron persisted in using ATP funds to pay for non-grant expenses, Benedict went before CASI's board of directors to request that CASI's checkbooks, along with the company's books and records, be turned over to the bookkeepers for safekeeping.  (Tr. 978-79).  But even this drastic measure failed to stop Karron from misspending ATP funds.  Karron began using an electronic bills-paying service called "PayPal" to circumvent the restriction on her check-writing ability — i.e., instructing PayPal to write checks on her behalf and then paying PayPal using the company's AMEX credit card.  (Tr. 980-81).  When Benedict confronted Karron about her use of ATP funds to pay for disallowed expenses, Karron said simply:  "I have to pay the bills." (Tr. 982-83).  Toward the end of Benedict's tenure at CASI, when NIST began making inquiries about CASI's accounting, Benedict told Karron that "this was very serious," that "[s]he could go to jail for this," and that "[s]he could have between 300[,000] and 500,000 of disallowed expenditures."  (Tr. 997).  Once again, as she did with previous admonitions from NIST officials and her own employees, Karron dismissed this warning.  Referring to the amount of money she owed NIST, Karron told Benedict, "[D]on't worry about it, my mom's got it."  (Tr. 997).

Karron's intent to misapply the grant money entrusted to CASI was further borne out by the following e-mail Karron sent to a colleague, dated August 20, 2003.  Far from attempting in good-faith to repay the money she misspent, as a grantee who made honest mistakes would have done, Karron, even after the grant had been shut down for accounting

-9-

irregularities, was still planning to bend the rules her way and "weighing" the possibility of

engaging in financial blackmail to achieve her goal:

> I am weighing abandoning the grant at this point and forcing the
> government to try to collect 1.4M from me and *make the grant
> enough of a train wreck that they have to cooperate* on finding a
> liveable solution for all of us.  It is that bad and *I am ready to
> shove the situation to such a unpalatable end* that we get some
> cooperation from them.

(GX 203 at 3; Tr. 1083-86) (emphases added).

###### B.     The Defense Case

The defense called six witnesses:  a real estate broker who testified to the resale

price of Karron's apartment (Tr. 1096-100); the owner of the company that renovated her

apartment who testified to the nature of the renovation work on the apartment (Tr. 1102-123);

three character witnesses who testified to Karron's reputation for truthfulness and honesty (Tr.

1135-60); and a friend who testified that Karron never lived with her in Connecticut during the

time period charged in the Indictment, but lived in her own apartment in Manhattan on 33rd

Street.  (Tr. 1180-85).

###### C.     Conviction, Sentencing, and Direct Appeal

Trial ended on June 11, 2008, when Karron was convicted of the sole count in the

Indictment.  On October 20, 2008, the Court sentenced Karron to a custodial sentence of fifteen

months, to be followed by three years of supervised release, restitution in the amount of

$125,000, and a mandatory $100 special assessment.  On October 27, 2008, the Court amended

the judgment directing the defendant was to serve the fifteen-month custodial sentence as

follows: seven-and-a-half months of imprisonment to be followed by seven-and-a-half months of

home confinement.

On October 29, 2008, Karron appealed from her judgment of conviction.  On appeal, Karron advanced two arguments: (1) the District Court's jury instructions were erroneous because the jury was not instructed that Karron needed to have acted with a specific intent to defraud the Government to be guilty of the offense, and (2) the offense of conviction – Title 18, United States Code, Section 666 – was unconstitutionally vague.  By summary order dated October 7, 2009, the Second Circuit rejected these arguments and affirmed Karron's conviction.  Thereafter, Karron filed a petition for certiorari in the Supreme Court, which was denied on February 22, 2010.  She first filed the instant § 2255 petition on February 22, 2011.

## ARGUMENT

To obtain relief from a conviction under Section 2255, a movant must demonstrate a constitutional error, a lack of jurisdiction, or an error of law or fact that constitutes a fundamental defect resulting in a complete miscarriage of justice.  United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995).  Here, Karron argues that her constitutional rights were violated by receiving ineffective assistance of counsel and by the Government's alleged failure to disclose exculpatory evidence prior to trial.  Karron further asserts a claim of actual innocence, such that allowing her conviction to stand would constitute a miscarriage of justice.  For the reasons set forth below, these arguments are meritless and Karron's petition should be denied in its entirety without an evidentiary hearing.

## I.      Karron's Claim of Ineffective Assistance of Counsel is Meritless

Karron argues that she received ineffective assistance of counsel on a number of grounds, including that her counsel (i) adopted an unreasonably poor defense strategy that did not make use of forensic accounting evidence, (ii) failed to make a number of factual arguments

-11-

that Karron argues would have established that she did not misappropriate the government grant

funds that she received, (iii) failed to impeach the Government's witnesses and discredit its key

evidence, and (iv) did not prepare effectively for trial.  (Karron Br. at 95).  The crux of the first

two of these arguments is that Karron now disagrees with the trial strategy adopted by defense

counsel and contends that a different strategy would have been more effective, which is an

inadequate basis to support a claim of ineffective assistance of counsel.  The crux of the second

two arguments is that trial counsel did not effectively pursue the trial strategy that he did adopt

and that his performance was otherwise deficient, which is contradicted by the trial record.

Accordingly, Karron's claim of ineffective assistance of counsel should be dismissed.

### A.      Applicable Law

To prevail on a claim of ineffective assistance of counsel, a defendant must both

(1) overcome a "strong presumption" that his counsel's conduct was reasonable and show that

the representation he received "fell below an objective standard of reasonableness" under

"prevailing professional norms," and (2) "affirmatively prove prejudice," that is, that "but for

counsel's unprofessional errors, the result of the proceeding would have been different."

Strickland v. Washington, 466 U.S. 668, 687-89, 693-94 (1984); accord United States v. De La

Pava, 268 F.3d 157, 163 (2d Cir. 2001); United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000).

Only if both elements are satisfied can a defendant demonstrate that his counsel "was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that the

defendant was, as a result, deprived of a fair proceeding.  Strickland, 466 U.S. at 687.

Under the first prong of the Strickland analysis, the reviewing court " 'must

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance,' bearing in mind that 'there are countless ways to provide effective assistance in any given case' and that 'even the best criminal defense attorneys would not defend a particular client in the same way.' " United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (quoting Strickland, 466 U.S. at 689).

A defendant cannot prevail on a claim of ineffective assistance merely because he believes that his counsel's strategy was inadequate. See United States v. Sanchez, 790 F.2d 245, 253 (2d Cir. 1986). As the Supreme Court cautioned in Strickland, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

To satisfy the second prong of the Strickland analysis, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994) (quoting Strickland, 466 U.S. at 694). It is insufficient to show merely that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Strickland, 466 U.S. at 693.

**B.   Discussion**

Despite expressing her clear displeasure with the decisions and performance of her trial counsel, Karron fails to establish that her trial counsel's conduct was unreasonable or

-13-

that she suffered any prejudice from such conduct.  Karron's claims of ineffective assistance therefore fail to satisfy either prong of <u>Strickland</u> and cannot succeed.

   Karron's principal argument is that her trial counsel chose to pursue a defense strategy based on lack of intent, which she contends was a poor strategy in light of <u>United States</u> v. <u>Urlacher</u>, 979 F.2d 935 (2d Cir. 1992), which held that a defendant need not have an intent to defraud the Government to violate Title 18, United States Code, Section 666.  (Karron Br. 86-89).  Instead, Karron asserts that trial counsel should have argued that Karron did not, in fact, misappropriate any government funds at all, and that his failure to "provide and convincingly argue a forensic foundation upon which to trace ownership of the funds used to pay for indirect or unallowable payments" amounted to constitutionally deficient representation.  (Karron Br. at 25).  In support of this argument, Karron asserts that her trial counsel failed to make use of the forensic analysis of CASI's expenditures that had been completed by the outside accountants Spitz and Dunlevy, which she claims showed that CASI's unallowable expenses either had been reclassified as allowable expenses with ATP's consent – for example, rent had been reclassified as salary and paid out of Karron's wages – or had been paid out of Karron's own funds or by other legitimate co-funding sources.  (Karron Br. 25-70).

   This argument is nothing more than an after-the-fact critique of trial counsel's legitimate and reasonable trial strategy and does not support a claim of ineffective assistance. <u>See</u> <u>Cuevas</u> v. <u>Henderson</u>, 801 F.2d 586, 590 (2d Cir. 1986) (lack of success of a chosen strategy does not warrant judicial second-guessing); <u>see</u> <u>also</u> <u>Strickland</u>, 466 U.S. at 690-81 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").  Trial counsel's decision to pursue a defense strategy based on lack

of intent was entirely reasonable under the circumstances.  Even assuming that the forensic

accounting analysis showed what Karron claims it showed, it would have been extremely

difficult for trial counsel to explain to the jury the complexities of how various budget line items

were reclassified and how all of the unallowable expenditures could be traced back to either non-

ATP funds or reallocated ATP funds.  In the end, the jury would have been left to decide

between the Government's analysis and Karron's analysis, which would have been a risky

strategy, especially in light of the testimony from the Government's witnesses that Karron was

told repeatedly that he could not spend ATP funds on unallowable costs and that NIST ATP

never approved his budget reclassifications.  (Tr. 122-23, 130, 258-59, 303-04, 314-15).  Trial

counsel's chosen defense – that Karron did not intend to misappropriate funds – had the appeal

of being much simpler and more direct, and allowed him to argue that Karron should not be

convicted because she acted with the good-faith belief that her expenditures of grant funds were

authorized, proper, and not wrongful in any way.[1]  Accordingly, Karron cannot establish that

trial counsel's choice of defense strategy was unreasonable.  See United States v. Aguirre, 912

F.2d at 560 ("'[T]here are countless ways to provide effective assistance in any given case' and

that 'even the best criminal defense attorneys would not defend a particular client in the same

way.'"(quoting Strickland, 466 U.S. at 689)).

    As to prejudice, the mere fact that trial counsel proved unsuccessful in securing

an acquittal does not establish prejudice.  Rather, prejudice exists only when the errors of

---

[1]  Karron is incorrect that proceeding on a lack of intent theory was fatal because Urlacher
eliminated intent as an element of 18 U.S.C. § 666.  (Karron Br. at 88-89).  While it is not necessary
for the Government to show an intent to defraud the government, it is necessary to show and intent
to use government funds for an improper purpose.  Urlacher, 979 F.2d at 938.

counsel undermine the fundamental fairness of the proceeding.  See Strickland, 466 U.S. at 696;

Lockhart v. Fretwell, 506 U.S. 364, 369 (1993) ("an analysis focusing solely on mere outcome

determination, without attention to whether the result of the proceeding was fundamentally

unfair or unreliable, is defective").  Here, Defendant presents no evidence that, had counsel

chosen a different strategy, there is a "reasonable probability that the result of the proceeding

would have been different."  United States v. Eisen, 974 F.2d 246, 266 (2d Cir. 1992).

   Karron's other principal argument is that trial counsel was deficient because he

did not impeach the Government's key witnesses, nor did he successfully discredit the

Government's key evidence – in particular, GX 114, which was a break-down of CASI

expenditures showing use of ATP funds for unallowable costs.  (Karron Br. at 52-54, 95).  As an

initial matter, it bears noting that Karron, herself, does not appear to believe that her trial

counsel's performance in cross–examining and impeaching the Government's witnesses was

deficient at all.  As Karron glowingly states in her memorandum, "[T]rial counsel was masterful

at the art of cross-examination.  He was successful enough at impeaching other Prosecution

witnesses so as to convince the Prosecution not to put their lead witness [Joan Hayes] on the

stand against him."  (Karron Br. at 65).  On that basis alone, the Court should dismiss this

particular claim of ineffective assistance as frivolous.

   Karron is quite right that trial counsel did an effective job at cross-examining and

impeaching the Government's witnesses.  In fact, he was so successful at cross-examining

Belinda Riley, the Government's accounting expert, that the Government had to spend a

significant portion of its summation re-explaining Ms. Riley's expenditure analysis to the jury

using the underlying source documentation.  (Tr. 1262-65).  Moreover, contrary to Karron's

-16-

assertions, trial counsel spent a great deal of time attacking GX 114 in exactly the way Karron

says that he should have – by attempting to discredit the way in which salary and rent were

calculated.  (Tr. 788-809).  Finally, the record plainly does not bear out Karron's assertion that

trial counsel did not adequately prepare for trial.  As trial counsel's cross-examination of Belinda

Riley makes clear, he was well-prepared to question the Government's witnesses and advance

his defense theory.  Accordingly, Karron's assertions that her trial counsel was ineffective for

failing to effectively cross-examine the Government's witnesses and challenge its key evidence,

and for failing to effectively prepare for trial, is belied by the record and contradicted by

Karron's own words.  Her claims of ineffective assistance should therefore be rejected.

## II.   Karron's Claim of Alleged <u>Brady</u> Violations is Procedurally Defaulted and Otherwise Without Merit

Karron next argues that the Government violated her constitutional rights by

suppressing or otherwise failing to disclose exculpatory <u>Brady</u> material.  Because Karron did not

raise this claim on direct appeal, despite being able to do so, this claim is now procedurally

defaulted and should be dismissed.  Moreover, Karron's <u>Brady</u> claim fails on the merits because

her allegations of supposed <u>Brady</u> violations are either entirely speculative or demonstrably

baseless.

### A.   Karron Is Barred from Raising Her <u>Brady</u> Claim Because She Did Not Raise It on Direct Appeal

It is well-settled that "[a] § 2255 petition may not be used as a substitute for direct

appeal."  <u>Marone</u> v. <u>United States</u>, 10 F.3d 65, 67 (2d Cir.1993) (citing <u>United States</u> v. <u>Frady</u>,

456 U.S. 152, 165 (1982)).  Hence, a collateral challenge brought under § 2255 is subject to the

"procedural default rule," which "prevents claims that could have been brought on direct appeal

from being raised on collateral review absent cause and prejudice." Yick Man Mui v. United States, 614 F.3d 50, 54 (2d Cir. 2010); see also Marone v. United States, 10 F.3d at 67 ("In order to raise a claim that could have been raised on direct appeal, a § 2255 petitioner must show cause for failing to raise the claim at the appropriate time and prejudice from the alleged error."); Campino v. United States, 968 F.2d 187, 190 (2d Cir.1992) ( "[F]ailure to raise a claim on direct appeal is itself a default of normal appellate procedure, which a defendant can overcome only by showing cause and prejudice."). If a petitioner cannot demonstrate cause and prejudice, the claim is procedurally defaulted unless it is a claim of ineffective assistance of counsel, see Yick Man Mui v. United States, 614 F.3d 50 at 54-57 (discussing Massaro v. United States, 538 U.S. 500 (2003)), or a claim of actual innocence. See Bousley v. United States, 523 U.S. 614, 623 (1998).

        To establish cause under the "cause and prejudice" test, the petitioner must ordinarily show that "some external impediment prevent[ed] counsel from constructing or raising the claim." Murray v. Carrier, 477 U.S. 478, 492 (1986). For example, "a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or that 'some interference by officials' . . . made compliance impracticable, would constitute cause under this standard." Coleman v. Thompson, 501 U.S. 722, 753 (1991) (quoting Murray v. Carrier, 477 U.S. at 488). Accordingly, cause "must be something external to the petitioner, something that cannot be fairly attributed to him." Marone, 10 F.3d at 67 (quoting Coleman v. Thompson, 501 U.S. at 753 (emphasis in original)). "Attorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" Coleman, 501 U.S. at 753 (quoting

-18-

Carrier, 477 U.S. at 488).  The element of prejudice requires "not merely that the errors at [ ]

trial created a possibility of prejudice, but that they worked to [a defendant's] actual and

substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions."

Femia v. United States, 47 F.3d 519, 524 (2d Cir. 1995) (quoting United States v. Frady, 456

U.S. at 170 (emphasis in original)).

        Here, Karron offers no explanation as to why she failed to raise, on direct review,

the issue she now presses: that the Government committed numerous Brady violations, including

withholding exculpatory evidence and intimidating possible defense witnesses who allegedly had

exculpatory evidence.  Karron does not allege that her appellate attorney refused to appeal the

Brady issue she now brings before the court, or that any other external factor prevented her from

raising this issue on appeal.  Indeed, assuming arguendo that Government had committed the

Brady violations that Karron alleges (which it did not), she was fully aware of the factual and

legal basis for the Brady claim at the time of the appeal and could have easily advised her

appellate counsel to advance that argument.  See Coleman, 501 U.S. at 753 (cause not

established when the factual or legal basis for a claim was "reasonably available" to counsel).

Because Karron herself was the cause of her failure to raise the Brady claim on direct appeal, she

has failed to show cause for her procedural fault.  See, e.g., Marone, 10 F.3d at 67 (where

petitioner had not instructed his attorney to file a notice of appeal, his failure to raise by appeal

the claims subsequently asserted in his § 2255 motion were attributed to his own conduct, and

petitioner therefore could not establish an external cause sufficient to overcome waiver of his

claims); Rickenbacker v. United States, 365 F. Supp. 2d 347, 352 (E.D.N.Y. 2005) (where

petitioner claims that her failure to raise claim of prosecutorial error on appeal was result of

counsel's failure to advise her of her rights, and her own "ignorance," these causes are directly attributable to petitioner rather than any external source, and failure to raise the claim on appeal is a procedural bar to any subsequent collateral attack on the sentence); Johnson v. United States, 307 F. Supp. 2d 380, 386 (D. Conn. 2003) (where petitioner failed to allege that he asked his attorney to appeal the issues he attempted to raise for the first time in a § 2255 petition, under Marone he has not shown cause for his procedural fault).  Accordingly, the Court can summarily dismiss this claim as procedurally defaulted on this ground alone.[2]

### B.    Karron's Allegations of Brady Violations Are Baseless

Even assuming that Karron's Brady claim were not procedural defaulted, the claim fails on its merits.  Under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, the Government has a constitutional obligation to disclose to a criminal defendant, in a timely fashion, favorable evidence that is in the Government's possession or of which the Government is constructively aware, when such evidence is material to guilt or punishment.  "The suppression of exculpatory documents does not cause a constitutional violation unless the documents are material, i.e., 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Boyette v. Lefevre, 246 F.3d 76, 90-93 (2d Cir. 2001) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)); Kyles v. Whitley, 514 U.S. 419, 435 (1995) (undisclosed evidence is material only if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").  Similarly, the Government has an obligation to disclose to a

---

[2]  Karron also cannot show prejudice.  As discussed immediately below, there is no merit to the Brady claim, and thus the failure to raise it on appeal did not prejudice Karron.

defendant evidence that may be used to impeach a prospective witness, when the reliability of that witness could be determinative of the defendant's guilt or innocence.  See United States v. Madori, 419 F.3d 159, 170 (2d Cir. 2005) (citing Giglio v. United States, 405 U.S. 150 (1972)). Finally, under the Jencks Act, the Government is required to produce previously made statements in its possession of any witnesses testifying at trial.  18 U.S.C. § 3500.

Throughout her memorandum, Karron accuses the Government of committing multiple alleged Brady violations, all of which are entirely speculative and baseless.  First, Karron asserts the Government withheld exculpatory evidence that NIST ATP formally approved her various budget reallocations and reclassifications of expenditures, including her reclassification of her rent payments as salary/wages.  (See Karron Br. at 25-29, 51, 53-54, 58-59, 66).  According to Karron, the withheld evidence of these alleged "negotiated agreements" would have shown that she did not, in fact, misappropriate the ATP grant funds and use them to pay for unallowable expenses.  (See Karron Br. at 53).  Yet Karron's allegations are either factually inaccurate or based on nothing more than pure supposition.

For example, Karron asserts, without any foundation, that alleged inconsistencies in the Government's own proof at trial – in particular, GX 114 – somehow implicitly reflects that NIST ATP actually approved of her budget reclassifications.  (See Karron Br. at 36) ("[W]e can now demonstrate [GX 114] as evidence of this initial exculpatory reclassification."); (see also id. at 51) ("The implicit evidence of the rent reclassification survives in plain sight, like fossils in exposed shale, in the corpus of the trial records.").  Hence, Karron argues that if this "implicit evidence" exists, "[t]here must be additional documentation" to support her claim that NIST ATP "explicitly" approved of the budget reclassifications.  (Karron Br. at 25, 51, 66).

Essentially, Karron's argument is that because she suspects something is there, it must be there. This is exactly the type of speculative allegation that is insufficient to support a <u>Brady</u> violation claim.  <u>See</u>, <u>e.g.</u>, <u>Skinner</u> v. <u>Duncan</u>, No. 01 Civ. 6656, 2003 WL 21386032, at *25 and n. 39 (S.D.N.Y. June 17, 2003) (collecting cases holding that conclusory, speculative allegations that the government failed to disclose evidence are insufficient to support a <u>Brady</u> violation); <u>Franza</u> v. <u>Stinson</u>, 58 F. Supp. 2d 124, 154 (S.D.N.Y. 1999) (same); <u>Harris</u> v. <u>United States</u>, 9 F. Supp. 2d 246, 275 (S.D.N.Y.1998) (denying petitioner's Section 2255 petition based upon withheld evidence because "the government does not bear the burden of establishing that documents were not withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [petitioner].  Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [petitioner] to relief") (citations omitted)).  Moreover, Karron's assertion is belied by the trial record.  The witnesses clearly testified that NIST ATP did not approve the budget reallocations and reclassifications proposed by Karron.  (Tr. 122-23, 130, 258-59, 303-04, 314-15).  There was no evidence to the contrary.  Indeed, Karron, herself, admits that the budget reallocations were never approved.  (<u>See</u> Karron Br. at 73) ("Had th[e] budget with the allocation been approved, there would be no case against Karron.  There was no reason why they could not have been approved.").

Furthermore, to the extent that Karron points to specific exculpatory evidence that she claims the Government failed to produce, her assertions are once again speculative and groundless.  Karron hypothesizes that the grant file must have contained evidence of NIST ATP's budget reclassification approvals and suggests that the Government did not provide the entire grant file to the defense prior to trial.  (<u>See</u> Karron Br. 25 & n.56).  Karron is incorrect on

both points.  On July 11, 2007, the Government produced over 5,000 pages of documents to the

defendant, including those portions of the grant file that it intended to use in its case-in-chief.

(See August 8, 2007 Discovery Letter, Ex. A at 1-2).  In that same letter, the Government

"offered defense counsel the opportunity to inspect the original copies of all documents in the

Government's possession, custody, or control," which included the complete grant file, and

reiterated that offer at a court conference a few weeks later.  (See id. at 1).  Defense counsel

never availed himself of that opportunity.  (See id.).  Moreover, Special Agent Rachel Ondrik,

one of the case agents on the case, sent the original copy of the grant file from Washington, D.C.

to the Government prosecutors in New York several weeks before the trial began, but Karron

never asked to review it.  (See Ondrik Decl. ¶ 6).  Finally, as Special Agent Ondrik points out,

her own review of the grant file yielded no exculpatory evidence; hence, there was nothing to

produce pursuant to Brady.  (See Ondrik Decl. ¶ 3).  Karron also suggests that the agents'

interviews of Peter Ross, Joan Hayes, and Belinda Riley yielded exculpatory evidence and that

the Government should have produced the notes of their interviews.  (See Karron Br. at 41, 64-

65, and 88).  That assertion is, once again, entirely speculative and also factually inaccurate.

(See Ondrik Decl. ¶ 4) ("None of the witnesses that were interviewed . . . provided any

exculpatory evidence.").

       Karron makes many other similarly groundless and unsubstantiated allegations

regarding alleged Brady violations by the Government.  For example, Karron asserts that the

DOC-OIG agents intimidated or coerced witnesses with allegedly exculpatory evidence so that

they decided not to testify.  (Karron Br. at 41, 71, 80-81).  Among these witnesses, Karron lists

Marc Stanley, Jayne Orthwein, Amiee Karron, Nathaniel Karron, Chaya Levin, Jill Feldman,

Peter Ross, Margaret Ferrand, and James Cox. (Id. at 71, 80-81). Karron even goes so far as to state that the OIG agents "expertly managed its witness parade against Karron to recant exculpatory e-mail and memorandum's [sic] they produced [such that they] may have perjured themselves en mass." (Id. at 73). This is patently absurd and is indicative of the kind of sweeping, baseless accusations that are found throughout her memorandum. Karron has supplied no affidavit from any of these witnesses that would substantiate her claim that they were intimidated. Moreover, Karron is once again incorrect about the facts. The DOC-OIG agents only spoke to some of the witnesses on his list, and did not intimidate or coerce any of them. (See Ondrik Decl. ¶¶ 4-5).[3]

In sum, all of the alleged Brady violations identified by Karron are either completely baseless or entirely speculative. Accordingly, they are insufficient to establish that the Government violated her constitutional rights and, as a result, this claim should be rejected. See Skinner v. Duncan, No. 01 Civ.6656, 2003 WL 21386032, at *25 and n. 39 (S.D.N.Y. June 17, 2003) (conclusory, speculative allegations that the government failed to disclose evidence are insufficient to support a Brady violation); Polanco v. United States, 2000 WL 1072303, *10 (S.D.N.Y. Aug. 3, 2000) ("undetailed and unsubstantiated assertions . . . have been consistently held insufficient" to make out constitutional 2255 claims).

---

[3] Karron also claims that the Government played "hide and seek" with a particular piece of alleged exculpatory evidence pertaining to CASI's power bills by burying it in "6,636 pages of discovery material." (Karron Br. at 68). Even assuming the evidence were exculpatory, which it was not, it was produced Karron prior to trial. Moreover, 6,636 pages amounts to at most 3-4 boxes worth of paper. That hardly constitutes "a needle in the haystack." (Karron Br. at 68).

**III.      Karron's Claim of Actual Innocence is Without Merit**

   Although Karron does not list a claim of actual innocence as a ground for relief in her habeas petition, she does assert that "no government funds were misappropriated" (Karron Br. at 70) and cites Schlup v. Delo, 513 U.S. 298 (1995) at various points in her memorandum. (Karron Br. at 19, 89).  Moreover, Karron asserts that the forensic analysis completed by Spitz and Dunlevy establishes that ATP funds were not misapplied (Karron Br. at 26) and includes and affidavit from Deborah Dunlevy, in which she states that she reviewed CASI's accounts for the relevant time period and "[did] not [find] any evidence of fraud."  Dunlevy Aff. at 2 ¶ 13. Accordingly, the Government will treat these references as a claim by Karron that she is entitled to habeas relief based on a claim of actual innocence.  For the reasons set forth below, this argument is meritless.

   As an initial matter, it is unclear whether freestanding claims of actual innocence that are not rooted in an alleged constitutional violation are cognizable in a § 2255 habeas petition arising from a federal conviction.  See Ermichine v. United States, No. 06 Civ. 10208 (LAP)(JLC), 2011 WL 1842951, at *14 (S.D.N.Y. May 12, 2011) (discussing Herrera v. Collins, 506 U.S. 390 (1993)).  Assuming arguendo that such claims are cognizable in a § 2255 petition, the petitioner faces a very high burden to reverse his conviction on the grounds that he is in fact innocent of the crime of conviction.  See id.  At a minimum, the petitioner has to demonstrate that in light of the new evidence "it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt."  Schlup v. Delo, 513 U.S. at 327.  Moreover, the Schlup standard is demanding and permits review only in the "'extraordinary'" case.  Schlup, 513 U.S. at 327 (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)); see also 513 U.S. at 324

(emphasizing that "in the vast majority of cases, claims of actual innocence are rarely successful").

    Here, there is nothing "extraordinary" about Karron's claim of actual innocence and Karron has not come close to proffering the type of evidence that would convince each and every rational juror that he is innocent of the crime of conviction.  The analysis of the forensic accounting of CASI's expenditures that Karron sets forth in her memorandum is muddled and confusing.  Moreover, the affidavit supplied by Deborah Dunlevy is mostly an invective against the incompetence of Joan Hayes and says next to nothing about the actual CASI expenditures. (See Dunlevy Decl.).  At best, Karron has put forth a competing analysis of the CASI expenditures that does not so clearly discredit the Government's own analysis that no rational juror considering both analyses could have convicted Karron.  See House v. Bell, 547 U.S. 518 (2006) (reviewing court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors) (citing Schlup, 513 at 329).  Accordingly, Karron's claim of actual innocence fails.

## IV.  This Court Should Deny Petitioner's Motion Without An Evidentiary Hearing

    All of Karron's claims should be dismissed without a hearing.  To obtain an evidentiary hearing, petitioner must establish that she has a "'plausible' claim," United States v. Tarricone, 996 F.2d 1414, 1417-18 (2d Cir. 1993), and must set forth in an affidavit specific facts supported by competent evidence, raising detailed and controverted issues of fact which, if proved at a hearing, would entitle him to relief.  See Machibroda v. United States, 368 U.S. 487, 494-95 (1962); Newfield v. United States, 565 F.2d 203, 207 (2d Cir. 1977).  Where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief,"

no hearing is required under Section 2255.  28 U.S.C. § 2255.  In particular, the Second Circuit has made clear that no hearing is required where (1) the allegations of the motion, accepted as true, would not entitle the petitioner to relief; or (2) the documentary record renders a testimonial hearing unnecessary.  Chang v. United States, 250 F.3d 79, 85-86 (2d Cir. 2001) (confirming that "allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner" and that it is within the court's discretion to determine whether a hearing is needed).

Here, petitioner has identified no disputed issues of fact that would warrant a hearing.  To the contrary, each ground cited by Karron as to the inadequacy of trial counsel's representation, alleged Brady violations by the Government, or new evidence of actual innocence is belied by the record or legally insufficient to support a claim of ineffective assistance of counsel.  Accordingly, a hearing is not warranted.

## **CONCLUSION**

For the foregoing reasons, Karron's 2255 petition should be denied in its entirety

without an evidentiary hearing.

Dated: New York, New York
       July 15, 2011

Respectfully Submitted,

PREET BHARARA
United States Attorney

By:       /s/ Christian R. Everdell
        Christian R. Everdell
        Assistant United States Attorney
        One St. Andrew's Plaza
        New York, New York 10007
        (212) 637-2556

## CERTIFICATE OF SERVICE

I, Christian R. Everdell, an Assistant United States Attorney for the Southern District of New York and attorney duly admitted to practice law in the State of New York and the Southern District of New York, do hereby certify that on July 16, 2011, I caused a true and correct copy of the foregoing Government's Memorandum of Law in Opposition to Defendants' Motion to Vacate, Set Aside, or Correct His Sentence Under 28 U.S.C. § 2255 to be served on petitioner by Federal Express at the following address:

> Daniel B. Karron
> 348 East Fulton Street
> Long Beach, NY 11561-2327

>    /s/ Christian R. Everdell
> Christian R. Everdell
> Assistant United States Attorney

Dated: New York, New York
      July 16, 2011